Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

*- additional counsel on signature page -*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG M. PLUMLEY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SEMPRA ENERGY, DEBRA L. REED, and JOSEPH A. HOUSEHOLDER,<br><br>Defendants. | Case No. **'16CV512 BEN RBB**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Craig M. Plumley ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Sempra Energy ("Sempra" or the "Company"), the Company's stock chart, conference call transcripts regarding the Company, and media and analyst reports about the Company. Plaintiff believes that

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants and their family members, directors and officers of Sempra and their families and affiliates, who purchased or otherwise acquired Sempra securities between May 14, 2015 and November 23, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Sempra operates as an energy services holding company worldwide. The Company's Southern California Gas Company ("SoCalGas") segment transmits, distributes, and stores natural gas. As of February 6, 2015, this segment served approximately 21 million consumers through 5.8 million meters in 500 communities. This segment's service territory comprises approximately 20,000 square miles throughout Central and Southern California.

3. Sempra was founded in 1998 and is headquartered in San Diego, California. The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SRE."

4. On October 23, 2015, Sempra's subsidiary SoCalGas discovered a natural gas leak from the Company's Aliso Canyon natural gas storage facility near the Porter Ranch neighborhood in Los Angeles (the "Porter Ranch Leak").

5. On October 28, 2015, after a strong gas odor became noticeable to Porter Ranch residents, SoCalGas publicly acknowledged the Porter Ranch Leak.

6. For the next several months, SoCalGas attempted unsuccessfully to plug the well. Meanwhile, local residents reported symptoms including headaches, nausea, and severe nosebleeds, and thousands of families were relocated from the area as SoCalGas unsuccessfully attempted to seal the well.

7. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, cash position, prospects, and internal controls. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SoCalGas lacked the capability to expeditiously repair gas leaks, causing a public hazard; (ii) an extended hazardous gas leak would constitute a serious threat to public health and safety; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

8. On November 23, 2015, displaced Porter Ranch residents filed a class action lawsuit against SoCalGas, seeking damages and an order requiring SoCalGas to disclose information related to the health risks associated with the Porter Ranch Leak.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

11. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Sempra is headquartered within this district.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14. Plaintiff, as set forth in the attached Certification, acquired Sempra securities at artificially inflated prices during the Class Period and has been damaged thereby.

15. Defendant Sempra is a California corporation with its principal executive

offices located at 101 Ash Street, San Diego, California 92101. Sempra's common stock trades on the NYSE under the ticker symbol "SRE."

16.   Defendant Debra L. Reed ("Reed") served at all relevant times as the Company's Chairman and Chief Executive Officer.

17.   Defendant Joseph A. Householder ("Householder") served at all relevant times as the Company's Chief Financial Officer and Executive Vice President.

18.   The Defendants named in ¶¶ 16-17 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

19.   Sempra operates as an energy services holding company worldwide. The Company's SoCalGas segment transmits, distributes, and stores natural gas. As of February 6, 2015, this segment served approximately to 21 million consumers through 5.8 million meters in 500 communities. This segment's service territory comprises approximately 20,000 square miles throughout central and Southern California. Sempra was founded in 1998 and is headquartered in San Diego, California.

20.   In late October 2015, Sempra's subsidiary SoCalGas discovered a natural gas leak from a well near the Porter Ranch neighborhood in Los Angeles. After local residents reported symptoms including headaches, nausea, and severe nosebleeds, thousands of families were relocated from the area as SoCalGas attempted, so far unsuccessfully, to seal the well.

## Materially False and Misleading
## Statements Issued During the Class Period

21. The Class Period begins on May 14, 2015, when SoCalGas issued a press release, entitled "SoCalGas Pursues Expanded Pipe Replacement, Repair Program; Utility to Accelerate Repair of Non-Hazardous Leaks, Reduce Emissions." In the press release, SoCalGas stated, in part:

> SoCalGas) is seeking to accelerate its pipeline replacement and leak repair program and has submitted a funding request with the California Public Utilities Commission (CPUC). If approved, it would enable SoCalGas to repair all currently identified, pending non-hazardous leaks on the SoCalGas system by the end of 2018 or earlier.
>
> . . .
>
> "SoCalGas has a longstanding commitment to reducing methane emissions, and we are proud to have one of the lowest natural gas leak rates of any utility in the nation," said Bret Lane, chief operating officer of SoCalGas. "We are working to make our system even safer, tighter and part of the solution to improving the environment."
>
> . . .
>
> As part of this effort, SoCalGas today published an interactive map on its website that allows the public to view methane indications and non-hazardous gas leaks located near its pipeline system. Federal regulations consider a non-hazardous leak to be one that is far from an ignition source and away from a structure where the gas can accumulate and become concentrated to dangerous levels. ***All hazardous leaks are repaired immediately*** and do not appear on the map.
>
> With safety as a core priority, SoCalGas focuses ratepayers' funds toward strategically replacing pipe as prioritized through engineering studies. By this infrastructure strategy, SoCalGas has succeeded in maintaining safety and reducing its rate of overall methane emissions to 0.12 percent of all gas delivered in 2011, one of the lowest rates in the nation. A Washington State

> University study published March 31, 2015, in Environmental Science & Technology found methane emissions from U.S. local natural gas distribution systems, including SoCalGas', are 36 to 70 percent lower than current estimates by the U.S. Environmental Protection Agency.
>
> . . .
>
> As one of the first local natural gas delivery companies to join the U.S. Environmental Protection Agency in reducing emissions in 1993, SoCalGas is considered a leader in reducing methane emissions. ***SoCalGas has implemented best management practices resulting in the reduction of more than 800,000 metric tons of carbon dioxide equivalent (CO2e).*** Additionally, SoCalGas' modernization program has upgraded pressure valves, eliminated all cast-iron pipe and installed resilient plastic pipe throughout half of its system.

(Emphases added.)

22. On August 4, 2015, Sempra filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, Sempra reported net income of $296 million, or $1.17 per diluted share, on revenue of $2.37 billion, compared to net income of $270 million, or $1.08 per diluted share, on revenue of $2.68 billion for the same period in the prior year.

23. The Q2 2015 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to Company's internal control over financial reporting.

24. On October 23, 2015, SoCalGas discovered the Porter Ranch Leak.

25. On October 28, 2015, after a strong gas odor became noticeable to Porter Ranch residents, SoCalGas publicly acknowledged the Porter Ranch Leak.

7

26. For the next several months, SoCalGas would attempt, unsuccessfully, to seal the well as local residents suffered from headaches, nausea, and severe nosebleeds, and thousands of families were relocated from the area.

27. On November 3, 2015, Sempra filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). For the quarter, Sempra reported net income of $248 million, or $0.99 per diluted share, on revenue of $2.48 billion, compared to net income of $348 million, or $1.34 per diluted share, on revenue of $2.82 billion for the same period in the prior year.

28. The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to Company's internal control over financial reporting.

29. On November 12, 2015, SoCalGas issued a bulletin addressing the Porter Ranch Leak, entitled "Aliso Canyon Storage Facility Update." The bulletin stated, in part:

> We sincerely apologize for any concern this odor is causing the neighboring communities. However, ***the leak does not pose an imminent threat to health or public safety***. The well is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest home or public area. Scientists agree natural gas is not toxic and that its odorant is not toxic at the minute levels at which it is added to natural gas. Health and air-quality officials said that the levels of the additive found in air samples taken in Porter Ranch should not pose a health problem.

. . .

> We have collected and analyzed all available data obtained during the diagnostics, and we are now preparing and planning our approach to stop the flow of gas. We have some of the world's best experts advising us, and they owe their success to their cautious approach.
>
> ***The leak site remains safe because it's in a localized area more than a mile away from homes and businesses.***

(Emphases added.)

30. The statements referenced in ¶¶ 21-23 and ¶¶ 27-29 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) SoCalGas lacked the capability to expeditiously repair gas leaks, causing a public hazard; (ii) an extended hazardous gas leak would constitute a serious threat to public health and safety; and (iii) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

31. On November 23, 2015, displaced Porter Ranch residents filed a class action lawsuit against SoCalGas in California Superior Court, Los Angeles County, seeking damages and an order requiring the Company to disclose information related to the health risks associated with the Porter Ranch Leak.

32. On news of the lawsuit, Sempra stock fell $0.80, or 0.79%, to close at $100.28 on November 24, 2015.

9

33. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Post-Class Period Disclosures**

34. On January 6, 2016, post-market, after visiting the Porter Ranch neighborhood and speaking with residents, California Governor Jerry Brown declared a state of emergency.

35. On February 2, 2016, California Attorney General Kamala D. Harris filed a lawsuit against SoCalGas alleging violations of state health and safety laws.

36. That same day, Los Angeles County filed criminal charges against SoCalGas for its failure to immediately report the leak following its detection.

37. On February 18, 2016, nearly four months after SoCalGas discovered the leak, state officials announced that the Porter Ranch Leak was permanently plugged.

**CLASS ACTION ALLEGATIONS**

38. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, as defined above.

39. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Sempra has more than 200 million shares of stock outstanding, owned by hundreds or thousands of persons.

40. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of Sempra common stock was artificially inflated during the Class Period; and

(f) The extent of damages sustained by Class members as a result of Defendants' conduct and the appropriate measure of damages.

41. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the same wrongful conduct by Defendants as outlined herein.

42. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

43. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## NO SAFE HARBOR

44. Defendants are not entitled to "safe harbor" protection under the federal securities laws.

45. Defendants' statements were not forward-looking, were not accompanied by risk warnings, and/or were accompanied by deficient warnings insufficient to give rise to "safe harbor" protection.

46. When Defendants spoke, they knew or were reckless in not knowing that their statements were false and or misleading when made.

47. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

   (a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   (b) The omissions and misrepresentations were material;

   (c) The Company's stock trade in an efficient market;

   (d) The Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

   (e) The Company's stock traded on the NYSE, and it was covered by multiple analysts;

  (f) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

  (g) Plaintiff and other members of the Class purchased Sempra common stock between the time Defendants misrepresented and/or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

48. At all relevant times, the market for Sempra's common stock was efficient for the following reasons, among others:

  (a) As a regulated issuer, Sempra filed period public reports with the SEC; and

  (b) Sempra regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

**(Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

49. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sempra securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Sempra securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and

documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sempra securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sempra's business, operations, and internal controls.

53. By virtue of their positions at Sempra, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Sempra, the Individual Defendants had knowledge of the details of Sempra's business, operations, and internal controls.

55. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the

Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sempra. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sempra's businesses, operations, and internal controls. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sempra securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Sempra's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Sempra securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

56. During the Class Period, Sempra securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sempra securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At

the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Sempra securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Sempra securities declined sharply upon corrective disclosure of the fraud alleged herein to the injury of Plaintiff and Class members.

57. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the corrective disclosure that the Defendants had been disseminating misinformation to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

59. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60. During the Class Period, the Individual Defendants participated in the operation and management of Sempra, and conducted and participated, directly and indirectly, in the conduct of Sempra's business affairs. Because of their senior positions,

they knew the adverse non-public information about Sempra's business, operations, and internal controls.

61. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sempra's business, operations, and internal controls, and to correct promptly any public statements issued by Sempra which had become materially false or misleading.

62. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, SEC filings, and other public statements which Sempra disseminated in the marketplace during the Class Period concerning Sempra's business, operations, and internal controls. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sempra to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Sempra within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sempra securities.

63. Each of the Individual Defendants, therefore, acted as a controlling person of Sempra. By reason of their senior management positions and/or being directors of Sempra, as well as their roles in signing and/or SOX certifying the Company's SEC filings at issue, each of the Individual Defendants had the power to direct the actions of,

and exercised the same to cause, Sempra to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Sempra and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sempra.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   February 29, 2016

          Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
Matthew L. Tuccillo
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
             mltuccillo@pomlaw.com
             ahood@pomlaw.com
             mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*