Adam C. McCall (SBN 302130)
**LEVI & KORSINSKY LLP**
Email: amccall@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290

*Attorneys for Plaintiff Stephen Graham and Co-Lead Counsel for Plaintiffs*

[*additional counsel on signature page*]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG M. PLUMLEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SEMPRA ENERGY, DEBRA L. REED, and JOSEPH A. HOUSEHOLDER,<br><br>Defendants. | No. 3:16-cv-00512-BEN-RBB<br><br>**<u>CLASS ACTION</u>**<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Roger T. Benitez |

Lead Plaintiffs Stephen Graham and Richard Berkowitz ("Lead Plaintiffs"), along with original named Plaintiff Craig Plumley, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Amended Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Sempra Energy ("Sempra" or the "Company") and Southern California Gas Company ("SoCalGas") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Sempra's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews with confidential witnesses; and (e) information readily obtainable on the internet.

Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons or entities, other than Defendants, Sempra's directors and officers, and their families and affiliates, who purchased or otherwise acquired Sempra common stock between November 14, 2014 and January 7, 2016, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants' violations of the federal securities laws arise from one of the largest natural gas leaks in history (the "Gas Leak"). Discovered on October 23, 2016, the Gas Leak spewed over 1,200 tons of methane gas and other toxic

contaminants into the atmosphere for almost four months completely unrestrained. The Gas Leak resulted in injury to hundreds if not thousands nearby residents as well as untold amounts of damage to the environment. Sempra and SoCalGas were responsible for the catastrophe.

3. Sempra owns and controls the SoCalGas. SoCalGas is the nation's largest natural gas distribution utility, delivering natural gas to 21.6 million consumers through 5.9 million customer gas meters. SoCalGas operates over 20,000 square miles throughout Central and Southern California, from Visalia to the Mexican border.

4. In addition to transporting gas to consumers through a complex interconnected network of pipeline, SoCalGas stores billions of cubic feet of natural gas for core, noncore and non-end-use customers. SoCalGas owns four natural gas storage facilities with a combined working gas capacity of 137 billion cubic feet (Bcf). SoCalGas' largest storage facility is located at the "Aliso Canyon" site. The Aliso Canyon site represents 63% of SoCalGas' natural gas reserves.

5. Lead Plaintiffs' claims in this lawsuit arise from Defendants' public statements about SoCalGas' ability to safely operate the Aliso Canyon gas storage facility and respond to crises such as the Gas Leak.

6. Early in the Class Period, Defendants made a broad range of false and misleading statements concerning the Aliso Canyon facility's safety, maintenance, and infrastructure, as well as Sempra's capabilities and policies regarding the plugging of any leaks. For instance, SoCalGas is regulated by the California Public Utilities Commission ("CPUC") and, as such, is required to submit applications for permission to raise its rates to consumers. With each application for a rate hike, SoCalGas must provide lengthy amounts of testimony in support explaining why a rate hike is necessary to accomplish certain objectives, such as capital expenditures

for safe operation. On November 14, 2014, the start of the Class Period, SoCalGas submitted an application with the CPUC, claiming in detail that an additional rate hike was necessary for the purpose of updating and repairing a number of components at the Aliso Canyon facility. Phillip Baker, SoCalGas' Director of Storage, testified in pertinent part that:

> Whenever a well may pose a safety risk, we act immediately to address the problem. Alternatives, such as plugging and abandoning the well, versus a major repair or well replacement, are evaluated based on conditions, including the age of the well, prior repair or maintenance history, performance during withdrawal or injection periods, and surface considerations, such as susceptibility to landslides.

7. Contrary to the impression created by Mr. Baker before the CPUC, Sempra and SoCalGas had already declined to repair equipment at Aliso Canyon known to be deficient, including in particular the valves responsible for the Company's inability to prevent and halt what would become one of the worst gas leaks in recent history.

8. On October 28, 2015, SoCalGas announced that it had discovered the Gas Leak at the Aliso Canyon facility. Thereafter, Defendants not only continued to misrepresent Sempra's ability to safely and quickly halt it, they also misrepresented the health threats it posed exhibiting a flagrant disregard to the wellbeing of nearby residents. In misrepresenting the leak's scope, the risks to area residents posed, and Sempra's ability to stop the leak quickly, Defendants said, among other things, that the leak "pose[d] no threat to public safety," was "confined to a localized, remote area," would only take "another week or longer to resolve," and that the methane and other toxins being released into the atmosphere were "harmless in the minute levels" supposedly being released. This was false, as the gasses and other contaminants being released into the atmosphere resulted in

widespread injury of nearby residents, untold damage to the environment, and the relocation of thousands of affected families.

9. SoCalGas spent the next four months attempting to seal it while over 5.4 billion cubic feet of methane (and other hazardous gasses) spewed into the atmosphere. Thousands of local residents suffered injury from the inhalation of dangerous chemicals, including mercaptans. State and federal regulatory agencies, along with the Los Angeles District and California Attorney General's Offices, investigated or filed complaints. Finally, on January 6, 2016, the truth as to Defendants' Class Period misstatements was fully revealed when California Governor Jerry Brown declared a state of emergency, causing the Company's stock price to plummet on unusually high volume.

10. Only after the California Governor declared a State of Emergency did investors finally discover the truth about Aliso Canyon and the Gas Leak. In response to Governor Brown's announcement, Sempra shareholders suffered massive losses as their shares plunged from $92.00 per share to $87.00 per share in the course of just one day. In total, Sempra suffered a market capitalization loss of approximately $1.25 billion. In the wake of the Gas Leak, Sempra and/or SoCalGas have been named as defendants in at least 138 lawsuits, including ones for criminal conduct. As of March 31, 2016, SoCalGas recorded estimated leak-related costs of $665 million, a number that is still growing.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Sempra has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages to Lead Plaintiffs and the Class, took place within this District.

14. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange,

## PARTIES

15. Lead Plaintiff Stephen Graham ("Graham") purchased Sempra common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Graham filed his certification evidencing his transactions previously with the Court in connection with his motion for appointment as lead plaintiff. Graham's certification is incorporated herein by reference.

16. Lead Plaintiff Richard Berkowitz ("Berkowitz") purchased Sempra common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Berkowitz filed his certification evidencing his transactions previously with the Court in connection with his motion for appointment as lead plaintiff. Berkowitz's certification is incorporated herein by reference.

17. Plaintiff Craig Plumley ("Plumley") purchased Sempra common stock at artificially inflated prices during the Class Period and was damaged upon the

revelation of the Defendants' fraud. Plumley previously filed his certification evidencing his transactions with the Court. Plumley's certification is incorporated herein by reference.

18. Defendant Sempra is a California corporation with its principal executive offices located at 101 Ash Street, San Diego, California 92101. Sempra's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SRE".

19. Defendants Debra L. Reed ("Reed") served at all relevant times as the Company's Chairman and Chief Executive Officer ("CEO").

20. Defendant Joseph A. Householder ("Householder") served at all relevant times as the Company's Chief Financial Officer and Executive Vice President.

21. Defendant SoCalGas is a California corporation, wholly-owned and controlled by Sempra. SoCalGas' principal place of business is 555 West 5th Street, Los Angeles, California 90013.

22. Defendants Reed and Householder are sometimes referred to herein as the "Individual Defendants." Sempra together with SoCalGas and the Individual Defendants are referred to herein as the "Defendants."

23. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Sempra's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had

not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24. Similarly, Sempra, because of its status as the parent company to and controlling stockholder of SoCalGas, possessed the power and authority to control the contents of SoCalGas' reports to the SEC, press releases, and public statements in general. Sempra was provided with copies of SoCalGas' reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of its position of control and access to material non-public information, Sempra knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Sempra is liable for the false statements pleaded herein.

25. Sempra is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

26. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Sempra under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

27. Sempra is a Fortune 500 energy-services holding company whose operating units invest in, develop and operate energy infrastructure, and provide gas

and electricity services to customers in North and South America. The Company's operating units are: (i) San Diego Gas & Electric Company ("SDG&E") and Southern California Gas Company (SoCalGas); (ii) Sempra International; and (iii) Sempra U.S. Gas & Power. SDG&E and SoCalGas are separate, reportable segments whose statements at all relevant times were attributable to, controlled by, and authored by Sempra. Nearly all executive officers of SoCalGas have been an employee of Sempra for at least the past five years.

28. SoCalGas is the nation's largest natural gas distribution utility. It owns and operates a natural gas distribution, transmission and storage system that supplies natural gas throughout its approximately 20,000 square miles of service territory. Its service territory extends from San Luis Obispo, California in the north to the Mexican border in the south, excluding San Diego County, the city of Long Beach and the desert area of San Bernardino County. SoCalGas provides natural gas service to residential, commercial, industrial, utility electric generation and wholesale customers through 5.9 million customer meters.

29. SoCalGas provides natural gas storage services for core, noncore and non-end-use customers. The California Utilities' core customers are allocated a portion of SoCalGas' storage capacity. SoCalGas offers the remaining storage capacity for sale to others, including SDG&E for its non-core customer requirements, through an open bid process.

30. SoCalGas owns four natural gas storage facilities. The facilities have a combined working gas capacity of 137 Bcf and have over 200 injection, withdrawal and observation wells. The Aliso Canyon storage facility represents 63 percent of SoCalGas' owned natural gas storage capacity.

31. Sempra indirectly owns all of the common stock of SoCalGas. SoCalGas has publicly held preferred stock. The preferred stock has liquidation

preferences totaling $22 million and represents less than 1% of the ordinary voting power of SoCalGas shares.

32. Sempra (through SoCalGas) is regulated by the CPUC. Consequently, CPUC regulates SoCalGas' rates and conditions of service, sales of securities, rates of return, capital structure, rates of depreciation, and long-term resource procurement. Sempra (through SoCalGas) must submit applications to CPUC for permission to increase its rates to consumers. These applications are supported by lengthy testimonial evidence advocating in support of the rate hike.

**B. The Aliso Canyon Well and Defendants' Decision Not to Upgrade**

33. Sempra's wells at Aliso Canyon comprise the largest natural gas storage reservoir in California and one of the largest reservoirs in the United States. Aliso Canyon is the largest of the Company's four underground natural gas storage facilities. The wells are located approximately one mile from the community of Porter Ranch and its 30,000 residents, and within a few miles of the residential communities of Chatsworth, Granada Hills, and Northridge.

34. The Aliso Canyon facility consists of approximately 115 underground wells. The site was placed into service in 1973 and provides storage for 86.2 billion cubic feet of natural gas. The depth of the wells at Aliso Canyon range from 6,997 feet to 10,691 feet. The well responsible for the leak at issue herein is referred to as "Standard Sesnon-25", or "SS-25", API03700776 (the "Well").

35. The gas at the Aliso Canyon Well is not from the region. Rather, Sempra injects and stores the gas underground at the Well, for subsequent distribution to customers. The gas injected in the Well is comprised of methane along with numerous additional toxic gases, including toluene, benzene, hydrogen sulfides, sulfur dioxide, ethylbenzene, and xylenes. If released, these toxic gases pose significant threats to the environment and to anyone exposed to the gases.

36. Sempra and SoCalGas have known for many years that Aliso Canyon has been in need of repair. In December 2010, SoCalGas submitted an application for a rate increase with the CPUC. SoCalGas' application requested an average rate revenue increase of $308 million (7.4%) over then-current levels. In support of the application, former SoCalGas Storage Engineering Manager, James D. Mansdorfer, testified that many valves, including safety valves, in the Aliso Canyon facility required a number of capital improvements necessitating the proposed rate hike. Mr. Mansdorfer stated, in pertinent part, that: "Many valves (block, well site, safety, etc.) in the Storage Field are leaking and new ones cost less than or equal to the cost of repair. This project will replace approximately 5% of the larger field valves every year (e.g. replace valves approximately every 20 years)." Mr. Mansdorfer allocated an annual capital expenditure of $898,000 for the "Aliso Canyon Valve Replacement Program."

37. Notwithstanding the fact that the CPUC approved the rate hike, Sempra and SoCalGas never repaired the Well at Aliso Canyon or replaced its degraded components, including the valves.

38. Several years later, in November 2014, SoCalGas submitted another application for a rate increase with the CPUC. The application sought an average rate increase of $256 million (12%) over then-current levels. In support of the application, SoCalGas submitted the testimony of Phillip Baker, Director of Storage. Mr. Baker testified that SoCalGas needed funds to inspect and repair old wells at the Aliso Canyon site on a more systematic basis.

39. Indeed, as part of its presentation in November 2014 to the CPUC regarding necessary improvements at Aliso Canyon, SoCalGas admitted it had not spent the same resources on well safety as it had on gas transmission pipelines:

> Historically, safety and risk considerations for wells and their associated valves and piping components have not been addressed in

> past rate cases to the same extent that distribution and transmission facilities have been under the Distribution and Transmission integrity management programs.

40. In remarks to the CPUC, Baker also highlighted SoCalGas' disparate treatment of underground gas wells compared to gas transmission pipelines, stating "we believe it is critical that we adopt a more proactive and in-depth approach. Historically, safety and risk considerations for wells and their associated valves and piping components have not been addressed in past rate cases to the same extent that distribution and transmission facilities have been under the Distribution and Transmission integrity management programs." He stated:

> Without a robust program to inspect underground storage wells to identify potential safety and/or integrity issues, problems may remain undetected within the high pressure above-ground wellheads, pipe laterals (up to 3,600 psig) and below-ground facilities (up to 4,400 psig) among the 229 storage field wells. This situation is evidenced by an increase in recent years in the type of work related to safety conditions observed as part of routine operations. This concern is further amplified by the age, length, and location of wells. Some SoCalGas wells are more than 80 years old with an average age of 52 years. Well depths can exceed 13,000 feet. In addition, some wells are located within close proximity to residential dwellings or high consequence areas.

41. He added: "[A] negative well integrity trend seems to have developed since 2008."

42. SoCalGas' November 2014 presentation to the CPUC also admitted that "Ultrasonic surveys conducted in storage wells as part of well repair work from 2008 to 2013 identified internal/external casing corrosion, or mechanical damage in 15 wells. External casing corrosion has been observed at relatively shallow depths in the production casing, and at deeper intervals near the Aliso Canyon shallow oil production zone at which is being water-flooded. Internal mechanical

wear has been observed in production casings, likely as a result of drilling operations that took place when the well was originally drilled. In addition, external tubing corrosion has been observed on tubing in the joint above the packer most likely as a result of stagnant fluid. In addition to the 36 well-related conditions . . . , and the corrosion or mechanically damaged wells that were previously identified, SoCalGas has 52 storage wells in service that are more than 70 years old. Half of the 229 storage wells are more than 57 years old as of July 2014."

43. Advocating for the rate increases needed to rectify these conditions, Mr. Baker concluded (with emphasis added): "Given the increasing trend in well integrity repairs, the corrosion threats that have been detected on some wells, the increasing age of the wells, and the success of the CPUC-approved TIMP [Transmission Integrity Management Program], which has been established to maintain the safety of horizontal high pressure pipelines that are subject to less harsh conditions than storage wells, the SIMP [Storage Integrity Management Program] is certainly justified. ***Without the SIMP***, SoCalGas will continue to operate in a reactive mode (with the potential for even higher costs to ratepayers) to address sudden failures of old equipment."

44. Mr. Baker's November 2014 presentation's proposals and ultimate decisions were reviewed and approved by the Board of Directors of SoCalGas and Sempra. The rate increases were approved, and the Company's customers and investors alike understood that the necessary repairs would be undertaken to ensure the integrity and safety of Aliso Canyon's operations going forward.

**C. The Gas Leak**

45. To the contrary, however, the Company never performed the upgrades, repairs, valve replacements, and other infrastructure work necessary to ensure the safety of Aliso Canyon. Moreover, the Company's policies and procedures were woefully inadequate and incommensurate to the risks posed by Aliso Canyon's

poorly maintained facilities. The Gas Leak, and the Company's handling thereof, revealed these facts over the course of several months, culminating in a State of Emergency declaration by the California Governor in January 2016.

46. The Gas Leak near the community of Porter Ranch in the City of Los Angeles has resulted in an ongoing public health and environmental emergency, sickening residents of Porter Ranch and compelling thousands to relocate.

47. The Gas Leak was discovered by Sempra on or about October 23, 2015, at the Well at the Aliso Canyon facility. The Aliso Canyon facility has the capacity to store approximately 86 billion cubic feet of natural gas. When the Gas Leak occurred, Aliso Canyon was filled almost to capacity with gas.

48. In September 2015, SoCalGas injected 5.7 Bcf of gas underground near the residents of Porter Ranch. In October 2015, SoCalGas was injecting what is believed to be similar amounts of gas when workers discovered the Gas Leak. Although SoCalGas claims to have discovered the Gas Leak on or about October 23, 2015, there is no certainty as to when the Gas Leak actually began, and on information and belief, it began even earlier.

49. The Gas Leak caused the release of significant quantities of natural gas containing methane and tert-butyl mercaptan and tetrahydrothiophene. The Gas Leak has also leaked several federally-listed hazardous air pollutants including toluene (a reproductive toxin), benzene (a known carcinogen and reproductive toxin), hydrogen sulfides, sulfur dioxide, ethylbenzene (a carcinogen), and xylenes (collectively, the "Air Pollutants").

50. Residents of the nearby upscale Porter Ranch neighborhood initially reported what they thought was a home with a major gas leak on October 23, 2015. Rather than reporting the Gas Leak to the appropriate government agencies and regulatory/oversight bodies, SoCalGas went door-to-door reassuring residents that

all was under control and that no danger existed. SoCalGas did not report the Gas Leak to authorities until October 26, 2015.

51. Sempra's three-day delay in reporting the Gas Leak after its discovery was in direct contravention of the law, which required Sempra to report it immediately. And, as noted above, for several days after discovering the Gas Leak, Sempra denied its existence to local residents, and even went house-to-house informing them that everything was fine.

52. The Gas Leak is believed to have resulted in over 1,200 tons of methane being released into the atmosphere every day. The following infrared




images, taken December 17, 2015 (almost two entire months after the leak was discovered) illustrate the vast clouds of methane gas spewing from the Well:

53. The Gas Leak persisted for months following Sempra's late reporting on October 26, 2015. Amid reports of health-related effects by local residents, Sempra was ordered to expedite leak abatement and to provide free, temporary

relocation to any residents affected by the Gas Leak. On December 4, 2015, Sempra began construction of a relief well.

54. Sempra's first attempts to stop the Gas Leak reportedly failed because the Well's safety valve had failed. However, Rodger Schwecke ("Schwecke"), a SoCalGas executive who coordinated the response to the leak, later admitted that, in actuality, the safety valve had been altogether removed back in 1979, due to difficulties finding a replacement part. Sempra opted not to replace the valve, despite SoCalGas's having requested and obtained regulatory permission to increase rates to replace the leaking valves at the Aliso Canyon storage field ***almost five years earlier***. Defendants knew of and authorized the decision not to upgrade the Well and to do nothing to remedy its degraded condition and deficient safety mechanisms prior to the Gas Leak.

55. The diagram below indicates how the Gas Leak occurred, including the leaking of gas through a faulty pipe, and shows where the safety valve should have been placed. While the Gas Leak occurred towards the top of the gas pipe, gas escaped through the leak and out through the bottom of the concrete casing that ended around 990 feet below the surface. The safety value should have been located around 8,500 feet below surface, near the gas reservoir and could have closed off the gas pipe completely, thus preventing any gas from the massive reservoir from flowing upward into the leaking pipe. Without a safety valve, the Company had to dig the relief well, as depicted below:




56. On February 18, 2016, SoCalGas finally sealed the Gas Leak. Following the completion of the relief well, SoCalGas injected cement to displace mud and other liquids and effectively sealed the Well on a permanent basis.

**D. Air Contaminations and Health Impacts**

57. The Gas Leak had an immediate and significant impact on the local community, despite the Company's consistent public statements to the contrary. The wellhead is approximately one mile from the residential community of Porter Ranch, which is home to about 30,500 people, including families with children and senior citizens, as well as disabled persons.

58. The released gases posed significant threats to the environment and to anyone exposed to the gases. The Gas Leak contained toxins including mercaptan, the Air Pollutants, and methane.

59. Mercaptan is a chemical compound that is added to the otherwise colorless, odorless natural gas to give it a rotten-egg smell that aids in leak detection. Mercaptan is known to cause short-term neurological, gastrointestinal, and respiratory symptoms. The human nose is incredibly sensitive to mercaptan and can detect it at very low levels. This means that even at small concentrations, people exposed to mercaptan can suffer physiological symptoms for the duration of the exposure, and possibly beyond, in addition to the discomfort caused when subjected to the noxious odor.

60. Residents of Porter Ranch reported physiological symptoms including nausea and vomiting, dizziness, nosebleeds, and headaches, likely attributable to mercaptan exposure. Over time, thousands of families were relocated to escape the odor and adverse health effects caused by the Gas Leak, and the community's schools were transferred to alternative facilities.

61. The Gas Leak also contained the Air Pollutants. Air sampling in the residential areas of the City adjacent to the Facility detected toluene and benzene. Exposure to elevated levels of toluene can cause acute and chronic damage to the central nervous system; symptoms include fatigue, sleepiness, headaches, and nausea. Benzene is categorized by the Environmental Protection Agency as a

carcinogen. Acute exposure to benzene can cause drowsiness, dizziness, and headaches, as well as eye, skin, and respiratory tract irritation, and long-tern exposure can cause blood disorders.

62. In addition, methane, when released into the air, absorbs the sun's heat and traps it in the earth's atmosphere, and is a far more destructive greenhouse gas than others, such as carbon dioxide.

63. The Gas Leak jeopardized the health and safety of persons responding to the leak as well as Porter Ranch residents.

**E. California Declares A State Of Emergency**

64. On January 6, 2016, at the end of the Class Period, Governor Brown declared a state of emergency (the "Proclamation") in connection with the Gas Leak. The Proclamation directed immediate response actions, in addition to those actions already being undertaken, and ordered a comprehensive review, utilizing independent experts, of the safety of the storage wells and the air quality of the surrounding community. The Proclamation also stated that SoCalGas was required to cover costs related to the Gas Leak and fund a program to mitigate the emissions.

65. The Gas Leak has been called the worst U.S. environmental disaster since the 2010 Deepwater Horizon rig explosion and resulting oil spill in the Gulf of Mexico. The Gas Leak became the biggest single source of methane emissions in all of California practically overnight and the largest natural case leak in U.S. history. In just 114 days, the Gas Leak spewed the equivalent emissions of two coal-fired power plants for an entire year. Put another way, the release of about 100,000 metric tons of methane gas and 10 million tons of carbon dioxide was roughly the same amount of pollution produced by half a million cars in one year.

66. To date, the Gas Leak has cost Sempra ***over half a billion dollars***, and the total is still rising. On May 4, 2016, SoCalGas announced that costs related to the Gas Leak had reached an estimated $665 million and counting as of March 31,

2016. Sempra and/or SoCalGas has been named as a defendant in at least 138 lawsuits and is or has been the subject of criminal allegations over its conduct before and during the Gas Leak. Investigations have been commenced and/or are ongoing by a number of governmental agencies, including the California Department of Conservation's Division of Oil, Gas, and Geothermal Resources, Los Angeles County Department of Public Health, South Coast Air Quality Management District, California Air Resources Board, California Public Utilities Commission (CPUC), U.S. Environmental Protection Agency, as well as prosecutors at the Los Angeles and the California Attorney General's Offices. The Department of Conservation's Division of Oil, Gas, and Geothermal Resources and CPUC retained an independent third-party investigator, Blade Energy Partners, to conduct a root cause analysis of the Gas Leak. The report is expected to be completed in late-2016 and/or early-2017. It is expected to substantially support the allegations herein.

**F. Defendants' Materially False and Misleading Statements And Omissions**

*November 14, 2014 – General Rate Case Application*

67. Sempra (through SoCalGas) submitted an application for a rate increase to the CPUC on November 14, 2014. In support of the application, Sempra and SoCalGas submitted: (i) testimony of Diana Day, Vice President, Enterprise Risk Management for SoCalGas, describing SoCalGas' "current risk management practices, its vision and commitment to continued enhancement of those practices and progress toward an integrated Enterprise Risk Management organization"; (ii) testimony of Douglas Schneider, Vice President – Gas Engineering and System Integrity, describing SoCalGas' "strong safety culture and its risk management policy and efforts for gas operations"; and (iii) testimony of Phillip Baker, Director of Storage, describing SoCalGas' plans for maintaining the integrity of its

underground storage facilities (including Aliso Canyon). The statements of all of these individuals are imputable to Sempra and SoCalGas.

68. However, contrary to the Company's application materials, Sempra and SoCalGas did not properly maintain its Aliso Canyon infrastructure or prioritize safety there. Included in the application were a series of false and misleading statements, including:

(a) Ms. Day's testimony emphasized SoCalGas' purported commitment to proper risk management. In pertinent part, Ms. Day stated that:

> Risk management at SoCalGas . . . occurs at multiple levels. As mentioned previously, our ***utilities exhibit consistent attention to safety and security in everyday operations***. One of our stated core values is, "***Treat safety as way of life***." ***At all levels within SoCalGas*** . . . , ***we pay significant attention to the development of structures, roles and processes to address the risks associated with our operations and facilities***.

and

> My testimony, and that of other witnesses, ***demonstrates that SoCalGas and SDG&E have been continuously committed to safety***, reliability ***and security for customers, employees and the communities we serve***.

(b) Mr. Schneider similarly testified that SoCalGas maintained a strong safety culture throughout its operations, stating in pertinent part:

> SoCalGas and SDG&E's longstanding commitment to safety focuses on three primary areas –public safety, customer safety, and employee safety. ***This safety focus is embedded in what we do and is the foundation for who we are*** – from initial employee training, ***to the design, installation, operation and maintenance of our utility infrastructure***, to our commitment to provide safe and reliable service to our customers.

and

> SoCalGas and SDG&E also invest in a variety of capital improvements. Specific factors considered in the prioritization process of capital work may vary depending on the type of project. ***The prioritization of pipeline projects*** (e.g., mains, services, cathodic protection, ***valves***, and regulator station replacements) ***is driven by a review of maintenance activities and findings***, ***results of field workforce inspections***, and the ability of the system to meet changing customer requirements. Other factors considered for the replacement of assets include ***the properties of the infrastructure***, ***general equipment reliability***, and/or ***design obsolescence***.

and

> ***Equally important to the monitoring of the system integrity and reliability is the effective implementation of programs designed to prevent damage to the pipeline, and in the event that an unintentional release of natural gas occurs, the public and emergency responders are prepared and the consequence of the release is minimized***. SoCalGas and SDG&E have excavation damage prevention and public awareness programs in place that promote pipeline safety and minimize risk.

(c) Mr. Baker's falsely and misleadingly testified as regard to SoCalGas' safety practices, stating in pertinent part:

> While we have historically managed risk at our storage facilities by relying on more traditional monitoring activities and identification of potential component failures, ***we believe that it is critical that we adopt a more proactive and in-depth approach***. Historically, safety and risk considerations for wells and their associated valves and piping components have not been addressed in past rate cases to the same extent that distribution and transmission facilities have been under the Distribution and Transmission integrity management programs. . . . ***Risk management activities, processes, and procedures for well integrity should have a focus similar to those employed under the Company's pipeline risk mitigation programs***.

and

> ***Well risk mitigation is evaluated on a case-by-case basis. <u>Whenever a well may pose a safety risk, we act immediately to address the problem</u>. Alternatives, such as plugging and abandoning the well, versus a major repair or well replacement, are evaluated based on conditions, including the age of the well, prior repair or maintenance history***, performance during withdrawal or injection periods, and surface considerations, such as susceptibility to landslides. ***These various conditions, and their associated costs, are evaluated to determine <u>the safest</u>, most cost-effective mitigation <u>option</u>. Another consideration that may influence repair decisions is the age and condition of certain well components that may have become obsolete and are no longer supported by the original equipment manufacturer and cannot be readily replaced or maintained***.

69. The above statements submitted in support of the Company's rate increase application, ostensibly to support its ongoing efforts to upgrade, repair, and replace degraded infrastructural elements like those that failed at Aliso Canyon and to upgrade and modernize the Company's policies and procedures for addressing such failures, were materially false and misleading. Each statement intentionally omitted material information concerning the deficient state of the Well at Aliso Canyon. For instance, despite the fact that the Well's safety valve had been removed and not replaced, the above statements misrepresented that Sempra and SoCalGas were committed to safe operations. Moreover, these statements were rendered misleading by omitting that the Well at Aliso Canyon was imminently hazardous and dangerous given the fact that it had been in service for an extended period without repair, such that its pipes were degraded or otherwise compromised. In addition, these statements misrepresented that the Company's policies and procedures prioritized safety and were being modernized both to account for the age and maintenance history of wells and to align with the stronger, more proactive policies applicable to pipelines. They further created the misleading impression that the Company would use the resources necessary to choose the "safest" option

for addressing safety deficiencies at Aliso Canyon, to either do necessary repairs and parts replacements or to plug or abandon the well as unsafe, and to modernize and enhance the Company's policies and procedures to address safety incidents, when in actuality, the Company was not taking these steps. Additionally, the Company failed to disclose that its largest well lacked a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled.

70. These misstatements and omissions above were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company. For instance, the omitted facts would have undercut the impression made by the Company's false and misleading statements that it was going to use its resources to remedy the infrastructural and policy deficiencies at the Well that missing information would have jeopardized Sempra's and SoCalGas's ability to obtain permission to increase gas rates to consumers. Further, had Sempra and SoCalGas disclosed the missing information, the public would have considered the information in deciding whether or not to invest in the Company in light of the increased likelihood of exposure arising from the deficient state of the Well at Aliso Canyon.

*November 16, 2014 – Contemporaneous Website and Corporate Policy Statements*

71. At the same time, Sempra contemporaneously published statements on its corporate websites that contained false and misleading misstatements and omissions about the safety of its facilities and infrastructure and about its safety procedures. Included among them were, *inter alia*, the following:

(a) At least as of November 16, 2014, on the SoCalGas website, in an area devoted to pipeline safety,[1] the Company stated, *inter alia*:

> Putting safety first
>
> ***It is our practice to respond promptly when we receive calls from customers regarding a natural gas leak***. We have about 5,000 employees who are trained and ready to respond to incidents that occur throughout our service territory.
>
> Our transmission and distribution pipelines are operated and maintained in accordance with or exceeding state and federal pipeline safety regulations. Additionally, ***regulators routinely audit our program to ensure that we are in compliance with all safety regulations***. ***We believe that our system is safe***.
>
> SoCalGas regularly performs pipeline safety tasks, including patrolling, testing, repairing and replacing pipelines. ***We meet or exceed all federal and state requirements for safe pipeline operations and maintenance, including ongoing technical training and testing for employees***. Our goal is to identify and resolve potential problems before a major problem occurs.
>
> ***SoCalGas has also implemented a rigorous integrity management program in highly-populated areas***. As the nation's largest natural gas distributor, ***we strive to apply state-of-the-art knowledge in the operation and maintenance of our natural gas pipeline facilities***. We use advanced safety inspection tools to monitor pipe condition and to verify the effectiveness of our ongoing maintenance activities.

[1] This webpage is available at available at https://web.archive.org/web/20141126055127/http://socalgas.com/safety/pipeline.shtml.

(b) At least as of November 16, 2014, on the SoCalGas website, in an area devoted to the Aliso Canyon facility,[2] the Company also stated, *inter alia*:

At the Aliso Canyon storage facility, we store natural gas thousands of feet below the earth's surface in depleted underground oil fields. ***Above the stored natural gas are <u>impermeable</u> layers of rock and geological formations***.

72. At least as of May 12, 2015, and thereafter throughout the Class Period, the Company also posted, via a link from the SoCalGas website, the "Aliso Canyon Safety Plan,"[3] which bore the corporate logos of both SoCalGas and Sempra (the "Safety Plan"). This document contained numerous false and misleading statements regarding safety, including, *inter alia*:

(a) The Safety Plan falsely and misleadingly stated:[4]

> Safety Policy
>
> ***Sempra Energy considers it essential to protect the health and safety of*** our employees, ***our customers and the diverse communities in which we operate and provide service***. Therefore, Aliso Canyon adheres to the following principles:
>
> - **Aliso Canyon provides *safe products and services to our customers*. *Safety is one of Aliso Canyon's corporate values and it all that we do, we are committed to deliver products and services safely*.**
>
> - **Aliso is committed to *comply with applicable*** international, ***federal, state and local health and safety laws and requirements***.

---

[2] This webpage is available at available at https://web.archive.org/web/20141211000748/http://www.socalgas.com/safety/aliso-canyon/index.shtml.

[3] This document is available at https://web.archive.org/web/20150328215834/http://socalgas.com/documents/safety/aliso-canyon-safety-plan-2014.pdf.

[4] For the Safety Plan, as quoted herein, all bold-only text reflects original emphasis while bold/italicized/underlined reflects emphasis added.

> • **Injuries and property damage can be prevented**; ***accidents are not an unavoidable consequence of doing business***. ***Hazards can be <u>eliminated</u> by ensuring safe work practices and proper preventative measures. Identification and reporting of potential hazards are the responsibility of every employee***.
>
> • **Management is responsible** for providing a safe workplace, and ***for promoting and ensuring behaviors and providing safeguards that prevent accidents and injuries***. ***<u>All management personnel</u> have a leadership role concerning safety*** within their areas of responsibility and for complying with both the Aliso Canyon and Corporate safety programs.
>
> • **Safety is a condition *of employment***. Working safely and looking out for the safety of fellow employees is an important part of job performance evaluations.

(b) The Safety Plan also recited the "Aliso Canyon Principle Goals and Objectives," falsely and misleadingly stating, *inter alia*:

> ***<u>Never</u> Compromise Safety***
>
> • We care first and foremost about employee and customer safety.
>
> * * *
>
> • ***<u>Never</u> allow shortcuts to safety***.
>
> * * *
>
> • ***<u>Never</u> compromise safety*** for production, customer satisfaction or other goals.
>
> • ***No activity is so important that it should jeopardize*** employee or ***customer safety***.

(c) The Safety Plan also falsely and misleadingly reassured customers and investors alike that any unsafe conditions would be identified and rectified

immediately upon detection. Among other things, it required "all employees" to "follow all safety rules and stop when safety is in question" and to "***report all incidents, near misses and at-risk conditions***" so as to "***encourage a 24/7 safety commitment***." It required the Aliso Canyon Safety Committee to "***Be alert to the presence of any hazard or hazardous conditions***. *If necessary secure the area and/or correct the hazard*. ***Report these to supervision as soon as possible after discovery***." It also required that a safety inspection be done "***when workplace conditions warrant an inspection***, *i.e.*, ***new unidentified hazard is recognized, injury or illness occurs***, etc."

(d) The Safety Plan further falsely and misleadingly stated:

> ***<u>A serious concealed danger</u> is one which, (1) results from normal company operations, (2) poses a substantial probability of death or great bodily harm, and (3) is not readily apparent to the individual who is likely to be exposed***. ***For these conditions that cannot be corrected immediately***, take the following steps: ***<u>STOP THE JOB</u>***

(e) The Safety Plan also falsely and misleadingly stated:

***Aliso Canyon is committed to ensuring the safety*** of our employees ***and protecting and conserving the environment, customers and the communities***. We are committed to complying with all applicable federal, state and local safety laws, rules and regulations and SCG Standards.

73. The Safety Plan also falsely and misleadingly described the Aliso Canyon facility's attributes and its safety features, including, *inter alia*:

(a) The Safety Plan falsely and misleadingly stated that the Aliso Canyon facility's policies, procedures, and programs complied with applicable regulations and laws, stating, *inter alia*:

> In accordance with General Order 112-E and by incorporation, 49 CFR Part 192…, SoCalGas has implemented and follows policies, procedures and programs that govern the design, construction,

> installation, operation, maintenance and determination of maximum allowable operating pressure for gas transmission and distribution facilities. These policies, procedures and programs are updated in a timely manner as appropriate in response to changes in regulation, safety advisories, and other safety information.
>
> ***These policies, procedures and programs have been developed to fit the needs of Aliso Canyon and comply with the code requirements***…

(b) The Safety Plan falsely and misleadingly touted the Aliso Canyon facility's design features, stating, among other things:

> DESIGN: 49 CFR Part 192 Subparts B, C, and D specify the minimum requirements for the material selection and design of pipe and pipeline components. ***SoCalGas' transmission and distribution pipe and facilities are designed with approved materials that have sufficient wall thickness and/or adequate protection to withstand anticipated external pressures and loads*** that will be imposed on the pipe after installation. ***The pipe and facilities are also designed with materials of sufficient strength to contain internal pressures plus appropriate design and/or safety factors***. ***Components, including valves***, flanges, and fittings ***meet the minimum prescribed requirements*** specified in the regulations. ***The design also includes pressure relief or other protective devices to prevent accidental over pressurization*** as further described in the maintenance section.

(c) The Safety Plan falsely and misleading touted the Aliso Canyon facility's compliance with applicable maintenance requirements, stating, *inter alia*:

> MAINTENANCE: 49 CFR Part 192 Subparts M and I specify the minimum requirements for the maintenance of transmission and distribution pipe facilities along with the associated corrosion protection facilities. ***Maintenance activities include*** the patrolling of pipeline, ***performing leakage surveys***, monitoring performance of corrosion protection systems, ***making repairs***, ***inspection and testing of pressure limiting and regulating equipment***, ***and valve*** and vault ***inspection and upkeep***. ***SoCalGas maintains its pipelines and facilities in accordance with these requirements***.

(d) It elaborated as to how leaks were to be detected and handled, falsely and misleadingly stating:

> LEAK SURVEY: SoCalGas conducts leakage surveys of its pipelines at frequencies that are specified in the regulations. These surveys are typically conducted using combustible gas detectors. Leak indications are to be recorded and assigned a priority code based upon the concentration of gas recorded by the instrument as well as other relevant factors that may exist in proximity to its location. ***The highest priority leaks are to be continuously monitored and repaired promptly***. Small leaks that pose little threat to the public are to be monitored and repaired based on operating conditions.

(e) The Safety Plan also described requirements to protect the integrity of the pipes at Aliso Canyon, stating, *inter alia*:

> *PRESSURE MONITOR & CONTROL*; Each pipeline system receives supply from higher pressure pipelines connected to the integrated system. Equipment exists between systems to regulate and control the pressure in each pipeline. Failure of pressure control equipment could result in the accidental over-pressurization of pipelines not designed to withstand the higher pressure of the upstream system. ***Accordingly, the pipeline systems are to be equipped with appropriate secondary pressure relieving, regulating, or limiting devices that will activate in the event the primary pressure control device fails***. The design and use of all gas pressure relieving devices are to conform to appropriate agency regulations and orders. ***These devices are to have sufficient capacity and be set to prevent the over-pressurization of pipe and pipeline components commensurate with regulatory requirements***.

(f) The Safety Plan also detailed the valve maintenance that was to be done at Aliso Canyon, falsely and misleadingly stating:

> VALVE MAINTENANCE: ***SoCalGas performs maintenance and inspection activities on all valves that may be necessary for the safe operation of its natural gas system***. These valves include system isolation valves, inlet and outlet valves to regulator stations, bridge approach valves and high pressure line sectionalizing valves. ***All***

> ***identified valves are to be checked and serviced at least once each calendar year***. Routine maintenance and inspection activities verify:
>
> - Valve is not leaking ;
> - Valve is properly identified;
> - Valves are adequately lubricated;
> - ***Valve operation is verified***.

***Any issues requiring immediate action are to be addressed right away***. All required follow-up work is managed through the issuance of an appropriate work order to perform needed repair or maintenance activities.

74. All of the above website and corporate policy statements were false or misleading because despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but failed to do so, while failing to disclose to investors that the its largest well did not have a safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. Additionally, Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Thus, contrary to Defendants' prior public statements, the Company was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having

publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

*May 5, 2015 – Quarterly Earnings Results Announcement*

75. On May 5, 2015, the Company announced its quarterly earnings for Q1 2015 via a press release (the "May 5, 2015 Press Release") that quoted Defendant Reed and that was filed with the SEC as an exhibit to a Form 8-K signed by signed by Trevor Mihalik, Sempra's Senior VP, Controller, and Chief Accounting Officer (the "May 5, 2015 8-K"). In it, the Company announced earnings of $437 million for Sempra and $214 million for SoCalGas, and Defendant Reed stated, "Our strong first-quarter operating results keep us on truck to meet both our growth expectations and our 2015 adjusted earnings guidance."

76. These statements were materially false or misleading because the Company's earnings were artificially inflated by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower. Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to costs and liabilities exceeding $655 million (and rising).

77. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure

and policies, thereby giving the impression that the announced financials accounted for the true costs of such efforts.

*May 5, 2015 – Form 10-Q*

78. On May 5, 2015, the Company filed with the SEC its Form 10-Q (the "May 2015 10-Q") announcing its results for the quarter ended March 31, 2015, which was certified under the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Reed and Householder. The May 2015 Form 10-Q was signed by Mihalik and Bruce Folkman, SoCalGas's VP, Controller, Chief Financial Officer and Chief Accounting Officer, and states the Company's financials. In it, the Company reported: (a) SoCalGas revenue of $1,048 million, operation and maintenance expenses of $314 million, accrued capital expenditures of $129 million and net income of $214 million and (b) Sempra revenue of $2,682 million, operation and maintenance expenses of $658 million, accrued capital expenditures of $272 million, and net income of $458 million.

79. These financials were materially false or misleading because the Company artificially inflated reported revenue and net income numbers, while understating operation and maintenance expenses and capital expenditures, by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower. Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to costs and liabilities exceeding $655 million (and rising). These misstatements and omissions were material because a reasonable investor

would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, thereby giving the impression that the announced financials accounted for the true costs of such efforts.

80. Additionally, the May 2015 Form 10-Q addressed the safety of the Company's natural gas pipeline, stating that "in 2015, we expect to make capital expenditures and investments of approximately $3.3 billion," including "capital projects and plant improvements" costing a total of "$1.3 billion at SoCalGas." The SoCalGas expenditures were to include "***$1.1 billion for improvements to distribution, transmission, and storage systems, and for pipeline safety***."

81. These statements were materially false and misleading for failure to disclose that, contrary to the Company's prior public statements, it was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. Additionally, the Company failed to disclose that its largest well lacked a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

82. The Company also stated the following about Sempra's safety measures:

> *Natural Gas Pipeline Operations Safety Assessments*
>
> Pending the outcome of the various regulatory agency evaluations of natural gas pipeline safety regulations, practices and procedures, Sempra Energy, including the California Utilities, may incur incremental expense and capital investment associated with their natural gas pipeline operations and investments. ***In August 2011***, ***SoCalGas***, SDG&E, Pacific Gas and Electric Company (PG&E) and Southwest Gas ***filed implementation plans*** with the [California Public Utilities Commission ("CPUC")] ***to test or replace natural gas transmission pipelines located in populated areas that have not been pressure tested***…. The California Utilities' current total estimated cost for Phase 1 (the 10-year period of 2012 to 2022) of a two-phase plan is $2.1 billion ($1.6 billion for SoCalGas and $500 million for SDG&E). …
>
> ***In June 2014, the CPUC issued a final decision*** in the Triennial Cost Allocation Proceeding (TCAP) ***addressing*** SDG&E's and ***SoCalGas' Pipeline Safety Enhancement Plan (PSEP) that approved the utilities' model for implementing PSEP***, and established the criteria to determine the amounts related to PSEP that may be recovered from ratepayers and the processes for recovery of such amounts, including providing that such costs are subject to a reasonableness review.

83. The above statements were false or misleading because despite the Company's statements about safety, its infrastructure and safety measures at the Well were deficient. The Company knew the Well was over 60 years old and needed to be upgraded, but it failed to do so, while failing to disclose to investors that the its largest well did not have a safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. Additionally, the Company

failed to disclose that its largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Thus, contrary to the Company's prior public statements, it was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

84. In connection with the Company's May 2015 Form 10-Q, Defendants Reed and Householder each SOX-certified that they reviewed the May 2015 Form 10-Q. Their certifications stated, *inter alia*:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Sempra Energy;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. ***The registrant's other certifying officer and I have disclosed***, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

85. Given the false and/or misleading nature of the statements and omissions in the May 2015 Form 10-Q, as outlined above, Reed's and Householder's certifications were consequently false and/or materially misleading. Either Reed and Householder failed to oversee the design and implementation of disclosure controls and internal controls over financial reporting sufficient to identify the false and misleading statements alleged herein, or having done so and been apprised of the facts and circumstances rendering them false and misleading, falsely certified that the May 5, 2015 Form 10-Q disclosed all facts necessary to make the statements it made not misleading and disclosed all frauds. These omissions and/or misrepresentations were material to Sempra's investors because the true facts would have altered the total mix of information available when deciding whether to purchase Sempra stock.

*May 5, 2015 – Earnings Call*

86. On May 5, 2015, the Company held an earnings call (the "May 2015 Earnings Call") announcing its first quarter results. During it, Defendants made materially false and misleading statements, as follows:

(a) Defendant Reed stated:

Moving to our financial performance. Earlier this morning, we reported first quarter adjusted earnings of $428 million or $1.71 per share. When

comparing earnings on a quarterly basis, please keep in mind the impact from applying seasonality to SoCalGas earnings beginning in 2015.

Dennis discussed this item at the Analyst Conference and showed that substantially all of SoCalGas' annual earnings will now be reported in the first and fourth quarters of the year. Though seasonality will not affect full-year 2015 earnings, it resulted in $113 million of increased earnings in the first quarter, relative to the same period last year.

(b) In addition, Defendant Householder added:

Thanks, Debbie. Earlier this morning, we reported first quarter earnings of $437 million or $1.74 per share. First quarter adjusted earnings were $428 million or $1.71 per share.

* * *

Debbie mentioned at the start of this call that compared with 2014, first quarter earnings now reflect the impact of seasonality in SoCalGas' revenues. This change alone increased earnings by $113 million relative to the first quarter of last year. The application of seasonality in revenues for SoCalGas will result in substantially all of their earnings being recorded in the first and fourth quarters. But it will not affect the full-year earnings result.

87. The financial data provided by Defendants Reed and Householder was materially false or misleading because the Company artificially inflated reported revenue and net income numbers, while understating operation and maintenance expenses and capital expenditures, by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower. Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to

costs and liabilities exceeding $655 million (and rising). These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, thereby giving the impression that the announced financials accounted for the true costs of such efforts.

88. In addition, during the May 2015 Earnings Call, when asked by an analyst about potential settlement of a rate case, Defendant Reed stated, "[O]ur filings were pretty vanilla. And they really focused on safety issues and reliability issues and dollars needed for that at our utilities. And it wasn't about a lot of new programs or activities. … Clearly, the parties are interested in safety and investing in safety as a system."

89. These statements were false or misleading because despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but it failed to do so, while failing to disclose to investors that the its largest well did not have a safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. Additionally, Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Thus, contrary to Defendants' prior public statements, the Company was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper

measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

*May 14, 2015 – Press Release*

90. On May 14, 2015, SoCalGas issued a press release (the "May 2015 Press Release"), entitled "SoCalGas Pursues Expanded Pipe Replacement, Repair Program; Utility to Accelerate Repair of Non-Hazardous Leaks, Reduce Emissions." The May 2015 Press Release notified investors and the general public that Sempra and SoCalGas intended on seeking approval to accelerate its "pipeline replacement and leak repair program." The May 2015 Press Release stated in pertinent part:

> "SoCalGas has a longstanding commitment to reducing methane emissions, and we are proud to have one of the lowest natural gas leak rates of any utility in the nation," said Bret Lane, chief operating officer of SoCalGas. "***We are working to make our system even safer, tighter and part of the solution to improving the environment***."
>
> * * *
>
> As part of this effort, SoCalGas today published an interactive map on its website that allows the public to view methane indications and non-hazardous gas leaks located near its pipeline system. Federal regulations consider a non-hazardous leak to be one that is far from an ignition source and away from a structure where the gas can accumulate and become concentrated to dangerous levels. ***All hazardous leaks are repaired immediately*** and do not appear on the map.
>
> (emphasis added).

91. The above statements were false or misleading because the Company's infrastructure and safety measures at the Well were deficient. As revealed by Schwecke, the Well at Aliso Canyon that ultimately led to the Gas Leak was deficient due to the fact that it did not have a properly functioning safety valve. Further, the Well had been allowed to remain in a deficient state for decades.

92. The truth concerning the above statements was material because Sempra and SoCalGas purportedly prided themselves on placing safety above all else. Given the reality about the Well at Aliso Canyon, Sempra's and SoCalGas' reputation would be undermined and financial damage to the stock would ensue. The Company's lack of proper safety procedures would alter the total mix of information available to investors when considering to invest in the Company.

*August 4, 2015 – Quarterly Earnings Results Announcement*

93. On August 4, 2015, the Company announced its quarterly earnings for Q2 2015 via a press release (the "August 4, 2015 Press Release") that quoted Defendant Reed and that was filed with the SEC as an exhibit to a Form 8-K signed by signed by Trevor Mihalik, Sempra's Senior VP, Controller, and Chief Accounting Officer (the "August 4, 2015 8-K"). In it, the Company announced earnings of $295 million for Sempra and $70 million for SoCalGas, and Defendant Reed stated, "Our financial and operating results in the second quarter were very strong and keep us on track to meet our 2015 adjusted earnings guidance."

94. These statements were materially false or misleading because the Company's earnings were artificially inflated by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower.

Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to costs and liabilities exceeding $655 million (and rising).

95. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, thereby giving the impression that the announced financials accounted for the true costs of such efforts.

*August 4, 2015 – Form 10-Q*

96. On August 4, 2015, the Company filed with the SEC its Form 10-Q (the "August 2015 10-Q") announcing its results for the quarter ended June 30, 2015, which was certified under SOX by Defendants Reed and Householder. The August 2015 Form 10-Q was signed by Mihalik and Bruce Folkman, SoCalGas's VP, Controller, Chief Financial Officer and Chief Accounting Officer, and states the Company's financials. In it, the Company reported: (a) SoCalGas revenue of $780 million, operation and maintenance expenses of $346 million, accrued capital expenditures of $14 million and net income of $71 million and (b) Sempra revenue of $2,367 million, operation and maintenance expenses of $713 million, accrued capital expenditures of $30 million, and net income of $320 million.

97. These financials were materially false or misleading because the Company artificially inflated reported revenue and net income numbers, while understating operation and maintenance expenses and capital expenditures, by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and

maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower. Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to costs and liabilities exceeding $655 million (and rising). These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, thereby giving the impression that the announced financials accounted for the true costs of such efforts.

98. Additionally, the August 2015 Form 10-Q addressed the safety of the Company's natural gas pipeline, stating that "in 2015, we expect to make capital expenditures and investments of approximately $3.5 billion," including "capital projects and plant improvements" costing a total of "$1.3 billion at SoCalGas." The SoCalGas expenditures were to include "***$1.1 billion for improvements to distribution, transmission, and storage systems, and for pipeline safety***."

99. These statements were materially false and misleading for failure to disclose that, contrary to the Company's prior public statements, it was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. Additionally, the Company failed to disclose that its largest well lacked a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." In reality, the proper measures were not in place

and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

100. The Company also stated the following about Sempra's safety measures:

> *Natural Gas Pipeline Operations Safety Assessments*
>
> Pending the outcome of the various regulatory agency evaluations of natural gas pipeline safety regulations, practices and procedures, Sempra Energy, including the California Utilities, may incur incremental expense and capital investment associated with their natural gas pipeline operations and investments. ***In August 2011***, ***SoCalGas***, SDG&E, Pacific Gas and Electric Company (PG&E) and Southwest Gas ***filed implementation plans*** with the [California Public Utilities Commission ("CPUC")] ***to test or replace natural gas transmission pipelines located in populated areas that have not been pressure tested***…. The California Utilities' current total estimated cost for Phase 1 (the 10-year period of 2012 to 2022) of a two-phase plan is $2.1 billion ($1.6 billion for SoCalGas and $500 million for SDG&E). …
>
> ***In June 2014, the CPUC issued a final decision*** in the Triennial Cost Allocation Proceeding (TCAP) ***addressing*** SDG&E's and ***SoCalGas' Pipeline Safety Enhancement Plan (PSEP) that approved the utilities' model for implementing PSEP***, and established the criteria to determine the amounts related to PSEP that may be recovered from ratepayers and the processes for recovery of such amounts, including providing that such costs are subject to a reasonableness review.

101. The above statements were false or misleading because despite the Company's statements about safety, its infrastructure and safety measures at the Well were deficient. The Company knew the Well was over 60 years old and needed to be upgraded, but it failed to do so, while failing to disclose to investors that the its largest well did not have a safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. Additionally, the Company failed to disclose that its largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Thus, contrary to the Company's prior public statements, it was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

102. In connection with the Company's August 2015 Form 10-Q, Defendants Reed and Householder each SOX-certified that they reviewed the August 2015 Form 10-Q. Their certifications stated, *inter alia*:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Sempra Energy;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. ***The registrant's other certifying officer and I have disclosed***, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

103. Given the false and/or misleading nature of the statements and omissions in the August 2015 Form 10-Q, as outlined above, Reed's and Householder's certifications were consequently false and/or materially misleading. Either Reed and Householder failed to oversee the design and implementation of disclosure controls and internal controls over financial reporting sufficient to identify the false and misleading statements alleged herein, or having done so and been apprised of the facts and circumstances rendering them false and misleading, falsely certified that the August 2015 Form 10-Q disclosed all facts necessary to make the statements it made not misleading and disclosed all frauds. These omissions and/or misrepresentations were material to Sempra's investors because the true facts would have altered the total mix of information available when deciding whether to purchase Sempra stock.

*August 4, 2015 – Earnings Call*

104. On August 4, 2015, the Company held an earnings call (the "August 2015 Earnings Call") announcing its second quarter results. During it, Defendants made materially false and misleading statements, as follows:

(a) Mark Snell, President of Sempra, stated:

> Our financial performance for the second quarter was very strong. Earlier this morning, we reported second quarter adjusted earnings of $260 million or $1.03 per share. As you may recall, these figures include the impact from applying seasonality to the SoCalGas revenues in 2015. While this change does not affect full-year earnings for SoCalGas that results in almost all of their earnings being reported in the first quarter and fourth quarter of the year. Specifically, the impact from seasonality was $48 million of lower earnings this quarter, and $65 million of higher earnings year-to-date. Given our solid financial results in both the first quarter and second quarter, we are on track to achieve our 2015 adjusted earning guidance.

(b) Defendant Householder added:

> Thank you, Mark. Earlier this morning, we reported second quarter earnings of $295 million or $1.17 per share. On an adjusted basis, we reported second quarter earnings of $260 million or $1.03 per share. Second quarter earnings in 2014 were $269 million or $1.08 per share.
>
> * * *
>
> I also wanted to note that compared with the same period of last year, second quarter earnings now reflect the impact of seasonality in SoCalGas revenues. As Mark mentioned earlier, this impact resulted in $48 million of lower earnings this quarter and $65 million of higher earnings year-to-date.
>
> Looking to the third quarter please be aware that we could report a loss for SoCalGas due to seasonality. You can refer to the appendix for additional detail where we illustrate 2014 SoCalGas earnings at seasonality and revenues been applied. As the appendix shows third

> quarter 2014 earnings would have reflected a loss in the third quarter. So there was no impact on a full year basis.

105. The financial data provided by Mr. Snell and Householder was materially false or misleading because the Company artificially inflated reported revenue and net income numbers, while understating operation and maintenance expenses and capital expenditures, by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower. Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to costs and liabilities exceeding $655 million (and rising). These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, thereby giving the impression that the announced financials accounted for the true costs of such efforts.

106. In addition, during the August 2015 Earnings Call, Mr. Snell stated as follows about SoCalGas' rate application with the CPUC: "Our California utilities are making steady progress on their general rate case applications. Since our last call, we have completed evidentiary hearings, and are well situated to receive a timely decision. Briefs are due in August and September with the draft decision scheduled for year end. After participating in the hearing process, we believe our

recommendations make a compelling case in support of the state's priorities around safety and reliability."

107. These statements were false or misleading because despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but it failed to do so, while failing to disclose to investors that the its largest well did not have a safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. Additionally, Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Thus, contrary to Defendants' prior public statements, the Company was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

*August 11, 2015– Press Release*

108. On August 11, 2015, the Company issued a press release on its website in conjunction with SoCalGas (the "August 11, 2015 Press Release"). The August

11, 2015 Press Release was entitled "SoCalGas Reminds Contractors, Customers and Business Owners to 'Call 811 Before You Dig,'" and stated in pertinent part:

> "**Safety is SoCalGas' top priority and we work hard to maintain the integrity and reliability of our natural gas pipeline system**. The majority of damage to our pipelines is from dig-ins from contractors and home owners and can help be prevented with a simple call," said Jimmie Cho, senior vice president of gas operations and system integrity.

109. The above statements were false or misleading because despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but failed to do so, while failing to disclose to investors that the its largest well did not have a safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. Additionally, Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Thus, contrary to Defendants' prior public statements, the Company was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps

necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

*October 28, 2015 – Press Release*

110. At some point prior to October 28, 2015, gas began leaking from the Well. The Company claimed to have purportedly discovered the Gas Leak on October 23, 2015, and thereafter began a series of false and misleading statements that minimized its scope and the risks it posed, while creating a false sense that the Company could address the Gas Leak before a state of emergency was declared.

111. For instance, on October 28, 2015, SoCalGas publically addressed the Gas Leak for the first time in a press release on its website, despite having learned of it nearly a week earlier, in a press release bearing both the SoCalGas and Sempra logos (the "October 28, 2015 Press Release"). It stated in pertinent part:

> On October 23, SoCalGas crews discovered a leak at one of the natural gas storage wells at its Aliso Canyon storage field. In response, we activated the appropriate procedures to begin to address the leak.
>
> We regret that the smell of the odorant in natural gas is unpleasant and that some people are sensitive to the odor, and we sincerely apologize for the annoyance and concern this odor is causing the neighboring communities. However, ***the leak does not pose an imminent threat to public safety*****.** The well is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest home or public area. Scientists agree natural gas is not toxic and that ***its odorant is harmless at the minute levels at which it is added to natural gas*****.** In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.
>
> ***We have assembled a world-class team of experts, and we are working as quickly as safety will allow to stop the leak***. In addition, we are in regular communication with L.A. City and County Fire and Hazmat

Departments, the L.A. County Department of Health, the California Division of Oil, Gas & Geothermal Resources, and the South Coast Air Quality Management District.

112. These statements were materially false and/or misleading because the Company misrepresented to investors that the Gas Leak did not pose an imminent threat to public safety and that the odorant was harmless. However, the Company made these statements while knowing that the mercaptans being leaked in the Gas Leak posed a health threat to the community, including short-term neurological, gastrointestinal, and respiratory symptoms from inhalation. Additionally, the Company failed to disclose that Gas Leak also contained the Air Pollutants, including toluene, exposure to which can cause fatigue, sleepiness, headaches, nausea, and acute and chronic damage to the central nervous system, and benzene, exposure, an EPA-categorized carcinogen, acute exposure to which can cause drowsiness, dizziness, and headaches, as well as eye, skin, and respiratory tract irritation, and long-term exposure to which can cause blood disorders. Indeed, the mercaptans and Air Pollutants being released into the environment from the Gas Leak resulted in local residents immediately reporting headaches, nausea, and severe nosebleeds. About 50 children per day saw school nurses for severe nosebleeds. Local residents also experienced neurological, gastrointestinal, and respiratory ailments, dizziness, and vomiting. In light of the health risks to local residents, Sempra was ordered to expedite leak abatement and to provide free, temporary relocation to any residents affected by the Gas Leak.

113. These statements were also materially misleading for failure tell investors that the Company had not immediately reported the Gas Leak to authorities and had instead waited for at least several days before doing so. As later detailed in the criminal complaint brought by the District Attorney of Los Angeles,

SoCalGas failed to immediately report the release or threatened release of hazardous material, including but not limited to methane, mercaptans, benzene, and butane until October 26, 2015.

114. Additionally, the above statements were misleading because they omitted to tell investors that Defendants were at a material disadvantage in terms of stopping the Gas Leak. As Defendants knew, the Well at Aliso Canyon was not equipped with a safety valve because the safety valve had failed long ago and had never been replaced. Consequently, the above statements concerning the Company's efforts to repair the Gas Leak as quickly as possible were misleading to the extent that they failed to tell investors that such a task would take materially longer and be substantially more difficult in light of the state of disrepair that the Well was already in prior to the Gas Leak. Indeed, anything short of a declared state of emergency was unrealistic, given what Defendants knew, but failed to disclose, about the Well and the history of maintenance failures at Aliso Canyon.

115. These misstatements and omissions were material because they altered the total mix of information available to investors about the Company. Sempra and SoCalGas had previously and repeatedly represented its commitment to safety. For instance, had investors known that Sempra and SoCalGas were in fact not committed to safe operation as they claimed, and that, in the event that a safety event like a leak occurred, they could not remedy it immediately, investors would have considered the Company differently.

*October 30, 2015 – Press Release*

116. On October 30, 2015, SoCalGas issued a press release announcing an update on the Gas Leak. The press release was located on SoCalGas's website and contained SoCalGas's and Sempra's logos on top of the page (the "October 30, 2015 Press Release"). It stated in pertinent part:

> We want to again apologize for any concerns, inconvenience or annoyance you experience from the gas leak at our Aliso Canyon facility. ***Although natural gas is not considered to be toxic***, we realize the odorant smells bad and can bother some people.
>
> We are working with the L.A. City and County Fire and Hazmat Departments, the L.A. County Department of Health, the California Division of Oil and Gas & Geothermal Resources, and the South Coast Air Quality Management District – as well as world-renowned experts in natural gas well management.
>
> ***We have assembled a team of experts and are working as quickly as safety will allow us to stop the leak. <u>The leak continues to pose no threat to public safety as the site is confined to a localized, remote area</u>.*** In outdoor locations such as this, natural gas quickly dissipates into the air.
>
> Timeline Update
> ***After considerable testing and analysis, we expect this situation to take another week*** or longer ***to resolve.*** We know this will come as unwelcome news to many and regret you may continue to experience odors.
>
> ***We have experts taking air samples in multiple random locations to reassure the community that <u>the air quality continues to be within safe levels</u>***. We will share the results with customers, the public and governing agencies at socalgas.com.

117. These statements were materially false and/or misleading because the Company misrepresented to investors that the Gas Leak did not pose an imminent threat to public safety because the site was "confined," the gas was "not considered to be toxic," "the leak continues to pose no threat," and "the air quality continues to be within safe levels," while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants pose significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the

Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. This was not true. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

*November 2-4, 2015 Press Releases*

118. Between November 2, 2015, and December 18, 2015, Sempra and SoCalGas released a number of press releases purporting to update the public about the Gas Leak. Each of these press releases materially misled the public by misrepresenting the dangers presented by the Gas Leak as well as the Company's ability to control it and remediate it in a timely and efficient manner. Collectively, they served to perpetuate the inflation in Sempra's stock price and to mute the effects of a corrective on November 23, 2015 (described below).

119. For instance, press releases issued by the Company on November 2, 3, and 4, 2015 and published on the Company's corporate websites all stated in pertinent part:

> On October 23, SoCalGas crews discovered a leak at one of its natural gas storage wells at its Aliso Canyon storage field. ***In response, we activated the appropriate procedures, alerted public officials and began addressing the leak***.
>
> We recognize that the smell of the odorant in natural gas is unpleasant, and we sincerely apologize for the annoyance and concern this odor is causing the Porter Ranch community and surrounding areas. However, ***the leak poses no threat to public safety*****.** It is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than any home or public area. ***Scientists agree natural gas is not toxic and that its odorant is harmless in the minute levels at which it is added to natural gas*****.** In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.
>
> * * *
>
> A team of our environmental specialists and retained experts continued conducting air quality sampling and monitoring on both Saturday and Sunday, at both the leak site and within the community. Although experts agree that natural gas is non-toxic, and ***the levels of the odorant***

> ***in the natural gas are too low to be a concern, we are conducting this sampling to reassure the community.*** The samples we are taking are in addition to those being taken by the SCAQMD. Results from our tests should be available within the next several days.

120. These statements were materially false and/or misleading because the Company misrepresented to investors that the Gas Leak "poses no threat to public safety," "natural gas is not toxic," "the levels of the odorant in the natural gas are too low to be a concern," while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. This was not true. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of

emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

*November 3, 2015 – Quarterly Earnings Results Announcement*

121. On November 3, 2015, the Company announced its quarterly earnings for Q3 2015 via a press release (the "November 3, 2015 Press Release") that quoted Defendant Reed and that was filed with the SEC as an exhibit to a Form 8-K signed by signed by Trevor Mihalik, Sempra's Senior VP, Controller, and Chief Accounting Officer (the "November 3, 2015 8-K"). In it, the Company announced earnings of $248 million for Sempra and a loss of $8 million for SoCalGas, and Defendant Reed stated, "Through three quarters, we are on track to exceed our 2015 financial and operational objectives, so we have raised our adjusted earnings guidance for the year."

122. Defendant Reed's statements, including the raising of adjusted earnings, were false and misleading for the additional reason that she failed to address the Gas Leak or its impacts on the Company's financial and operational results. These statements were materially false and/or misleading because the Company misrepresented to investors that "natural gas is not toxic," "levels of the odorant in the natural gas are too low to be a long-term health concern," "the leak does not pose an imminent threat to public safety," and "the odorant is harmless at the minute levels at which it is added to natural gas" while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed

significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

*November 3, 2015 – Form 10-Q*

123. On November 3, 2015, the Company filed with the SEC its Form 10-Q (the "November 2015 10-Q") announcing its results for the quarter ended September 30, 2015, which was certified under the SOX by Defendants Reed and Householder. The November 2015 Form 10-Q was signed by Mihalik and Bruce Folkman, SoCalGas's VP, Controller, Chief Financial Officer and Chief Accounting Officer, and states the Company's financials. In it, the Company reported: (a) SoCalGas revenue of $620 million, operation and maintenance expenses of $325 million, accrued capital expenditures of $29 million and net loss of $8 million and (b) Sempra revenue of $2,481 million, operation and maintenance expenses of $701 million, accrued capital expenditures of $157 million, and net income of $282 million.

124. These financials were materially false or misleading because the Company artificially inflated reported revenue and net income numbers, while understating operation and maintenance expenses and capital expenditures, by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower. Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to costs and liabilities exceeding $655 million (and rising). These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies,

thereby giving the impression that the announced financials accounted for the true costs of such efforts.

125. Additionally, the November 2015 Form 10-Q addressed the safety of the Company's natural gas pipeline, stating that "in 2015, we expect to make capital expenditures and investments of approximately $4.8 billion," including "capital projects and plant improvements" costing a total of "$1.3 billion at SoCalGas." The SoCalGas expenditures were to include "***$1.1 billion for improvements to distribution, transmission, and storage systems, and for pipeline safety***."

126. These statements were materially false and misleading for failure to disclose that, contrary to the Company's prior public statements, it was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. Additionally, the Company failed to disclose that its largest well lacked a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

127. The Company also stated the following about Sempra's safety measures:

> *Natural Gas Pipeline Operations Safety Assessments*
>
> Pending the outcome of the various regulatory agency evaluations of natural gas pipeline safety regulations, practices and procedures, Sempra Energy, including the California Utilities, may incur incremental expense and capital investment associated with their natural gas pipeline operations and investments. ***In August 2011***, ***SoCalGas***, SDG&E, Pacific Gas and Electric Company (PG&E) and Southwest Gas ***filed implementation plans*** with the [California Public Utilities Commission ("CPUC")] ***to test or replace natural gas transmission pipelines located in populated areas that have not been pressure tested***…. The California Utilities' current total estimated cost for Phase 1 (the 10-year period of 2012 to 2022) of a two-phase plan is $2.1 billion ($1.6 billion for SoCalGas and $500 million for SDG&E). …
>
> ***In June 2014, the CPUC issued a final decision*** in the Triennial Cost Allocation Proceeding (TCAP) ***addressing*** SDG&E's and ***SoCalGas' Pipeline Safety Enhancement Plan (PSEP) that approved the utilities' model for implementing PSEP***, and established the criteria to determine the amounts related to PSEP that may be recovered from ratepayers and the processes for recovery of such amounts, including providing that such costs are subject to a reasonableness review.

128. The above statements were false or misleading because despite the Company's statements about safety, its infrastructure and safety measures at the Well were deficient. The Company knew the Well was over 60 years old and needed to be upgraded, but it failed to do so, while failing to disclose to investors that the its largest well did not have a safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. Additionally, the Company

failed to disclose that its largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Thus, contrary to the Company's prior public statements, it was not prioritizing the repair and maintenance projects of greatest need, and therefore was not focusing its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, and prioritizing the projects of greatest need.

129. In connection with the Company's November 2015 Form 10-Q, Defendants Reed and Householder each SOX-certified that they reviewed the November 2015 Form 10-Q. Their certifications stated, *inter alia*:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Sempra Energy;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. ***The registrant's other certifying officer and I have disclosed***, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

130. Given the false and/or misleading nature of the statements and omissions in the November 2015 Form 10-Q, as outlined above, Reed's and Householder's certifications were consequently false and/or materially misleading. Either Reed and Householder failed to oversee the design and implementation of disclosure controls and internal controls over financial reporting sufficient to identify the false and misleading statements alleged herein, or having done so and been apprised of the facts and circumstances rendering them false and misleading, falsely certified that the November 2015 Form 10-Q disclosed all facts necessary to make the statements it made not misleading and disclosed all frauds. These omissions and/or misrepresentations were material to Sempra's investors because the true facts would have altered the total mix of information available when deciding whether to purchase Sempra stock.

*November 3, 2015 – Earnings Call*

131. On November 3, 2015, the Company held an earnings call (the "November 2015 Earnings Call") announcing its third quarter results. During it, Defendants made materially false and misleading statements, as follows:

(a) Defendant Reed stated:

During the third quarter, our solid operating and financial performance across the company continued. With strong year-to-date results, we are

> now raising our 2015 adjusted earnings guidance range to $4.95 per share to $5.15 per share.
>
> (b) Defendant Householder added:
>
> Thanks, Debbie. Earlier this morning, we reported third quarter earnings of $248 million or $0.99 per share. On an adjusted basis, we reported third quarter earnings of $250 million or $1 per share. Third quarter earnings in 2014 were $348 million or $1.39 per share.

132. Defendant Reed also emphasized the Company's supposed prioritization of safety: ". . . So that Cameron adds a lot in 2018 and 2019 to that growth rate, but we're also growing our business in a lot of other areas and ***we've had exceptional performance in safety, reliability, customer and financial performance from our utilities as well as our other businesses***."

133. The financial data provided by Defendants Reed and Householder was materially false or misleading because the Company artificially inflated reported revenue and net income numbers, while understating operation and maintenance expenses and capital expenditures, by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at the Well at Aliso Canyon. Had the Company properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been substantially higher and, by extension, its net income would have been lower. Moreover, the Company was failing to make appropriate reserves and to take necessary charges against income to account for the significant liabilities posed by the condition of the Well at Aliso Canyon, which shortly thereafter gave rise to costs and liabilities exceeding $655 million (and rising). These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company,

particularly in the context of its having publicly stated that it was taking the steps necessary to modernize its infrastructure and policies, thereby giving the impression that the announced financials accounted for the true costs of such efforts.

134. These statements were also materially false and/or misleading because they misrepresented to investors that the Company had "had exceptional performance in safety" while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and

omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

*November 5-20, 2015 – Press Releases*

135. An additional 16 press releases issued by the Company every day between November 5, 2015 and November 20, 2015, both dates inclusive, stated in pertinent part:

> On October 23, SoCalGas crews discovered a leak at one of its natural gas storage wells at its Aliso Canyon storage field. In response, we activated the appropriate procedures, alerted public officials and began addressing the leak.
>
> We recognize that the smell of the odorant in natural gas is unpleasant, and we sincerely apologize for the annoyance and concern this odor is causing the Porter Ranch community and surrounding areas. However, ***the leak poses no threat to public safety*.** It is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than any home or public area. Scientists agree natural gas is not toxic and that ***its odorant is harmless in the minute levels at which it is added to natural gas*.** In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.
>
> * * *
>
> A team of our environmental specialists and retained experts continued conducting daily air sampling and monitoring at several representative sites both within the leak site and the community. Although experts agree that natural gas is not toxic and that ***the levels of the odorant in the natural gas are too low to be a long-term health concern***, ***we are continuing to conduct this sampling to provide the community with***

> ***more information***. The samples we are taking are in addition to those being taken by the SCAQMD. Air sampling results from our tests are available at: http://www.SoCalGas.com/news-room/aliso-canyon-air-sample-results.shtml.

136. These statements were materially false and/or misleading because the Company misrepresented to investors that the Gas Leak "poses no threat to public safety," "natural gas is not toxic," "the levels of the odorant in the natural gas are too low to be a concern," while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared

and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

<u>*November 12, 2015 – Bulletin*</u>

137. On November 12, 2015, the Company published a bulletin on SoCalGas' website entitled "Aliso Canyon Storage Facility." The bulletin stated in pertinent part:

> We have been working closely with all of the appropriate public agencies, including the L.A. City and County Fire Departments and Hazmat Departments, the L.A. County Department of Health, the California Division of Oil, Gas & Geothermal Resources, and the South Coast Air Quality Management District.
>
> We sincerely apologize for any concern this odor is causing the neighboring communities. However, ***the leak does not pose an imminent threat to health or public safety.*** The well is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest home or public area. ***Scientists agree natural gas is not toxic and that its odorant is not toxic at the minute levels at which it is added to natural gas***. ***Health and air-quality officials said that the levels of the additive found in air samples taken in Porter Ranch should not pose a health problem***.

138. These statements were materially false and/or misleading because the Company misrepresented to investors that the Gas Leak "does not pose an imminent threat to health or public safety" while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed significant health threats to the nearby community. Furthermore, despite Defendants' statements about

safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

*November 21-23, 2015 – Press Releases*

139. Each day between November 21, 2015, and November 23, 2015, inclusive, SoCalGas issued additional press releases, posted to the Company's corporate websites, stating in pertinent part:

> A team of our environmental specialists and retained experts will continue conducting daily air sampling and monitoring at several representative sites both within the leak site and the community. ***Although experts agree that natural gas is not toxic and that the levels of the odorant in the natural gas are too low to be a long-term health concern, we are continuing to conduct this sampling to provide the community with more information***. … Air sampling results from our tests are available at www.SoCalGas.com/newsroom/aliso-canyon-updates/air-sample-results.
>
> * * *
>
> On October 23, SoCalGas crews discovered a leak at one of the natural gas storage wells at its Aliso Canyon storage field. In response, we activated the appropriate procedures to begin to address the leak.
>
> We regret that the smell of the odorant in natural gas is unpleasant and that some people are sensitive to the odor, and we sincerely apologize for the annoyance and concern this odor is causing the neighboring communities. However, ***the leak does not pose an imminent threat to public safety***. The well is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest home or public area. ***Scientists agree natural gas is not toxic and that its odorant is harmless at the minute levels at which it is added to natural gas.*** In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.

140. These statements were materially false and/or misleading because the Company misrepresented to investors that "natural gas is not toxic," "levels of the

odorant in the natural gas are too low to be a long-term health concern," "the leak does not pose an imminent threat to public safety," and "the odorant is harmless at the minute levels at which it is added to natural gas" while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it

had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

## G. The Truth Began To Emerge In A Partial Corrective Event

*November 23, 2015 – Porter Ranch Complaint*

141. On November 23, 2015, displaced Porter Ranch residents filed a class action lawsuit against SoCalGas in California Superior Court, Los Angeles County, seeking damages and an order requiring the Company to disclose information related to the health risks associated with the Porter Ranch Leak.

142. The complaint filed by residents of Porter Ranch partially revealed the truth about the Gas Leak and, in particular, the fact that Sempra and SoCalGas had been downplaying the dangers arising from the Gas Leak as well as their ability to remediate it, and the impacts on area residents.

143. On news of the lawsuit, Sempra stock began to drop, falling $0.80 to close at $100.28 on November 24, 2015. However, Defendants' continued, ongoing stream of false and misleading statements served to mute the impact of this corrective event and to perpetuate inflation of Sempra's stock price.

## H. Defendants' Continued False And Misleading Statements Mute The Corrective Effect And Perpetuate The Stock Price Inflation

*November 24-December 3, 2015 – Press Releases*

144. Between November 24, 2015, and December 3, 2015, inclusive, SoCalGas issued a series of 10 press releases, posted to the Company's corporate websites, claiming that the Gas Leak presented no serious risk to health and safety to nearby residents, stating in pertinent part:

> A team of our environmental specialists and retained experts will continue conducting daily air sampling and monitoring at several representative sites both within the leak site and the community.

> ***Although experts agree that <u>natural gas is not toxic and that the levels of the odorant in the natural gas are too low to be a long-term health concern</u>, we are continuing to conduct this sampling to provide the community with more information***. The samples we are taking are in addition to those being taken by South Coast Air Quality Management District (SCAQMD). Air sampling results from our tests are available at www.SoCalGas.com/newsroom/aliso-canyon-updates/air-sample-results.
>
> * * *
>
> On October 23, SoCalGas crews discovered a leak at one of the natural gas storage wells at its Aliso Canyon storage field. In response, we activated the appropriate procedures to begin to address the leak.
>
> We regret that the smell of the odorant in natural gas is unpleasant and that some people are sensitive to the odor, and we sincerely apologize for the annoyance and concern this odor is causing the neighboring communities. However, ***<u>the leak does not pose an imminent threat to public safety</u>***. The well is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest home or public area. ***<u>Scientists agree natural gas is not toxic and that its odorant is harmless at the minute levels at which it is added to natural gas.</u>*** In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.

145. These statements were materially false and/or misleading because the Company misrepresented to investors that "natural gas is not toxic," "levels of the odorant in the natural gas are too low to be a long-term health concern," "the leak does not pose an imminent threat to public safety," and "the odorant is harmless at the minute levels at which it is added to natural gas" while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the

Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

*December 9-17, 2015 – Press Releases*

146. Between December 9 and 17, 2015, SoCalGas issued nine more press releases, posted on the Company's websites. The press release perpetuated the

misrepresentation that the Gas Leak was not harmful to neighboring residents. In pertinent part, the press release stated:

> **Safety at Aliso Canyon**
> ***The safety of our employees, contractors and people in the communities we serve continues to be our highest priority***. We continue to work alongside multiple agencies such as L.A. County and City Fire, The Department of Public Health, CAL-OES, DOGGR and CPUC, to oversee the operation and worker safety.
>
> **FAA Notice**
> The FAA issued a temporary localized no-fly zone near the leaking well. What this means is planes and helicopters can fly over the well as long as they are at least 2000 feet above the well. This was done to prevent any safety issues at the well site, and in the air.
>
> **Air Samples & The Environment**
> A team of our environmental specialists and retained experts will continue conducting daily air sampling and monitoring at several representative sites both within the leak site and the community. ***Although experts agree that natural gas is not toxic and that the levels of the odorant in the natural gas are too low to be a long-term health concern***, we are continuing to conduct this sampling to provide the community with more information. The samples we are taking are in addition to those being taken by South Coast Air Quality Management District (SCAQMD). …
>
> *　　*　　*
>
> On October 23, SoCalGas crews discovered a leak at one of the natural gas storage wells at its Aliso Canyon storage field. In response, we activated the appropriate procedures to begin to address the leak.
>
> We regret that the smell of the odorant in natural gas is unpleasant and that some people are sensitive to the odor, and we sincerely apologize for the annoyance and concern this odor is causing the neighboring communities. However, ***<u>the leak does not pose an imminent threat to public safety</u>***. The well is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest

home or public area. Scientists agree natural gas is not toxic and ***that its odorant is harmless at the minute levels at which it is added to natural gas***. In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.

147. These statements were materially false and/or misleading because the Company misrepresented to investors that "natural gas is not toxic," "levels of the odorant in the natural gas are too low to be a long-term health concern," "the leak does not pose an imminent threat to public safety," and "the odorant is harmless at the minute levels at which it is added to natural gas" while Defendants knew that the site was not confined and that mercaptans and the Air Pollutants posed significant health threats to the nearby community. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of

greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company, particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims.

*December 18, 2015 – Press Release*

148. On December 18, 2015, Sempra issued a Press Release on its website titled "SoCalGas Commits to Mitigate Environmental Impact of Gas Leak" (the "December 18, 2015 Press Release"). The December 18, 2015 Press Release states in pertinent part:

> **Addressing the Community's Concerns**
>
> SoCalGas opened its Porter Ranch Community Resource Center Dec. 16 in the Porter Ranch Town Center, 19731 Rinaldi Street, to provide services and information to the community.
>
> ***SoCalGas recently began providing several options of in-home air filtration to reduce residents' exposure to the odorant, which may produce symptoms in those sensitive to its smell.***
>
> ***The company is also continuing to provide temporary accommodation for those who want to relocate until the leak is stopped***.

149. These statements were materially false and/or misleading because the Company misrepresented to investors that the Gas Leak was a minor incident that

caused "symptoms for some people" and by stating it would offer temporary housing to those "who want" to relocate," while Defendants knew that the site was not confined, that mercaptans and the Air Pollutants posed significant health threats to the nearby community, and that residents were becoming sick and seeking medical attention as a result of exposure to the methane and Air Pollutants emanating from the Gas Leak.. Furthermore, despite Defendants' statements about safety, the Company's infrastructure and safety measures at the Well were deficient. Defendants knew the Well was over 60 years old and needed to be upgraded, but the Company had failed to do so, while failing to disclose to investors that it lacked a safety valve. Defendants failed to disclose that the Company's largest well did not have a safety valve because, according to Schwecke, "the part was hard to find, so the Company opted not to replace it." Given the Well's state of disrepair (*e.g.*, no safety valve), the representation that the Gas Leak would take a week to resolve was materially misleading because it omitted to tell the public about the significant obstacles Sempra and SoCalGas actually confronted. By omitting to tell the public about the absence of a safety valve at the Well, Sempra and SoCalGas misled investors into believing that the Gas Leak would be fixed quickly and without further incident. Contrary to Defendants' prior public statements, the Company had not prioritized the repair and maintenance projects of greatest need, and therefore had not focused its resources on the significant risks posed by the aging and deficient infrastructure at the Well at Aliso Canyon, including the replacement of its missing safety valve. In reality, the proper measures were not in place and once a gas leak at the Well started, it could not be halted before a state of emergency was declared and a relief well was eventually drilled. These misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company,

particularly in the context of its having publicly stated that it had taken the steps necessary to modernize its infrastructure and policies, had prioritized the projects of greatest need, and had been spending over $1 billion within 2015 alone to accomplish these aims. Indeed, the situation had deteriorated to the point that it was on the cusp of desperate action by the State of California to protect residents.

## I. The Truth Continued To Emerge In A Partial Corrective Event

*January 6, 2016 – Proclamation*

150. After the market closed on January 6, 2016, Governor Brown issued the Proclamation of a State of Emergency. The Proclamation gutted the notion that the Company's response to the Gas Leak had been sufficient, effective, or indicative of a functional safety plan:

> ***Given the prolonged and continuing duration of the Aliso Canyon gas leak*** and at the request of residents and local officials, Governor Edmund G. Brown Jr. today issued a proclamation that ***declares the situation an emergency*** and details the administration's ongoing efforts to help stop the leak. ***The order also directs further action to protect public health and safety***, ensure accountability and strengthen oversight of gas storage facilities. …
>
> Today's proclamation builds on months of regulatory and oversight actions from seven state agencies mobilized to protect public health, oversee Southern California Gas Company's actions to stop the leak, track methane emissions, ensure worker safety, safeguard energy reliability and address any other problems stemming from the leak. Actions include:
>
> * * *
>
> ***Last month, the Governor sent a letter to the CEO of Southern California Gas stating that the company's response has been "insufficient" and must be sped up, while noting that state agencies' multiple ongoing investigations will be coordinated with the California Attorney General's Office***.

151. The Proclamation also described the broad array of state resources that had to be mobilized to address the deficiencies in the Company's leak response efforts, stating in relevant part:

> The Office of Environmental Health Hazard Assessment is reviewing air quality measurements, evaluating public health concerns from the gas leak and assisting other state agencies in determining whether additional actions are needed beyond those already required by local public health agencies.
>
> The Governor's Office of Emergency Services established an incident command structure, including a physical post on-site at Aliso Canyon to better coordinate the local, state and federal response and information sharing and is maintaining a public webpage to provide real-time information regarding the state's multi-agency response and air quality monitoring.
>
> The Division of Oil, Gas and Geothermal Resources is investigating the leak and overseeing Southern California Gas Company's efforts to stop it, including issuing emergency orders in November and December directing Southern California Gas Company to halt gas injections into the storage facility, immediately work on alternatives to stop the leak and provide testing results, data, daily briefings and a written plan and schedule for sealing the well. The Division also established a panel of experts from the Lawrence Berkeley National Laboratory, Lawrence Livermore National Laboratory and the Sandia National Laboratory to provide independent monitoring and technical expertise and review Southern California Gas Company data and information reported to the Division.
>
> The Office of Environmental Health Hazard Assessment is reviewing air quality measurements, evaluating public health concerns from the gas leak and assisting other state agencies in determining whether additional actions are needed beyond those already required by local public health agencies.
>
> The California Public Utilities Commission is investigating the gas leak

> to determine its cause and any possible violations and is collecting information about the costs of responding to and fixing the leak. The Commission and Division of Oil, Gas and Geothermal Resources also directed Southern California Gas Company to retain and pay for an independent, third party to perform a technical analysis of the well failure and its cause and share the results with regulators and the public.
>
> The California Air Resources Board is measuring the leak rate and estimating total methane emissions over the duration of the leak and is using ground-level monitoring, specially-equipped airplanes, and satellite information to provide updates of emissions.
>
> The Division of Occupational Safety and Health is ensuring on-site worker safety at Aliso Canyon.
>
> The California Energy Commission is coordinating with California Public Utilities Commission to maintain energy reliability during this incident.
>
> The California Air Resources Board is measuring the leak rate and estimating total methane emissions over the duration of the leak and is using ground-level monitoring, specially-equipped airplanes, and satellite information to provide updates of emissions. …

152. The Proclamation also described the "key orders" that were implemented by the state to impose corrective measures on the Company for its abject failure to ensure the safe operation of the Aliso Canyon facility, including, *inter alia*:

(a) It described the necessity to stop the Gas Leak, showing that all actions taken up to this point were inadequate. It stated in pertinent part:

> **Stopping the Leak:** All necessary and viable actions will be taken to ensure Southern California Gas Company: maximizes daily withdrawals of natural gas from the Aliso Canyon Storage Facility for use or storage elsewhere; captures leaking gas and odorants while relief wells are being completed; and identifies how it will stop the gas leak if relief wells fail to seal the leaking well, or if the existing leak worsens.

(b) It described the state's total shutdown of the Aliso Canyon facility until California could do a "comprehensive review" of its safety, undercutting any notion that the Company had done proper and effective safety reviews before and during the Class Period. Specifically, it stated:

> **Protecting Public Health and Safety:** The state will: continue its prohibition against Southern California Gas Company injecting any gas into the Aliso Canyon Storage Facility until a comprehensive review of the safety of the storage wells and the air quality of the surrounding community utilizing independent experts is completed; expand its real-time monitoring of emissions in the community; convene an independent panel of scientific and medical experts to review public health concerns; and take all actions necessary to ensure the continued reliability of natural gas and electricity supplies in the coming months.

(c) It heightened all gas storage oversight, proving that the Company's safety regulation was ineffective. It stated:

> **Strengthening Oversight:** The state will promulgate emergency regulations for gas storage facility operators throughout the state, requiring: at least daily inspection of gas storage well heads using gas leak detection technology such as infrared imaging; ongoing verification of the mechanical integrity of all gas storage wells; ongoing measurement of annular gas pressure or annular gas flow within wells; regular testing of all safety valves used in wells; minimum and maximum pressure limits for each gas storage facility in the state; a comprehensive risk management plan for each facility that evaluates and prepares for risks, including corrosion potential of pipes and equipment. Additionally, the Division of Oil, Gas and Geothermal Resources, the California Public Utilities Commission, the California Air Resources Board and the California Energy Commission will submit to the Governor's Office a report that assesses the long-term viability of natural gas storage facilities in California.

(d) It ensured that SoCalGas took responsibility for the Gas Leak requiring that the Company properly cover all costs, thereby establishing that the Company's prior-stated financial and operating results in its May, August, and November earnings releases, earnings call and Forms 10-Q were materially false and misleading. It stated:

> **Ensuring Accountability**: The California Public Utilities Commission will ensure that Southern California Gas Company covers costs related to the natural gas leak and its response, while protecting ratepayers; and the state will develop a program to fully mitigate the leak's emissions of methane funded by the Southern California Gas Company.

153. On January 7, 2016, Sempra filed with the SEC a Form 8-K announcing the "Status Update Regarding the Company's Aliso Canyon Natural Gas Storage Facility" ("January 7, 2016 Form 8-K") and attached the Proclamation that was announced by Governor Jerry Brown on January 6, 2016, as exhibit 99.1. The January 7, 2016 Form 8-K revealed that the Company's efforts up to this point were insufficient, stating:

> The Company has been working closely with several of the world's leading experts to stop the leak. ***Since discovering the leak, the Company has made <u>seven attempts</u> to plug SS25 by pumping fluids down the well shaft. <u>The Company has been unable to stop the leak using this approach</u> and is now working to stop the leak through a relief well.***
>
> ***On December 4, 2015, the Company commenced drilling a relief well that is designed to stop the leak by plugging SS25 at its base. The Company currently estimates that the relief well will be completed between the end of February and the end of March. The Company is also <u>preparing to drill a back-up relief well</u> as a precautionary measure***. At the same time, the Company is actively working with leading experts to engineer technologies for reducing the natural gas

> emissions from SS25, as well as reducing the impact of the odorant that is required to be added to the natural gas for safety purposes.
>
> In order to reduce the pressure of the gas in storage and the amount of gas emitted by SS25, the Company continues to withdraw gas and has not injected natural gas into the Aliso Canyon natural gas storage facility since October 25, 2015. The Company estimates that as of December 31, 2015, approximately 33 billion cubic feet ("Bcf") of natural gas has been delivered to customers or moved to other gas storage facilities from an initial starting point of approximately 77 Bcf of gas in storage on October 23, 2015 at the Aliso Canyon facility. Based on information from the California Air Resources Board ("CARB"), gathered by fly-overs of the site, the leak rate and estimated level of methane emissions appear to have declined significantly since CARB began providing preliminary estimates in November 2015. Once the gas leak is terminated, the Company will conduct an objective measurement of natural gas lost from the leak and will provide that information to the relevant regulatory bodies.

154. Additionally, the January 7, 2016 Form 8-K revealed the truth about the health risks posed by the Gas Leak, stating in pertinent part:

> According to the Los Angeles County Department of Public Health ("LA County DPH"), mercaptans, the odorant in the gas at Aliso Canyon, are not associated with long-term health effects. Mercaptans may, however, cause eye, nose and throat irritation, coughing and nasal congestion, shortness of breath, nausea, stomach discomfort, dizziness and headaches. A number of the residents of the nearby Porter Ranch community have reported experiencing one or more of these symptoms. These symptoms may recur on a daily basis as long as the odors remain.

155. On this news, shares of Sempra common stock fell from $93.51 per share on January 6, 2016, to $87.00 per share at close on January 7, 2016, a drop of approximately 7% on usually heavy trading volume. The significant decline in Sempra's stock price was caused directly by the Company's disclosure of the state of emergency and the revelation of the dangers surrounding the Gas Leak.

### J. Defendants Acted with Scienter

156. The materially false and misleading misrepresentations and omissions alleged herein were made by the Defendants with scienter.

*Defendants Sempra and SoCalGas Benefitted Financially*

157. Sempra and SoCalGas are regulated by the CPUC. As stated in the Company's filings with the SEC, Sempra and SoCalGas are subject to significant fines and penalties if found to be in noncompliance with regulatory and/or safety rules.

158. In November 2014, Sempra and SoCalGas submitted an application for permission to increase consumer rates. In an effort to secure the permission, Sempra and SoCalGas omitted material information from their application about the Aliso Canyon facility and, in particular, the fact that the Well was materially deficient. Sempra and SoCalGas were motivated to withhold this information in order to secure the rate hike. While the rate hike has not yet been approved, Defendants acted with scienter in hopes that the benefit would outweigh the cost.

159. Similarly, on November 13, 2015, Sempra filed a prospectus with the SEC (the "Prospectus") for the offering and sale of $400 million of 2.85% notes due in 2020 and $350 million of 3.75% notes due in 2025. The Prospectus ***makes no mention of the Gas Leak or of the deficiencies that would render impossible any prompt remedy.*** By downplaying the Gas Leak and effect on the public, while not disclosing the fact that stopping the leak would be a long-term, costly and difficult effort, Sempra was able to benefit financially from the fraud. Thus, this transaction is material and highly indicative of scienter, including the corporate scienter of Defendant Sempra.

*Defendants Reed and Householder Benefitted Financially*

160. Defendants Reed's and Householder's motivation behind the misrepresentations and omissions throughout the Class Period stems from their desire to profit financially. On January 4, 2016, just two days prior to the Governor Brown's Proclamation, Reed received her biggest stock payout since taking the helm in 2011. The stock award was for 140,852 shares of Sempra common stock at $0, instantly worth $13.1 million. Additionally, according to a Form 4, filed with the SEC on January 4, 2016, at the same time Reed was awarded the shares, Reed immediately disposed of 72,000 shares, almost double the amount she has ever sold in the past, at $93.18, for a gain of $6,708,960. Had Reed waited just three days when the truth was fully revealed, Reed would have lost approximately $444,960, almost 33% of her base salary in 2015. Additionally, there is a strong inference that Defendant Reed knew that the Proclamation was about to be disclosed as Governor Brown's sister, Kathleen Brown serves on Sempra's Board and was compensated $235,000 in 2015. Since Reed's stock sales in January 2016, she has not sold a single share.

161. Defendant Householder also benefitted from the fraud. Again on January 4, 2016, just two days prior to the Governor Brown's Proclamation, Householder received 46,559 shares for $0 per share, worth $4.3 million. Additionally, according the Form 4, filed with the SEC on the same day, Householder immediately disposed of 22,798 shares, almost half of what he was awarded, at $93.18, for a gain of $2,124,317. Had Householder waited just three days when the truth was fully revealed, Reed would have lost approximately $140,891, over 21% of his base salary in 2015. Additionally, there is a strong inference that Defendant Householder knew that the Proclamation was about to be disclosed as Governor Brown's sister, Kathleen Brown serves on Sempra's Board

and was compensated $235,000 in 2015. Since Householder's stock sales in January 2016, he has not sold a single share.

*Defendants Knew About the Hazardous Gases*

162. Indicative of scienter is the fact that Defendants knew the Gas Leak contained hazardous materials but failed to disclose them to the public. On February 2, 2016, the Attorney General filed a Criminal Complaint on behalf of the People of the State of California against SoCalGas. The Complaint alleged that between October 23, 2015, and October 26, 2015 Sempra failed to immediately report the release of hazardous materials that escaped from the Gas Leak. The Complaint states that the hazardous material that were released included but were not limited to methane, mercaptan, benzene and butane. The Complaint additionally states that the Gas Leak caused injury, detriment, nuisance or annoyance, endangered the comfort, repose health, or safety of the public, or caused or had a natural tendency to cause, injury or damage to business or property.

163. The February 2, 2016 criminal complaint shows that Defendants knew about the toxic gases but downplayed the Gas Leak and consequently failed to fully inform investors and the victims of the potential harm that the Gas Leak could cause. This cover-up of the Air Pollutants is highly indicative of scienter.

*Change in Warning Language*

164. Proof that Defendants knew that they were materially misleading investors is the Company's change in warnings during its daily updates on the website. The Company began by disclosing to investors that the Gas Leak was "harmless," before changing the language to tell investors and victims that the Gas Leak did not pose a "long-term health concern." By changing the language, the Company shows that it knew that the Gas Leak was not "harmless" as it was reporting to investors and the victims.

165. The Company also changed its language when addressing the daily air sampling. The Company initially stated, "we are conducting this sampling to *reassure the community,*" but later changed this language to state, "we are continuing to conduct this sampling to *provide the community with more information.*" This shows that the Company was initially trying to downplay and cover-up the significance of the gas leak. By changing the language the Company showed that it knew the Gas Leak was serious despite the fact that they continued to downplay it.

166. These changes are material because while continuing to ensure investors and victims that everything is okay, they are also hiding the entire truth about the dangers of all of the toxins. These facts indicate that the Defendants acted with scienter.

*<u>Defendants Knew About The Insufficient Safety Infrastructure and Maintenance</u>*

167. Defendants also knew about the shoddy infrastructure and maintenance issues at Aliso Canyon that led to the Gas Leak. Knowledge of the needed repairs to the Aliso Canyon Well is demonstrated by the presentation that SoCalGas made to the CPUC in November 2014 regarding the proposed SIMP and recommended Operations and Maintenance expenses and capital improvements to SoCalGas's underground natural gas storage wells, including those at Aliso Canyon. In remarks prepared by Phillip E. Baker, Director of Gas Distribution at SoCalGas, the Company admitted the substantial capital improvements needed at the Aliso Canyon underground wells, as described above.

168. Significantly, Mr. Baker implicitly conceded that SoCalGas and Sempra had not adequately safeguarded the Company's operations from hazardous conditions. In his remarks, Mr. Baker stated "we believe it is critical that we adopt a more proactive and in-depth approach. Historically, safety and risk considerations

for wells and their associated valves and piping components have not been addressed in past rate cases to the same extent that distribution and transmission facilities have been under the Distribution and Transmission integrity management programs." Mr. Baker's comments on this point amount to an admission that the Company's wells were deficient and, in particular, that a harmful incident at the Well responsible for the Gas Leak was only a matter of time.

169. Baker's statements indicate that the Company knew that their well safety procedures were inadequate despite ensuring investors otherwise. This is corroborated by Schwecke's admission that the safety valve for the Well had been altogether removed back in 1979, due to difficulties finding a replacement part. These facts are highly indicative of scienter.

*Sempra's Core Operations Were Implicated*

170. Knowledge as to all the foregoing topics is also imputable, given the Individual Defendants' titles, roles, responsibilities, and duties in overseeing the day-to-day operations of Sempra, as well as the implication of Sempra's core operations. The Aliso Canyon storage facility is the largest natural gas storage facility West of the Mississippi and was particularly important to Sempra's operations and profitability. The Well is the largest of the Company's four underground storage facilities, representing over 63% of the Company's working gas. The characteristics of the four wells are as follows:

**Southern California Gas Company**

Descriptive Statistics of Gas Storage Fields

| Descriptive Statistic | Aliso Canyon | La Goleta | Honor Rancho | Playa del Rey | Total All Fields |
|---|---|---|---|---|---|
| Year Field Placed in Service | 1973 | 1941 | 1975 | 1942 | - |
| Injection/Withdrawal/Observation Wells | 115 | 20 | 40 | 54 | 229 |
| Gas Compressor Units (number) | 8 | 8 | 5 | 3 | 24 |
| Compression Horsepower (bhp) | 42,000 | 5,700 | 27,500 | 6,000 | 81,000 |
| Maximum Reservoir Pressure (psig) | 3,600 | 2,050 | 4,400 | 1,700 | - |
| Working Gas (Bcf) | 86.2 | 21.5 | 26.0 | 2.4 | 136.1 |
| Maximum Withdrawal Rate (MMcfd) | 1,860 | 420 | 1,000 | 400 | 3,760 |
| Maximum Injection Rate (MMcfd) | 600 | 140 | 300 | 75 | 1,115 |
| Maximum Well Depth (feet) | 10,691 | 6,912 | 13,300 | 6,575 | - |
| Minimum Well Depth (feet) | 6,997 | 4,247 | 9,165 | 6,049 | - |
| Average Well Depth (feet) | 8,146 | 4,886 | 9,959 | 6,339 | - |

171. The Aliso Canyon natural gas storage facility contains 115 wells tapping a reservoir that holds up to 86 billion cubic feet of natural gas for distribution to residences, businesses, and electric utilities in the L.A. basin. The field is the second largest storage facility of its kind in the United States.

172. The fact that the Well was the Company's biggest storage facility and attributed to over 60% of the Company's gas storage is highly indicative that the Company knew or should have known in any deficient safety plans or equipment.

*Defendants Were Reckless To The Extent They Disclaim Knowledge*

173. The Safety Plan contained a detailed "Expectations of Leadership" section that included, among other things, requirements to document safety issues in an electronic database. Among other things, the Storage Operations Manager was required to conduct semi-annual safety inspections of the Aliso Canyon facility; document the results, including any corrective actions, in a Safety Information Management System (SIMS); and verify all corrective actions are completed within specified timeframes. The Storage Operations Manager also had to conduct "an

annual self-assessment of Aliso Canyon facilities and operations to assess compliance with applicable safety regulatory requirements and internal company policies," the results of which, including any corrective actions, likewise had to be documented in SIMS, with corrective actions verified as completed. The Safety Plan described SIMS in some detail, stating that, "Using SIMS maintains compliance with policy requirements of…the Environmental and Safety Compliance Management Program (ESCMP)." Per the Safety Plan, all inspections were recorded and all inspection records retained in SIMS.

174. The Safety Plan also describes the ESCMP as, *inter alia*, instituting a Self-Assessment Process regarding the Company's facilities and operations, designed to "assess compliance with the applicable safety regulatory requirements and internal Company policies; identify areas, actions or activities that are not consistent with regulatory requirements or internal policies; and finally, develop the appropriate corrective action(s)." It describes required "periodic communications" and quarterly reports as to, among other things, "the status of ESCMP open corrective actions pertaining to safety." It also describes ESCMP checklists to be completed by the Storage Operations Manager "to assess compliance with safety and environmental laws and regulations and Company policies and procedures," which were then approved by an in-line Director, a Vice President, and a Senior Vice President, and thereafter kept for four years. The Safety Plan stated, *inter alia*:

> The Safety & Environmental ESCMP Facility-Based Year-end Checklist is a combined safety and environmental ESCMP checklist signed by the Aliso Canyon Storage Operations Manager and the Director of Storage to address safety and environmental permitting, spill reporting and other safety and environmental facility-based compliance concerns.

* * *

> Prior to certifying an ESCMP year-end checklist, it is important that a thorough review is conducted to verify that compliance processes and activities reasonably ensure compliance with safety and environmental laws and regulations and Company policies and procedures. Electronic approval of the checklist certifies that to the best of the approver's knowledge, after all appropriate inquiry, all entries are true, accurate and complete. The annual reviews create an opportunity to identify gaps in compliance and implement corrective measures. The checklist review is completed through the end of each year and due back to the Directors of Safety, Wellness, & Disability Services and Environmental Services by early-January. The Aliso Canyon Storage Operations Manager or the Director of Storage, or their designees, must provide quarterly updates on the status of open corrective actions to Safety and Environmental Services until properly closed.

175. In addition, the Safety Plan included an Aliso Canyon Safety Committee Organizational Chart, which displayed the clear chain-of-command that led all safety issues and materials, including the SIMS and ESCMP, to the Aliso Storage Operations Manager, whose duties it described as, among other things, "Provides overall authority and support to the Aliso Canyon Safety Committee," "Has overall facility responsibility for the safe operation and maintenance at Aliso Canyon, and for compliance with all regulations," and "Approves safety committee findings and audits." According to the Safety Plan:

> ***The function of the Aliso Canyon safety committee is to work with corporate*** and site ***management to*** help ***recognize safety hazards and assist in finding corrective actions*** to better incorporate safe work practices and continue to meet state, federal, and local requirements. Assist in safety inspections, audits, and review and make Aliso specific recommendations for corrective actions.

176. The Safety Committee also had to report hazardous conditions:

> Be alert to the presence of any hazard or hazardous conditions. If necessary secure the area and/or correct the hazard. Report these to supervision as soon as possible after discovery. Create a corrective

> work order in Maximo and send an email describing the issue to all members of the safety committee and assist with the delivery of safety meetings and training.

177. Maximo is a "computerized maintenance management system for scheduling and tracking maintenance, inspections and follow-up corrective activities," which the Safety Plan describes as follows:

> The IBM MAXIMO computerized maintenance management system is an integrated productivity tool and database that helps manage assets on a single software platform. MAXIMO provides a comprehensive view of all asset types, their conditions and location, and the work processes that support them, to provide planning, audit, and compliance capability.
>
> All maintenance work performed by Storage Operations personnel on pipelines, equipment, and facilities is planned, scheduled, and documented using MAXIMO, in accordance with Company Gas Standard 223.0375, MAXIMO – Transmission and Storage Operations. This includes maintenance work required by the DOT, CPUC, and DOGGR, and maintenance work that is not mandated by a regulatory agency or entity.
>
> All pipeline, facility or maintenance data, including all scheduled (planned) and corrective (reactive) maintenance work is entered or uploaded into MAXIMO by various work groups consistently and accurately to facilitate: creating/generating work orders; scheduling and tracking work activities and; querying/creating reports on the maintenance work or assets in the system.

178. The Safety Plan also required inspections be done whenever a "new unidentified hazard is recognized" or "injury or illness" occurs, and stated that "All inspection records are retained for a minimum of one year. It similarly required that all records of hazard control actions had to be retained for a minimum of three years.

179. Defendants had access to all the foregoing databases, reports, and information sources before and throughout the Class Period. Such access meant that

Defendants knew or were reckless in not knowing that their Class Period statements were materially false or misleading as alleged herein.

**K. Loss Causation and Economic Loss**

180. During the Class Period, as detailed herein, Sempra and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sempra's securities and operated as a fraud or deceit on Class Period purchasers of Sempra's securities by materially misleading the investing public. Later, when Sempra and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Sempra's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Sempra's securities during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

181. Sempra's stock price fell in response to partial corrective events on November 23, 2015, January 6, 2016, and January 7, 2016, as noted *supra*. The November 23, 2015 drop was muted, and its effects dulled, by the contemporaneous and ongoing stream of misstatements by the Company, as alleged herein. The January 6, 2016 drop, tied to the Governor's Proclamation of a state of emergency, was sharp, on high volume, and removed the inflation from Sempra's stock. Defendants' disclosure on January 7, 2016 through the January 7, 2016 Form 8-K caused a further decline in Sempra's stock, as the market received the truth about the Defendants' efforts to repair the Gas Leak as well as the health risks posed by the Gas Leak.

**L. Presumption of Reliance; Fraud-On-The-Market**

182. At all relevant times, the market for Sempra's common stock was an efficient market for the following reasons, among others:

(a) Sempra's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b) Sempra communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Sempra was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Sempra was reflected in and incorporated into the Company's stock price during the Class Period.

183. As a result of the foregoing, the market for Sempra's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Sempra's stock price. Under these circumstances, all purchasers of Sempra's common stock during the Class Period suffered similar injury through their purchase of Sempra's common stock at artificially inflated prices, and a presumption of reliance applies.

184. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not

a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**M. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

185. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

186. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

187. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Sempra and/or SoCalGas who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

188. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sempra securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

189. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sempra securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sempra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 28, 2015, the date of the Company's last quarterly or annual report within the Class Period, there were 248,210,449 shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

190. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

191. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

192. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sempra;

(c) whether SoCalGas and/or the Individual Defendants caused Sempra to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Sempra's securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

193. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

## COUNT I
## Against All Defendants
## for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

194. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

195. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

196. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sempra securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Sempra's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

197. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sempra's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and the Gas Leak.

198. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

199. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Sempra's internal affairs.

200. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors

of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sempra's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sempra's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company and the Gas Leak which were concealed by defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Sempra's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

201. During the Class Period, Sempra's securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sempra's securities at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Sempra's securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of Sempra's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

202. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

## Against the Individual Defendants and Sempra for Violations of Section 20(a) of the Exchange Act

204. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

205. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Sempra's misstatements regarding the Gas Leak.

206. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Gas Leak, and to correct promptly any public statements issued by Sempra which had become materially false or misleading.

207. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sempra disseminated in the marketplace during the Class Period concerning the misrepresentations.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sempra to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sempra's securities.

208. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sempra to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

209. During the Class Period, Sempra participated in the operation and management of SoCalGas, and conducted and participated, directly and indirectly, in the conduct of SoCalGas' business affairs. Because of Sempra's control over SoCalGas through its ownership structure and overlapping management, Sempra knew the adverse non-public information about SoCalGas' misstatements regarding the Gas Leak.

210. Sempra, as the parent company and controlling stockholder of SoCalGas, had a duty to disseminate accurate and truthful information with respect to the Gas Leak, and to correct promptly any public statements issued by Sempra which had become materially false or misleading.

211. Because of its position of control and authority as SoCalGas' parent company, Sempra was able to, and did, control the contents of the various reports,

press releases and public filings which SoCalGas disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, Sempra exercised their power and authority to cause SoCalGas to engage in the wrongful acts complained of herein. Sempra therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, Sempra participated in the unlawful conduct alleged which artificially inflated the market price of Sempra's securities.

212. Sempra, therefore, acted as a controlling person of SoCalGas. By reason of its status as the parent company and controlling stockholder of SoCalGas, Sempra had the power to direct the actions of, and exercised the same to cause, SoCalGas to engage in the unlawful acts and conduct complained of herein. Sempra exercised control over the general operations of SoCalGas and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

213. By reason of the above conduct, the Individual Defendants and/or Sempra are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company and/or SoCalGas.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs and additional named Plaintiff Plumley as the Class representatives;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: July 25, 2016

/s/ Adam C. McCall
**LEVI & KORSINSKY LLP**
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Fax: (202) 333-2121
Email: amccall@zlk.com

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt (DC 457611) (NY 2798460)
Adam M. Apton (DC 1017720) (NY 4759841)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
*pro hac vice to be submitted*

***Attorneys for Stephen Graham and Co-Lead Counsel for Plaintiffs***

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210

Telephone: (818) 532-6499
Email: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman (NY 4161352)
Matthew L. Tuccillo (NY 5008750)
J. Alexander Hood II (NY 5030838)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (NY 2212736)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Richard Berkowitz and Co-Lead Counsel for Plaintiffs***

**GOLDBERG LAW PC**
Michael Goldberg (SBN 188669)
Brian Schall (SBN 290685)
13650 Marina Pointe Dr.. Ste. 1404
Marina Del Rey, California 90292
Phone: 800-977-7401
Fax: 800-536-0065
Email: michael@goldberglawpc.com
Email: brian@goldberglawpc.com

***Attorneys for Richard Berkowitz***

**CERTIFICATE OF SERVICE**

I, Adam C. McCall, hereby declare under penalty of perjury as follows:

On July 25, 2016, I electronically filed the foregoing complaint with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on July 25, 2016.

/s/ Adam C. McCall

Adam C. McCall

4842-0359-8389, v. 1