

FILED

17 JUN 20 PM 2: 12

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MXN     DEPUTY
BY:

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG M. PLUMLEY, individually and on behalf of all others similarly situated, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SEMPRA ENERGY, et al., <br><br> Defendants. | Case No.: 3:16-cv-00512-BEN-AGS <br><br> **ORDER:** <br><br> **(1) DENYING PLAINTIFFS' MOTION TO FILE A SUR-REPLY;** <br><br> **(2) DENYING DEFENDANT SOUTHERN CALIFORNIA GAS COMPANY'S MOTION TO DISMISS FOR LACK OF STANDING; and** <br><br> **(3) GRANTING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT WITHOUT PREJUDICE FOR FAILURE TO STATE A CLAIM** |

Before the Court is the Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC") filed by Defendants Sempra Energy, Debra L. Reed, and Joseph A. Householder, which was joined by Defendant Southern California Gas Company. (Docket Nos. 29, 35.) Plaintiffs have also filed a Motion for Leave to File a Sur-Reply in Further Opposition to Southern California Gas Company's Joinder in Defendants'

Motion to Dismiss. (Docket No. 49.) The Motions are fully briefed, and the Court held a hearing for oral arguments. For the reasons set forth below, Plaintiffs' Motion to File Sur-Reply is **DENIED,** Southern California Gas's Motion to Dismiss for Lack of Standing is **DENIED**, and Defendants' Motion to Dismiss for Failure to State a Claim is **GRANTED without prejudice**.

## BACKGROUND[1]

Defendant Sempra Energy ("Sempra") is a publicly traded energy-services holding company whose operating units invest in, develop, and operate energy infrastructure, and provide gas and electricity services to customers in North and South America. During all time periods relevant to this lawsuit, Defendant Debra L. Reed ("Reed") served as Sempra's Chairwoman and Chief Executive Officer ("CEO"), and Defendant Joseph A. Householder ("Householder") served as Sempra's Chief Financial Officer ("CFO") and Executive Vice-President.

Defendant Southern California Gas Company ("SCG") is one of Sempra's operating units. SCG is a natural gas distribution utility and operates over 20,000 square miles throughout Central and Southern California. SCG's operations includes the storage of natural gas. It owns four natural gas storage facilities, the largest located at the Aliso Canyon facility ("Aliso Canyon"). Aliso Canyon contains approximately 115 underground wells. This putative securities class action arises out of a natural gas leak at Aliso Canyon, from a well identified as "SS-25."

**A.    SCG'S December 2010 and November 2014 Rate Increase Applications**

SCG is regulated by the California Public Utilities Commission ("CPUC"). SCG must apply for and obtain the CPUC's approval prior to increasing its rates to consumers. In December 2010, SCG submitted a rate increase application based on the need for

---

[1] The Court is not making any findings of fact, but rather, summarizing the relevant allegations of the FAC for purposes of evaluating Defendants' Motion to Dismiss.

2

1  capital improvements, including replacement of safety valves on wells at Aliso Canyon.
2  In support of this application, SCG Storage Engineering Manager James D. Mansdorfer
3  testified that "[m]any valves (block, well site, safety, etc.) in the Storage Field are leaking
4  and new ones cost less than or equal to the cost of repair." (FAC ¶ 36.) Mr. Mansdorfer
5  further testified that "[t]his project will replace approximately 5% of the larger field
6  valves every year (e.g. replace valves approximately every 20 years)." (*Id.*) The CPUC
7  approved SCG's December 2010 application, but neither Sempra nor SCG replaced SS-
8  25's valves.

9       In November 2014, SCG submitted a rate increase application based on the
10  purported need to inspect and repair old wells at Aliso Canyon on a more systemic basis.
11  In support of this application, SCG Director of Storage Phillip Baker testified that:

> Historically, safety and risk considerations for wells and their
> associated valves and piping components have not been
> addressed in past rate cases to the same extent that distribution
> and transmission facilities have been under the Distribution and
> Transmission integrity management programs.

16  (FAC ¶¶ 39, 40.) Mr. Baker also testified that:

> Without a robust program to inspect underground storage wells
> to identify potential safety and/or integrity issues, problems
> may remain undetected within the high pressure above-ground
> wellhead, pipe laterals (up to 3,600 psig), and below-ground
> facilities (up to 4,400 psig) among the 229 storage field wells.
> This situation is evidenced by an increase in recent years in the
> type of work related to safety conditions observed as part of
> routine operations. This concern is further amplified by the
> age, length, and location of the wells. Some [SCG] wells are
> more than 80 years old with an average age of 52 years. In
> addition, some wells are located within close proximity to
> residential dwellings or high consequence areas.

26  (*Id.* ¶ 40.) He also stated that "a negative well integrity trend seems to have developed
27  since 2008." (*Id.* ¶ 41.)

28

3

In addition, SCG presented information that surveys conducted in its storage wells from 2008 to 2013 "identified casing corrosion, or mechanical damage in 15 wells. . . . [SCG] has storage wells in service that are more than 70 years old. Half of the 229 storage wells are more than 57 years old as for July 2014." (*Id.* ¶ 42.) Mr. Baker concluded that, without implementation of the proposed Storage Integrity Management Program ("SIMP"), SCG would "continue to operate in a reactive mode (with potential for even higher costs to ratepayers) to address sudden failures of old equipment." (*Id.* ¶ 43.)

**B. The October 23, 2015 Gas Leak in Aliso Canyon**

Sempra/SCG[2] discovered the Aliso Canyon gas leak at the SS-25 well on or about October 23, 2015, when residents in the nearby Porter Ranch neighborhood reported what they believed to be a home with a major gas leak. Sempra/SCG did not immediately report the gas leak to the appropriate government agencies as required by law. Instead, SCG "went door-to-door reassuring residents that all was under control and that no danger existed." (*Id.* ¶ 50.) Three days later, on October 26, 2015, Sempra/SCG reported the gas leak to the appropriate authorities.

The gas leak released "significant quantities of natural gas containing methane, tert-butyl mercaptan, and tetrahydrothiophene," as well as several "federally-listed hazardous air pollutants." (*Id.* ¶ 49.) Some Porter Ranch residents reported physiological symptoms such as nausea, vomiting, dizziness, nosebleeds, and headaches. Thousands of families were relocated to escape the odor and adverse health effects, and the community's schools were transferred to alternative facilities.

---

[2] The FAC is at times inconsistent as it appears to equate Sempra's actions with SCG's actions, and vice versa. (*See e.g.* "[SCG] did not report the Gas Leak to authorities until October 26, 2015. Sempra's three-day delay in reporting the Gas leak was in direct contravention of the law, which required Sempra to report it immediately." FAC ¶ 50-51.) When the allegations appear inconsistent as to which entity Plaintiffs are attributing conduct/statements, the Court refers to the entity as "Sempra/SCG."

4

The gas leak persisted for months. On December 4, 2015, Sempra/SCG began constructing a relief well. On January 6, 2016, Governor Brown declared a state of emergency (the "Proclamation") regarding the gas leak. The Proclamation directed additional immediate actions to respond to the leak, and ordered a comprehensive independent review of the safety of the storage wells and the air quality of the surrounding community. The Proclamation also charged SCG with payment of the costs related to the gas leak, as well as the funding of a program to mitigate the emissions. Sempra/SCG sealed the gas leak on February 18, 2016.

Sempra and SCG have been jointly or separately named as defendants in at least 138 lawsuits related to the gas leak. A number of state and federal agencies, including the CPUC, the U.S. Environmental Protection Agency, and the California Attorney General's office have investigated, or are continuing to investigate, Sempra's and/or SCG's conduct before and during the gas leak. The CPUC and the California Department of Conservation's Division of Oil, Gas, and Geothermal Resources commissioned Blade Energy Partners, a third-party investigator, to conduct a root cause analysis of the gas leak. To date, the report has not been completed. (Tr. of Mot. to Dismiss Hearing on January 11, 2017 at 39:10-18.)

## LEGAL STANDARD

The FAC claims violations of Section 10(b) and 20(a) of the Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5.[3] To state a securities

---

[3] Section 10(b) of the Exchange Act makes it unlawful to:

use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to that section, the SEC promulgated Rule 10b-5, which makes it unlawful to "make any untrue statement of a material fact or to omit to state a

5

fraud claim, a plaintiff must plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase and sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Reese v. Malone*, 747 F.3d 557, 567 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 14-16814, 2017 WL 1753276, at *10 (9th Cir. May 5, 2017).

All factual allegations are accepted as true and "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[4]

Securities fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of

---

material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), states that a person who:
> directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such a controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Section 20(a) claims may be dismissed summarily if, as here, the plaintiff fails to adequately plead a primary violation of Section 10(b). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

[4] The Court grants Defendants' Request for Judicial Notice as to all documents relied on or referred to in the FAC, and other publicly available financial documents, including Sempra's, Reed's and Householder's SEC filings. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006) (SEC filings subject to judicial notice).

6

1   1995 ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir.
2   2012). Under Rule 9(b), plaintiffs must "state with particularity the circumstances
3   constituting fraud." *Id.* "In passing [the PSLRA], Congress 'significantly altered
4   pleading requirements in securities fraud cases by . . . requiring that a complaint plead
5   with particularity both falsity and scienter.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d
6   1046, 1052 (9th Cir. 2014) (quoting *Zucco Partners*, 552 F.3d at 990-91). "A plaintiff
7   must 'state with particularity both the facts constituting the alleged violation, and the
8   facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or
9   defraud.'" *Tellabs*, 551 U.S. at 313 (describing these pleading requirements as "among
10  the control measures Congress included in the PSLRA."). "Rule 9(b) applies to all
11  elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret.*
12  *Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

## DISCUSSION

14      Defendants Sempra, Reed, and Householder filed a motion to dismiss for failure to
15  state a claim. (Docket No. 29.) Defendant SCG filed a joinder in Defendants' motion to
16  dismiss, and moved for dismissal on a separate ground that Plaintiffs lacked standing to
17  bring claims against it. (Docket No. 35.) After filing oppositions to both dismissal
18  motions, Plaintiffs subsequently moved to file a sur-reply to SCG's joinder in
19  Defendants' motion. (Docket No. 49.) The Court addresses each motion in turn.

20  **I.    Plaintiffs' Motion to File Sur-Reply**

21      Plaintiffs move to file additional briefing to further support their opposition to
22  SCG's joinder in the motion to dismiss as untimely. (Docket No. 49.) SCG maintains
23  that it timely filed its notice of joinder. A review of the action's procedural history
24  indicates SCG's joinder was timely.

25      On February 29, 2016, Plaintiff Craig M. Plumley filed the initial Complaint.
26  (Docket No. 1.) On June 6, 2016, the Court appointed Plaintiffs Steven Graham and
27  Richard Berkowitz as Co-Lead Plaintiffs. (Docket No. 17.) Plaintiffs filed their

28

consolidated First Amended Complaint ("FAC") on July 26, 2016. (Docket No. 22.) At that time, all defendants except SCG had executed waivers of service. (Docket Nos. 9-11.) On August 10, 2016, following multiple joint requests for extensions of time, the Plaintiffs and Defendants Sempra, Reed, and Householder filed another joint motion to modify the Court's scheduling order. (Docket No. 24.) The motion was granted in part on August 16, 2016, and the moving defendants were ordered to respond to the FAC by September 12, 2016. (Docket No. 26.) Defendants Sempra, Reed, and Householder timely filed the pending motion to dismiss on September 12, 2016. (Docket No. 29.)

Plaintiffs' sent SCG a request for waiver of service on August 2, 2016. (Docket No. 25.) SCG executed the waiver on August 10, 2016, and the waiver was filed with the Court on August 12, 2016. Thus, barring any other stipulation, SCG had sixty days from the date the waiver of service was sent (i.e., October 1, 2016) to respond to the FAC. Fed. R. Civ. P. 4(d)(3). On September 15, 2016, three days after Defendants' filed their motion to dismiss, SCG filed a one-page notice of joinder in the motion to dismiss. (Docket No. 35.) In two paragraphs, SCG moved to join in the pending motion to dismiss and assert an additional argument that Plaintiffs lacked standing to assert a claim against SCG. (*Id.*) Subsequently, Plaintiffs filed two separate oppositions, one directed against the motion to dismiss, and one directed against SCG's notice of joinder. (Docket Nos. 38, 41.) The opposition to SCG's joinder motion raised both procedural and substantive arguments. (Docket No. 41.) SCG filed its reply to Plaintiffs' opposition, to which Plaintiffs filed the instant motion to file a sur-reply. (Docket No. 46.)

Plaintiffs' sur-reply argues that the Court's August 16, 2016 Order required SCG to respond by September 12, 2016. However, Plaintiffs ignore the fact that SCG was not identified as a moving party in the August 10, 2016 motion for modification of the

scheduling order.[5] (Docket No. 24.) As noted above, SCG was not required to respond to the FAC until October 1, 2016 pursuant to Rule 4(d)(3) of the Federal Rules of Civil Procedure. Further, even if SCG's joinder motion was untimely, the Court may consider it "to secure the just, speedy, and inexpensive determination" of the action. Fed. R. Civ. P. 1. The Court finds consideration of SCG's joinder would promote the just, speedy, and inexpensive determination of this action. Moreover, the Court finds Plaintiffs do not appear to have suffered any prejudice considering they provided a robust opposition to the single paragraph of argument. Accordingly, Plaintiffs Motion to File Sur-Reply is **DENIED**.

## II. SCG's Motion to Dismiss for Lack of Standing

SCG contends it should be dismissed from the case because Plaintiffs do not have standing to bring claims against it. The Court disagrees.

It is well established that "[o]nly a purchaser or seller of securities has standing to bring an action under section 10(b) and Rule 10b–5." *Binder v. Gillespie*, 184 F.3d 1059, 1066 (9th Cir. 1999) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749 (1975)). SCG asks the Court to stretch *Binder*'s holding and find Plaintiffs lack standing to pursue section 10(b) and Rule 10b-5 claims against SCG because they did not allege that they purchased SCG stock. But *Binder* does not support such a requirement.

In *Binder*, the Ninth Circuit upheld summary judgment because the plaintiff did not have standing to bring claims against individual defendants. *Id.* Specifically, the court concluded that the plaintiff lacked standing because he did not purchase or sell any stock in connection with the defendants' alleged omissions or misrepresentations. *Id.* ("We agree with the district court that summary judgment was appropriate for Wilson,

---

[5] Although the Court's docket reflects that the motion was filed by Sempra and SCG, the actual document filed reflects that only Plaintiffs, Sempra, Reed, and Householder jointly moved for modification of the scheduling order. (Docket No. 24.) Indeed, the motion expressly defines "Defendants" as Sempra, Reed, and Householder. (*Id.* at 2.)

9

Stevens, and Fitchey. None of these defendants had any role in AVBC prior to Binder's purchase of stock . . . A cause of action under section 10(b) applies only to misrepresentations or omissions made 'in connection with the purchase or sale of any security.' 15 U.S.C. § 78j(b).").  The *Binder* court did not suggest that a plaintiff asserting a claim under section 10(b) or Rule 10b-5 only has standing to sue the company it purchased shares from.  Rather, the court reiterated the principle that "[s]hareholders 'who did no more than retain their shares[] are . . . barred by the purchaser-seller rule from maintaining an action under Rule 10b-5.'" *Binder*, 184 F.3d at 1066.

Additionally, as Plaintiffs pointed out in their opposition, at least two courts have allowed a plaintiff to pursue section 10(b) or Rule 10b-5 claims against a subsidiary who is the alleged source of misleading information. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 466-67 (S.D.N.Y. 2005); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 408 (S.D.N.Y. 1998).  Where, as here, a plaintiff alleges it relied upon a third-party's (i.e. SCG's) materially false statements or omissions in connection with the purchase or sale of securities (i.e. Sempra stock), he or she has sufficiently pled facts to demonstrate standing. 15 U.S.C. § 78j(b).  Accordingly, SCG's motion to dismiss for lack of standing is **DENIED**.

## III. Defendants'[6] Motion to Dismiss for Failure to State a Claim

Defendants argue that the FAC fails to sufficiently allege any materially false or misleading statements or scienter.  The Court agrees.

### A.   Materially False or Misleading Statements

"The complaint must plead *specific* facts indicating why any alleged misrepresentation was false or any omission rendered a representation misleading." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (emphasis added).

---

[6] Having found SCG may join in the motion to dismiss filed by Defendants Sempra, Reed, and Householder, the Court's reference to "Defendants" in this section also includes SCG.

10

1   Plaintiffs allege two categories of statements that were allegedly false or misleading: (1)

2   pre-Aliso Canyon gas leak statements, and (2) post-Aliso Canyon gas leak statements.

3                    1.    Pre-Aliso Canyon Gas Leak Statements

4        Plaintiffs identify numerous allegedly false or misleading statements that were

5   made prior to the Aliso Canyon gas leak, including statements that emphasize

6   Sempra's/SCG's focus on and commitment to safety and the speed of SCG's response

7   time in the event of a natural gas leak. Examples include: 1) SCG's "utilities exhibit

8   consistent attention to safety and security in everyday operations. One of [SCG's] stated

9   core values is, 'Treat safety as a way of life.' At all levels within [SCG] . . . we pay

10  significant attention to the development of structures, roles and processes to address the

11  risks associated with our operations and facilities " (FAC ¶ 68)[7]; 2) "[I]n the event that an

12  unintentional release of natural gas occurs, the public and emergency responders are

13  prepared and the consequence of the release minimized" (*id.*); 3) "Whenever a well may

14  pose a safety risk, we act immediately to address the problem" (*id.*); and 4) "It is our

15  practice to respond promptly when we receive calls from customers regarding a natural

16  gas leak. . . . We believe that our system is safe. . . . We meet or exceed all federal and

17  state requirements for safe pipeline operations and maintenance, including ongoing

18  technical training and testing for employees." (*Id.* ¶ 71).

19       Plaintiffs further allege that SCG's "Aliso Canyon Safety Plan," a document

20  published on SCG's website since at least May 12, 2015, contains false or misleading

21  statements such as: 1) "Aliso is committed to comply with applicable international,

22  federal, state and local health and safety laws and requirements" (*id.* ¶ 72); 2) "Aliso

23  Canyon is committed to ensuring the safety of our employees and protecting and

24  conserving the environment, customers, and the communities" (*id.*); and 3) "VALVE

25

26  _____

27  [7] The Court has removed all original emphasis when quoting the FAC in this section for
28  ease of reading.

                                    11

MAINTENANCE: [SCG] performs maintenance and inspection activities on all valves that may be necessary for the safe operation of its natural gas system" (*id.* ¶ 73).

In essence, Plaintiffs contend that all of these types of statements were false or misleading because Sempra/SCG did not contemporaneously disclose that SS-25 lacked a safety valve.[8] Therefore, Plaintiffs conclude, all of Defendants' statements regarding the condition of SCG's natural gas storage facilities, Sempra's/SCG's compliance with federal, state and local health and safety laws and regulations, and Sempra's executive's statements regarding Sempra's/SCG's earnings were also fraudulent or misleading. Defendants argue that SCG disclosed the conditions of its facilities and the associated risks, that the safety-related statements were true or are not specific enough to be actionable, and that the omission of SS-25's lack of safety valve was immaterial. Because Plaintiffs rely on the same alleged facts for almost all of the alleged misrepresentations in this category, the Court will only address the substance of Plaintiffs' proffered support once.

Both parties cite to *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712 (S.D. Tex. 2012) to support their respective positions. In *BP*, the district court found "general statements about BP's 'commitment to safety,' prioritization of 'process safety performance,'. . . and desire to become a 'world leader in process safety'" were "too squishy, too untethered to anything measureable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.* at 756-57. On the other hand, it found specific and measurable statements sufficient to survive a motion to dismiss. *Id.* at 757-58. ("Many of Plaintiffs' allegations in this category are statements that refer to progress in process safety as measured against the metrics set forth in the Baker Report's recommendations. . . . The Baker Panel recommendations did not leave BP with a

---

[8] Indeed, Plaintiffs cite almost identical facts, if not replicate the same paragraph, as evidence of falsity of each statement in this category.

12

"squishy" mandate. To the contrary, the Panel's number one recommendation . . .
required BP's corporate management to 'demonstrate their commitment to process safety
by articulating a clear message on the importance of process safety and matching that
message both with the policies they adopt and the actions they take.' . . . Plaintiffs'
allegations raise a triable issue as to whether BP followed through on the latter portion of
the Baker Panel's recommendation, which required BP to match the message with
policies and actions.")

The Court finds that the FAC's alleged fraudulent or misleading statements
regarding its commitment to or prioritization of safety, and all similarly alleged
statements, are too nonspecific and unmeasurable to state a claim for securities fraud.
Unlike the statements the *BP* court found actionable, Plaintiffs have not identified any
metrics, reports, recommendations, etc., from which SCG's actions may be compared to.
The alleged misrepresentations are more akin to corporate puffery, which are not
actionable. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060
(9th Cir. 2014) (internal citation omitted) ("Statements of mere corporate puffery, 'vague
statements of optimism like 'good,' 'well-regarded,' or other feel good monikers are not
actionable because 'professional investors and most amateur investors as well, know how
to devalue the optimism of corporate executives.'"). In sum, none of these alleged
misstatements or omissions resemble quantifiable statements upon which a reasonable
investor would rely in deciding whether to purchase or sell a security. *See BP*, 843 F.
Supp. 2d at 756-57.

As to the FAC's allegations that SCG made fraudulent or misleading statements
that it maintained its facilities in accordance with state and federal regulations because
SS-25 lacked a safety valve, Plaintiffs acknowledged at oral argument that an
investigation into SS-25's natural gas leak was still ongoing. Plaintiffs also
acknowledged that they were unaware of any fines assessed against any Defendants
either for: 1) the lack of safety valve on SS-25, or 2) other noncompliance with applicable

13

laws and regulations. As a result, Plaintiffs' allegation that SS-25 was required to have a safety valve is an assumption or a legal conclusion. Without any additional facts to support this claim, the Court determines Plaintiffs have not sufficiently plead facts to demonstrate how Defendants' statements regarding their compliance with applicable laws and regulations were false or misleading.

Additionally, Plaintiffs have not established how the nondisclosure of SS-25's lack of safety valve was material. In considering materiality, the Court must decide "whether a *reasonable* investor would have viewed the nondisclosed information, 'as having *significantly* altered the total mix of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (emphasis in original)). The Ninth Circuit has stated that "[t]o be actionable under the securities laws, an omission must be misleading . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Police Ret. Sys., supra*, 759 F.3d at 1061 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Here, Plaintiffs' FAC indicates SCG disclosed the conditions of the Aliso Canyon wells and their valves prior to SS-25's leak. First, Plaintiffs allege that, in December 2010, SCG submitted an application for a rate increase with the CPUC. To support the rate increase application, SCG's then Storage Engineering Manager James D. Mansdorfer "testified that many valves, including safety valves, in the Aliso Canyon facility required a number of capital improvements." (FAC ¶ 36.) Mr. Mansdorfer further testified that "Many valves (block, well site, safety, etc.) in the Storage Field are leaking and new ones cost less than or equal to the cost of repair. *This project will replace approximately 5% of the larger field valves every year* (e.g. replace valves approximately every 20 years)." (*Id.*) (emphasis added). Thus, at the time of SS-25's October 23, 2015 natural gas leak occurred, investors presumably were aware that, at most, 20% of the Aliso Canyon well valves would have been replaced (i.e. 5% a year beginning in 2011).

14

Second, Plaintiffs also allege that, in November 2014, SCG submitted another rate application increase to the CPUC, wherein SCG presented information that:

> Ultrasonic surveys conducted in storage wells as part of well repair work from 2008 to 2013 identified internal/external casing corrosion, or mechanical damage in 15 wells. . . . In addition to the 36 well-related conditions . . . , and the corrosion or mechanically damaged wells that were previously identified, [SCG] has 52 storage wells in service that are more than 70 years old. Half of the 229 storage wells are more than 57 years old as of July 2014.

(FAC ¶ 42.) To "rectify these conditions," Director of Storage Phillip Baker indicated that a rate increase was necessary to implement a Storage Integrity Management Program ("SIMP"). (*Id.* ¶ 43.) ("Given the increasing trend in well integrity repairs, the corrosion threats that have been detected in some wells, the increasing age of the wells . . . the SIMP . . . is certainly justified.") Mr. Baker testified that, "[w]ithout the SIMP, [SCG] will continue to operate in a reactive mode (with the potential for even higher costs to ratepayers) to address sudden failures of old equipment." (*Id.*) Thus, it appears to the Court that Plaintiffs' own allegations contradict their claims that SCG failed to disclose the risks associated with its natural gas storage facilities, including the condition of the Aliso Canyon wells and their components.

Finally, Plaintiffs' FAC alleges SS-25 was one of 115 underground wells at Aliso Canyon, and that Aliso Canyon was one of four gas storage facilities owned by SCG. (FAC ¶¶ 30, 34.) The Court agrees with Defendants that, in light of the facts alleged in the FAC, requiring SCG or a similarly situated company to release specific information about the accoutrements of each individual well demands disclosures "with a level of granularity that the securities laws do not require because it would 'bury the shareholders in an avalanche' of information." *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 448-449 (1976). The Court notes that the Ninth Circuit has "expressly declined to require a rule

15

of completeness for securities disclosures because 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'" *Police and Ret. Sys.*, 759 F.3d at 1061 (quoting *Brody*, 280 F.3d at 1006).

In sum, Plaintiffs have not met their burden to show how the pre-Aliso Canyon gas leak statements were false, misleading, or material.

### 2. Post-Aliso Canyon Gas Leak Statements

Plaintiffs allegations regarding Sempra's/SCG's post-Aliso Canyon gas leak statements identify numerous statements which allegedly minimized the scope and risks the gas leak posed, and "creat[ed] a false sense that [Sempra/SCG] could address the Gas Leak before a state of emergency was declared."[9] (FAC ¶ 110.) Examples include: 1) "the leak does not pose an imminent threat to public safety" (*id.* ¶ 111)[10]; 2) "Scientists agree natural gas is not toxic and its odorant is harmless at the minute levels at which it is added to natural gas" (*id.*); 3) "We have assembled a world-class team of experts, and we are working as quickly as safety will allow to stop the leak" (*id.*); 4) "The leak continues to pose no threat to public safety as the site is confined to a localized, remote area" (*id.* ¶ 116); 5) "After considerable testing and analysis, we expect this situation to take another wear or longer to resolve" (*id.*); and 6) "We have experts taking air samples at multiple random locations to reassure the community that the air quality continues to be within safe levels" (*id.*). Plaintiffs also identify as false and misleading Sempra's/SCG's quarterly earnings announcements and earnings call from November 3, 2015,

---

[9] The FAC also alleges some of Sempra's/SCG's post-gas leak statements were misleading "for failure to tell investors that [Sempra/SCG] had not immediately reported the Gas Leak to authorities," which resulted in a criminal complaint by the Los Angeles District attorney. (FAC ¶ 113.) Because neither party addressed these statements in their briefings, the Court will not address the merits of the statement.

[10] The Court has removed all original emphasis when quoting the FAC in this section for ease of reading.

16

Sempra's/SCG's November 2015 Form 10-Q, and Defendants Reed and Householder's SOX certifications for the November 2015 Form 10-Q.

Effectively, Plaintiffs assert that all of these statements were false and misleading because Sempra/SCG did not disclose that SS-25 did not have a safety valve, the leak took longer than a week to resolve, and the gas leak posed a threat to human safety.[11] Defendants argue that its statements were accurate and truthful, and that Plaintiffs failed to plead with particularity how the November Form 10-Q and related SOX certifications were false, misleading, or material.

As to the statements that Sempra/SCG would work quickly to stop the gas leak, the Court agrees that Plaintiffs have not sufficiently plead facts to indicate that they were false or misleading. First, Sempra's/SCG's statements that they were "working as quickly as safety will allow to stop the leak" are not actionable because they are vague statements of optimism, i.e. inactionable corporate puffery. *See Police Ret. Sys.*, 759 F.3d at 1060. Plaintiffs' allegations may be sufficient if their complaint included factual allegations indicating Defendants failed to act at all, or even that their actions were delayed, *in response to the leak*. Instead, Plaintiffs merely allege Defendants were literally unable to work quickly due to SS-25's lack of a safety valve. This is an assumption that the Court need not assume is true, nor is it an inference supported by the factual allegations.

Second, to the extent that the FAC alleges that investors should have been advised that stopping the leak "would take materially longer and be substantially more difficult in light of the state of disrepair [SS-25] was already in prior to the Gas Leak," these allegations are contradicted by the FAC's earlier allegations. (FAC ¶ 114.) As discussed

---

[11] The Court notes that, similar to the pre-Aliso Canyon gas leak statements, Plaintiffs cite to the same, or nearly the same, alleged facts to support their assertions that the post-gas leak claims were fraudulent or misleading. As it determined above, the Court shall address the substance of the proffered support only once.

17

in the pre-Aliso Canyon gas leak statements section above, Sempra/SCG disclosed the conditions and attendant risks of the Aliso Canyon wells prior to the leak.

Third, the Court finds Plaintiffs' allegation that the inclusion of a safety valve on SS-25 would have prevented the gas leak or expedited stopping the gas leak is, at best, premature. As discussed above, the investigation surrounding SS-25's gas leak is still ongoing, and neither Sempra nor SCG have been sanctioned for the lack of safety valve on SS-25. Fourth, inasmuch as the FAC alleges investors were misled into believing Sempra/SCG could stop the leak before a state of emergency was declared, Plaintiffs fail to allege any facts to indicate Sempra or SCG ever made such a statement.

With respect to the statement that Sempra/SCG would stop the leak within a week, the Court finds the FAC does not allege that Defendants promised investors or the public that it would stop the gas leak within a week, or any other specific or measurable timeframe. Specifically, the FAC alleges that Sempra/SCG stated on October 30, 2015: "After considerable testing and analysis, we *expect* this situation to take another week *or longer* to resolve." (FAC ¶ 117) (emphasis added). Plaintiffs do not allege additional facts other than that SS-25 lacked a safety valve, the omission of which they claim "misled investors into believing that the Gas Leak would be fixed quickly and without incident." (FAC ¶ 117.) However, Plaintiffs did not allege other facts to support an inference that the inclusion of the safety valve on SS-25 would have allowed Sempra/SCG to stop the leak more expeditiously such that this statement was false or misleading.

Finally, as to the statements regarding the Aliso Canyon gas leak's threat to public safety, the Court agrees that the statements, as pled, were not false or misleading. The FAC alleges Sempra/SCG made several public statements that essentially assured the public that the Aliso Canyon gas leak did not pose a threat to public safety, while simultaneously expressing its "regret that the smell of the odorant in natural gas is unpleasant and that some people are sensitive to the odor," which may "bother some

18

people." (FAC ¶¶ 111, 116.) To support this claim, Plaintiffs allege "local residents immediately report[ed] headaches, nausea, and severe nosebleeds" and "[a]bout 50 children per day saw school nurses for severe nosebleeds" as a result of the gas leak. (*Id.* ¶ 112.) However, Plaintiffs do not allege contemporaneous facts to indicate when Sempra/SCG became aware of the residents' complaints.

In addition, Plaintiffs allege various "Air Pollutants"[12] were released, but do not allege a specific amount of Air Pollutants were released into the air or what amount would have triggered Sempra's/SCG's duty to report. Nor do they specifically allege when Sempra/SCG became aware of the presence of the Air Pollutants with respect to their statements regarding the threat to public safety. Specific factual allegations stating when Sempra/SCG became aware of the negative public health impact are critical in determining whether these statements were false or misleading. *See Lloyd, supra,* 811 F. 3d at 1206 ("The complaint must plead specific facts indicating why any alleged misrepresentation was false or any omission rendered a representation misleading.").

Finally, Plaintiffs' allegations that the November 2015 Form 10-Qs and related SOX certifications are also deficient for failure to plead with specificity. Plaintiffs generally allege that the November Form 10-Q was false or misleading because it "understat[ed] operation and maintenance expenses and capital expenditures, by failing to expend the funds necessary to update, repair, replace, and modernize the infrastructure at [SS-25] at Aliso Canyon." Yet Plaintiffs do not allege how much should have been spent (which may or may not be a material amount). Rather, Plaintiffs assert a conclusory assumption that "[h]ad [Sempra/SCG] properly updated and maintained its aging and deficient equipment, its capital expenditures and related expenses would have been

---

[12] The FAC collectively refers to "toluene (a reproductive toxin), benzene (a known carcinogen and reproductive toxin), hydrogen sulfides, sulfur dioxide, ethylbenzene (a carcinogen), and xylenes" as "Air Pollutants." (FAC ¶ 49.)

19

1 substantially higher and, by extension, its net income would have been lower." (FAC ¶
2 124.) The Court finds these general allegations are insufficient under the heightened
3 pleading standards required in securities fraud claims.

4   In sum, none of the alleged false or misleading statements pled in the FAC are
5 sufficient to state a claim for securities fraud. Even if they were, Plaintiffs' FAC must
6 still be dismissed for failing to meet their burden to allege scienter.

7   **B.   Scienter**

8   Under the PSLRA, a complaint must "state with particularity facts giving rise to a
9 strong inference that the defendant acted with the required state of mind." 15 U.S.C. §
10 78u-4(b)(2)(A). In this circuit, scienter is a mental state that includes the "intent to
11 deceive, manipulate, or defraud," and deliberate recklessness.[13] *City of Dearborn*
12 *Heights*, 2017 WL 1753276, at *10 (quoting *Schueneman v. Arena Pharm., Inc.*, 840
13 F.3d 698, 705 (9th Cir. 2016) (internal citation and quotation marks omitted)). A strong
14 inference of scienter must be "at least as compelling as any opposing inference one could
15 draw from the facts alleged." *Id.* (quoting *Tellabs,* 551 U.S. at 324)). The Ninth Circuit
16 has instructed that a court first "determine[s] whether any of the allegations, standing
17 alone, are sufficient to create a strong inference of scienter." *Id.* (quoting *N.M. State Inv.*
18 *Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)). If none of the
19 individual allegations are sufficient, a court then "conducts a 'holistic' review of the same
20 allegations to determine whether the insufficient allegations combine to create a strong
21 inference of intentional conduct or deliberate recklessness." *Id.*

22   The allegations in the FAC neither individually nor holistically support a strong
23 inference that Defendants *intentionally* acted with scienter. All of the FAC's scienter

24
25
26 [13] The Supreme Court has "not decided whether recklessness suffices to fulfill the scienter
   requirement." *Matrixx Initiatives*, 563 U.S. at 48 (noting the defendant did not challenge
27 the Court of Appeals determination that deliberate recklessness may satisfy the scienter
28 requirement).

20

allegations are based solely upon alleged inferences about the defendants' financial motive and opportunity based on their knowledge that SS-25 did not have a safety valve. Thus, the question before the Court is whether Plaintiffs have pled a compelling and cogent inference, at least as compelling as possible alternatives, that when Sempra/SCG submitted their rate increase applications and made statements regarding their commitment to safety, the scope of the Aliso Canyon gas leak and the risks it posed, Defendants were *deliberately reckless* in not disclosing that SS-25 lacked a safety valve. They have not.

"An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese, supra*, 747 F.3d at 569 (9th Cir. 2014) (internal citation omitted). Nevertheless, "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of *intentional or conscious misconduct*." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1053 (emphasis added).

As discussed above, the Court is not persuaded that the lack of safety valve on SS-25, as pled, constitutes a material omission by Sempra or SCG. However, even if it were, Plaintiffs have not alleged specific facts to demonstrate Sempra's or SCG's intentional or conscious misconduct. The FAC heavily relies on the allegation that SCG executive Rodger Schwecke "admitted" that SS-25's safety valve was removed in 1979 "due to difficulties finding a replacement part."[14] (FAC ¶ 54.) However, the FAC fails to allege any specific facts demonstrating any of the defendants' knowledge of an imminent gas leak, or a resulting risk in the increase in time to stop such a gas leak, due to the lack of safety valve. At best, the FAC alleges Sempra/SCG knew that SS-25 lacked a safety valve, and had financial motive and opportunity to omit this information from: 1) the

---

[14] By the Court's count, this fact is repeated approximately twenty-one times in the FAC.

2010 and 2014 CPUC rate increase applications, 2) public statements regarding the scope and health effects of the Aliso Canyon gas leak, and 3) statements regarding Sempra's/SCG's commitment to safety. These allegations, without more, are not sufficient to support an inference of scienter. *See City of Dearborn Heights*, 2017 WL 1753276, at *10 (factual allegations that merely show "a motive to commit fraud and an opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness").

As to the allegations against Defendants Reed and Householder, Plaintiffs allege Reed and Householder received shares of stock on January 4, 2016, two days prior to Governor Jerry Brown's Proclamation (which declared the Aliso Canyon gas leak a state of emergency). Reed received 140,852 shares, the largest amount of shares she had received since 2011, and Householder received 46,559 shares. On the same day, Reed sold 72,000 of the shares she had received, and Householder sold 22,798 shares of the shares he had received. The FAC alleges these stock sales evidence their scienter because Sempra's stock price declined the day after Governor Brown's Proclamation, and Reed and Householder would not have received as much money for their stock sales if they had waited until after the Proclamation was issued. The FAC further alleges "there is a strong inference that [Defendants Householder and Reed] knew that [Governor Jerry Brown's] Proclamation was about to be disclosed" because "Governor Brown's sister, Kathleen Brown serves on Sempra's Board and was compensated $235,000 in 2015." (FAC ¶¶ 160-61.)

The Court finds Plaintiffs have failed to allege facts to support a strong inference of the individual defendants' scienter. In *Ronconi v. Larkin*, the Ninth Circuit discussed that "not every sale of stock by a corporate insider shows that the share price is about to decline." 253 F.3d 423, 435 (9th Cir. 2001). For example, "[a] corporate insider may sell stock to fund major family expenses, diversify his portfolio, or arrange his estate plan. He may sell stock in a pattern that has nothing to do with any inside information,

22

such as selling stock twice a year when the college tuition for his children is due." *Id.* A plaintiff relying on suspicious stock sales to demonstrate scienter must allege that the sales were "unusual" or "suspicious." *Id.* (internal citation omitted) ("insider trading is suspicious only when it is 'dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information*'") (emphasis in original). A district court considers three factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*

In their motion to dismiss, Defendants argued that Reed and Householder's stock sales were neither unusual nor suspicious because the stock sales were consistent with their prior trading history. Defendants explained that Reed and Householder annually receive shares of Sempra stock as part of their compensation, a portion of which each of them immediate sells to pay for their respective federal income tax withholding liability. To support this explanation, Defendants provided copies of Reed's and Householder's Form 4s from 2013 to 2016, which were filed with the SEC, and a copy of the Form 4 filing instructions. Defs.' RJN Exs. I-O. The Form 4s indicate that on January 2, 2013, January 3, 2014, January 1, 2015, and January 4, 2016, Reed and Householder received shares of stock, which they immediately sold. Defs.' RJN Exs. I-N. Where the Form 4 asked for a "Transaction Code," Reed and Housholder elected code "F," which represents "Payment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3." (Defs.' RJN Ex. O.)

In their opposition, Plaintiffs argue that Defendants' consistent history of stock "sales to offset tax costs . . . is irrelevant" because *Ronconi* does not list a sale's 'purpose' as a factor to be considered." (Pls.' Opp'n at 22, n. 19.) This statement misinterprets the *Ronconi* factors, which requires a court to determine "whether the sales were consistent with the insider's prior trading history." *Id.*, 253 F.3d at 435. Here,

Defendants have established prima facie evidence of Reed's and Householder's consistent stock trading history.[15] Rather than directly rebut this evidence, Plaintiffs assert that, because Kathleen Brown, Governor Brown's sister, serves on Sempra's board, a reasonable inference may be drawn that Governor Brown told Ms. Brown that he was going to issue the Proclamation, that Ms. Brown told Reed and Householder that the Proclamation would be issued, that Reed and Householder sold their stock based on this information, and that Reed and Householder therefore must have known the omission of SS-25's lack of safety valve was false or misleading. The Court finds such an inference is not reasonable, much less compelling, in light of the complete absence of any facts, other than Ms. Brown's position on Sempra's board, to support the multiple accusations.

In sum, the Court finds Plaintiffs' FAC fails to state a claim for securities fraud. Having found Plaintiffs have not adequately pled a primary violation of Section 10(b), the Court also dismisses Plaintiffs' Section 20(a) claims. *See Zucco Partners, LLC*, 552 F.3d at 990. Accordingly, the FAC is **DISMISSSED**. However, the Court grants Plaintiffs leave to file an amended pleading.

### CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to File Sur-Reply is **DENIED**, Defendant Southern California Gas's Motion to Dismiss for Lack of Jurisdiction is **DENIED**, and Defendants' Motion to Dismiss for Failure to State a Claim is **GRANTED without prejudice**. Plaintiffs' shall have **twenty-one (21) days** from the date of this

---

[15] Inasmuch as Plaintiffs rely on their allegations about the amount of stock Reed and Householder sold as a comparison to a percentage of their annual compensations, the Court is not persuaded that these facts alone demonstrate scienter. For instance, it is reasonable to infer that if Reed "received her *largest-ever* stock award" she may very well need to sell "twice the Sempra shares she ever sold before" to pay for her expected tax liability, as she appears to have done in prior years. (Pls.' Opp'n at 21-22) (emphasis in original.)

24

Order to file a Second Amended Complaint that addresses the deficiencies identified in this Order.

**IT IS SO ORDERED.**

DATED: June 20, 2017

HON. ROGER T. BENITEZ
United States District Judge

3:16-cv-00512-BEN-AGS