1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Adam C. McCall (SBN 302130)
**LEVI & KORSINSKY LLP**
Email: amccall@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel:  (213) 985-7290

*Attorneys for Plaintiff Stephen Graham*
*and Co-Lead Counsel for Plaintiffs*

[*additional counsel on signature page*]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG M. PLUMLEY, STEPHEN GRAHAM, and RICHARD BERKOWITZ, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>SEMPRA ENERGY, SOUTHERN CALIFORNIA GAS COMPANY, DEBRA L. REED, and DENNIS V. ARRIOLA,<br><br>                    Defendants. | No. 3:16-cv-00512-BEN-RBB<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Roger T. Benitez |

Lead Plaintiffs Stephen Graham and Richard Berkowitz ("Lead Plaintiffs"), along with original named Plaintiff Craig Plumley (altogether with the Lead Plaintiffs, the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Second Amended Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included review and analysis of, *inter alia*: (a) filings made by Sempra Energy ("Sempra"), Southern California Gas Company ("SoCalGas"), and Individual Defendants Reed and Arriola with the United States Securities and Exchange Commission (the "SEC"); (b) Sempra's and SoCalGas's public documents, conference calls, and press releases, and Defendants' other public statements; (c) Sempra's stock chart; (d securities analysts' reports and advisories concerning Sempra and SoCalGas; (e) interviews with confidential witnesses; (f) press coverage of the Gas Leak (as defined below) at Aliso Canyon, Sempra's and SoCalGas's responses thereto, and the aftermath thereof; (g) scientific, governmental, and industry research, studies, and analyses as to the components of natural gas and as to the scope and effects of the Aliso Canyon Gas Leak, including its public health and environmental impacts; (h) complaints, pleadings, orders, and other materials from other criminal and civil litigation against Sempra and/or SoCalGas related to the Aliso Canyon Gas Leak; (i) laws and regulations pertinent to the operation of the Aliso Canyon facility and/or to the Aliso Canyon Gas Leak; (j) consultation with an expert in economic methane emissions reduction from the oil and gas industry, with over 48 years of relevant experience; and (k) other information readily obtainable on the Internet.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery. Most facts supporting the allegations herein are known only to the Defendants or are exclusively within their control, while

others are the subject of ongoing, non-public governmental investigations into the Gas Leak.

## NATURE OF THE ACTION

1.     This is a class action lawsuit brought by Plaintiffs on behalf of a class consisting of all persons or entities, other than Defendants, Sempra's directors and officers, and their families and affiliates, who purchased or otherwise acquired Sempra common stock between November 14, 2014 and January 7, 2016, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants' violations of the federal securities laws arise from one of the largest natural gas leaks in history that occurred at the Aliso Canyon storage facility owned and operated by Sempra and SoCalGas (the "Gas Leak").  The Gas Leak was purportedly discovered by SoCalGas on October 23, 2015.  As stated in Sempra's Form 10-K for the year ended December 31, 2016, filed with the U.S. SEC on February 28, 2017 (the "2016 10-K"), according to SoCalGas's calculations, the Gas Leak spewed approximately 4.62 billion cubic feet (Bcf) of natural gas, completely unrestrained, over four months. The California Air Resources Board ("CARB") said the Gas Leak released 99,650 metric tons (and possibly as much as 109,000 metric tons) of methane, enough to heat 190,000 Los Angeles homes for a year.  The Gas Leak resulted in physical injuries and property damage to thousands of nearby residents and businesses, as well as untold damage to the environment. Sempra and SoCalGas were responsible for the catastrophe, which has cost them over roughly ***$800 million*** as of March 31, 2017 – well more than the book value of Aliso Canyon itself – a figure that excludes unsettled damage claims, restitution, and civil, administrative, and/or criminal fines and penalties.

3.     Sempra owns and controls the SoCalGas, which is the nation's largest natural gas distribution utility, delivering natural gas to 21.6 million consumers through 5.9 million customer gas meters and operating over 20,000 square miles throughout Central and Southern California, from Visalia to the Mexican border.

4.     As part of its operations, SoCalGas stores billions of cubic feet of natural gas for customer delivery. SoCalGas owns four natural gas storage facilities with a combined working gas capacity of 137 Bcf. The Aliso Canyon facility is SoCalGas's largest storage facility, representing 63% of its natural gas reserves.

5.     Entering the Class Period, Aliso Canyon was an aging facility in need of various infrastructure upgrades, such that Sempra investors looked to Defendants for reassurances that it could be operated safely and that any incidents that might occur could be handled quickly and cheaply by Sempra and SoCalGas.

6.     Plaintiffs' claims in this lawsuit arise from Defendants' pre-leak misstatements and omissions about Sempra's and SoCalGas's ability to safely operate the Aliso Canyon gas storage facility and to respond to crises such as the Gas Leak and their post-leak misstatements and omissions about the public safety risks posed by the Gas Leak, Sempra's and SoCalGas's ability to end the Gas Leak, and the necessity of large-scale resident relocations until it was ended.

7.     Pre-leak, Defendants' misstatements and omissions concerned Aliso Canyon's safety, maintenance, and infrastructure, as well as Sempra's and SoCalGas's capabilities and policies regarding the plugging of any leaks.  For instance, in support of a November 2014 rate hike application to the California Public Utilities Commission ("CPUC"), SoCalGas submitted the testimony of Phillip Baker, its Director of Storage, who testified that "Whenever a well may pose a safety risk, we act ***immediately*** to address the problem. Alternatives, such as plugging and abandoning the well, versus a major repair or well replacement, are

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

evaluated based on [various] conditions, including the age of the well [and] prior repair or maintenance history…."  The Aliso Canyon Safety Plan, at least as of May 2015, reassured investors that "SoCalGas performs maintenance and inspection activities on *all* valves that may be necessary for the safe operation of its natural gas system" whereby "*valve operation is verified*" and "any issues requiring immediate action are to be addressed *right away*."  The SoCalGas website also stated as of November 2014, "It is our practice to respond *promptly* when we receive calls from customers regarding a natural gas leak."

8.      However, contrary to these and other similar pre-leak statements, the Wells at Aliso Canyon were aging and in a deteriorated condition, yet Defendants knowingly permitted *all* wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter. Further, Defendants knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection occurring in 1979).  SoCalGas also did not prioritize the wells with greatest vulnerability and need for valve replacement and critical upgrades, and thus did not address the known deficiencies in Well SS-25 despite the CPUC's approval of SoCalGas's 2010 rate increase application. These circumstances knowingly violated Sempra's and SoCalGas's legal obligations, including the Franchise Agreement governing Aliso Canyon, codified in Los Angeles County Ordinance No. 6765, which since 1955 required shutoff

valves to be installed to protect life and property in the event of a leak, and Public Resources Code §3219, which required SoCalGas as operator of the Well to equip it with casings of sufficient strength and such other safety devices as may be necessary to prevent blowouts.

9. The Gas Leak arose in Well SS-25, one of the aging wells that tapped directly into Aliso Canyon's massive natural gas reservoir but that lacked modern monitoring, safety, and shutoff equipment, including in particular an emergency shutoff or safety valve that would enable Sempra and SoCalGas to quickly and cheaply stop the flow of natural gas escaping from the Aliso Canyon reservoir into Well SS-25 or a sliding sleeve valve that would maintain the flow of gas inside of Well SS-25's internal pipe tubing, preventing any breaches or fissures in its internal pipe tubing to permit gas to escape into the well's casing or external components (from which it can leak to the outside). SoCalGas first discovered the unhindered release of natural gas through Well SS-25 on October 23, 2015, yet – contrary to Defendants' prior statements as to Sempra's and SoCalGas's policies – SoCalGas failed to report it to authorities for three days and failed to make any public announcement for five days.

10. The Gas Leak posed an immediate, serious, and ongoing public health and environmental crisis, immediately doubling the rate of methane emissions from the entire greater Los Angeles region, while causing widespread, serious health impacts from the release of toxic substances. Defendants learned of these health impacts very shortly after the Gas Leak began. Beginning on October 24, 2015, and continuing thereafter, South Coast Air Quality Management District ("SCAQMD") received over 2,000 complaints from the public living or working near the Gas Leak. A hearing at the Community School in Porter Ranch on November 4, 2015, drew 100 residents complaining of headaches, respiratory

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

problems, nosebleeds, and vomiting.  During the Gas Leak, some 200 people per month reported these symptoms to the Los Angeles County Department of Public Health ("L.A. DPH"), leading to over 1,800 complaints by the time the Gas Leak was plugged.  The L.A. DPH began tracking complaints by email on November 9, 2015 and by phone on November 20, 2015 from residents with complaints of symptoms.  Some of these complaints were directly logged with SoCalGas.  By December 2, 2015, over 1,000 complaints, and counting, had been received by the SCAQMD.

11.     Yet, in their first public comments on October 28, 2015 and continuing in a steady stream of at least *forty-five statements* thereafter, Defendants falsely reassured Sempra investors, local residents, and the public at large that the Gas Leak posed no health risks, that they could stop the Gas Leak quickly, and, later, that important protective measures like relocations of area residents were optional and voluntary, rather than necessary.  Indeed, over the course of over *forty-five* separate press releases, updates, and other public statements, Defendants said that "[t]he leak continues to pose *no threat* to public safety as the site is confined to a localized, remote area," "its odorant is *harmless* at the minute levels at which it is added to natural gas," "we are working as *quickly* as safety will allow to stop the leak…[and] we expect this situation to take *another week* or longer to resolve," and, later, that SoCalGas would "provide temporary accommodation for those who *want* to relocate until the leak is stopped."

12.     The disparity with Defendants' public statements continued as SoCalGas made eight failed top-kill attempts to halt the Gas Leak, failing to begin drilling a necessary relief well until 42 days after the Gas Leak had begun (and after six of the top-kill attempts).

13.     Finally, on January 6, 2016, the truth was revealed when California Governor Jerry Brown declared a state of emergency and imposed a multitude of emergency actions, causing Sempra's stock price to plummet from $92.00 per share to $87.00 per share on unusually high volume, a single-day $1.25 billion market capitalization loss.  In the wake of the Gas Leak, Sempra and/or SoCalGas have been named as defendants in over 250 criminal and civil lawsuits, including claims by over 22,000 plaintiffs, as of May 2017. As of March 31, 2017, SoCalGas recorded estimated leak-related costs of $799 million, a number that is still growing.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Sempra has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Lead Plaintiff Stephen Graham ("Graham") purchased Sempra common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Graham filed his

certification evidencing his transactions previously with the Court in connection with his motion for appointment as lead plaintiff. Graham's certification is incorporated herein by reference.

19.  Lead Plaintiff Richard Berkowitz ("Berkowitz") purchased Sempra common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Berkowitz filed his certification evidencing his transactions previously with the Court in connection with his motion for appointment as lead plaintiff. Berkowitz's certification is incorporated herein by reference.

20.  Plaintiff Craig Plumley ("Plumley") purchased Sempra common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plumley previously filed his certification evidencing his transactions with the Court. Plumley's certification is incorporated herein by reference.

21.  Defendant Sempra is a California corporation with its principal executive offices located at 101 Ash Street, San Diego, California 92101. Sempra's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SRE".

22.  Defendant SoCalGas is a California corporation, wholly-owned and controlled by Sempra. SoCalGas's principal place of business is 555 West 5th Street, Los Angeles, California 90013.

23.  Defendants Debra L. Reed ("Reed") served at all relevant times as Sempra's Chairman and Chief Executive Officer ("CEO").

24.  Defendant Dennis V. Arriola was, during the Class Period, SoCalGas's Chairman, President, and CEO.

25.   Defendants Reed and Arriola are sometimes referred to herein as the "Individual Defendants."   Sempra together with SoCalGas and the Individual Defendants are altogether referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Background Facts

### *Sempra's and SoCalGas's Operations, including Aliso Canyon*

26.   Sempra is a Fortune 500 energy-services holding company whose operating units invest in, develop and operate energy infrastructure, and provide gas and electricity services to North and South American customers. Sempra's operating units include San Diego Gas & Electric Company ("SDG&E") and Southern California Gas Company (SoCalGas). SDG&E and SoCalGas are separate, reportable segments whose statements at all relevant times were controlled by and authored by Sempra and the Individual Defendants, and were attributable to Sempra. Nearly all executive officers of SoCalGas have been an employee of Sempra for at least the five years preceding the Class Period.  Sempra indirectly owns all of the common stock of SoCalGas. SoCalGas has publicly-held preferred stock. The preferred stock has liquidation preferences totaling $22 million and represents less than 1% of the ordinary voting power of SoCalGas shares.

27.   SoCalGas is the nation's largest natural gas distribution utility. It owns and operates a distribution, transmission and storage system that supplies natural gas throughout its 20,000 square miles of service territory extending from San Luis Obispo, California, south to the Mexican border, excluding San Diego County, Long Beach, and the desert area of San Bernardino County.

28.   SoCalGas provides natural gas service to residential, commercial, industrial, utility electric generation and wholesale customers through 5.9 million customer meters.  SoCalGas provides natural gas storage services for core, noncore and non-end-use customers. The California Utilities' core customers are allocated

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

a portion of SoCalGas's storage capacity. SoCalGas offers the remaining storage capacity for sale to others, including SDG&E for its non-core customer requirements, through an open bid process.  Sempra (through SoCalGas) is regulated by the CPUC, which among other things, regulates SoCalGas's rates and conditions of service, such that Sempra (through SoCalGas) must submit applications to CPUC for permission to increase its rates to consumers.

29.  SoCalGas owns four natural gas storage facilities, with a combined working gas capacity of 137 Bcf.  The largest of them, Sempra's Aliso Canyon facility, is the largest natural gas storage reservoir in California and one of the largest such reservoirs in the U.S.  By itself, Aliso Canyon has a capacity of 86.2 Bcf, accounting for 63% of SoCalGas's total capacity.  SoCalGas accounted for 29% of Sempra's 2014 revenues.  Aliso Canyon's wells are located one mile from the community of Porter Ranch and its 30,000 residents, and within a few miles of the residential communities of Chatsworth, Granada Hills, and Northridge.

30.  During the Class Period, the Aliso Canyon facility consisted of approximately 115 underground wells, with depths ranging from 6,997 feet to 10,691 feet. The well responsible for the leak at issue herein is referred to as "Standard Sesnon-25," or "SS-25", API03700776 (the "Well" or "Well SS-25"). Well SS-25 was used for both injecting natural gas into the Aliso Canyon reservoir and also withdrawing it for distribution to customers.

31.  Originally a depleted oil field from the 1950's, Aliso Canyon was placed into service as a natural gas storage facility in 1973 and provides storage for 86.2 Bcf of natural gas.  It is an enormous facility, serving 11 million customers and providing fuel to 17 natural-gas-fired power plants.  The gas stored at Aliso Canyon is not from the region. Rather, Sempra injects and stores the gas underground at Aliso Canyon, for subsequent distribution to customers.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

32.     Sempra and SoCalGas have known for many years that Aliso Canyon has been in need of repair. In December 2010, SoCalGas submitted an application with the CPUC requesting an average rate revenue increase of $308 million (7.4%) over then-current levels. In support of the application, former SoCalGas Storage Engineering Manager, James D. Mansdorfer, testified that: "Many valves (block, well site, safety, etc.) in the Storage Field are leaking and new ones cost less than or equal to the cost of repair. This project will replace approximately 5% of the larger field valves every year (e.g. replace valves approximately every 20 years)." Mr. Mansdorfer allocated an annual capital expenditure of just $898,000 for the "Aliso Canyon Valve Replacement Program."  He omitted to disclose the facts that Well SS-25 and the other wells at Aliso Canyon were altogether missing sliding sleeve valves (meant to redirect the flow of gas into an internal pipe) and safety or emergency shutoff valves (necessary to altogether stop the flow of gas in the event of a leak) and that Well SS-25's valves had in fact been ***removed*** in the 1970's and not replaced, purportedly due to the availability of replacement parts at that time.

33.     Despite the CPUC's approving the rate hike, Sempra and SoCalGas never repaired Well SS-25 or replaced its degraded components, including its missing sliding sleeve and subsurface safety valves.  Nor did they ever replace or install missing sliding sleeve and subsurface emergency shutoff valves on the other aging wells at Aliso Canyon.

### *The Valves Missing from the Aliso Canyon Wells, Including Well SS-25*

34.     Before the Gas Leak, ***none*** of the wells at Aliso Canyon – including Well SS-25 – were equipped with the valves necessary to operate the aging Aliso Canyon facility safely.

35.     Specifically, ***none*** of the wells at Aliso Canyon – including Well SS-25 – had been fitted with a surface-controlled safety or shutoff valve, despite the availability of such valves for many decades.  As early as the 1960's, Camco

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

International, Inc. ("Camco"), a company later acquired in the late 1990's by Schlumberger Ltd., introduced surface-controlled subsurface safety-valve (SCSSV) systems to supersede older subsurface-controlled safety valves that depended on downhole flow rates to operate and close.  This innovation became needed when energy markets changed in the 1970's and more production was demanded from wells, leading to difficulties in generating sufficient downhole flows to close older subsurface-controlled models.

36.    An SCSSV operates remotely through a control line that hydraulically connects the safety valve, up and through a wellhead, to an emergency shutdown system that has a hydraulic pressure supply.  If hydraulic pressure is lost, an SCSSV safety valve closes automatically through the action of an internal power-spring system, a normally-closed fail-safe design.  Such a design eliminated dependency on downhole flow conditions and permitted valves to be tested as desired or needed.

37.    Camco's flapper-valve model, which employed a door-like flapper opened or closed by a flow tube, became the most widely-used type of SCSSV.  An alternative was a ball valve, which employed a ball with a hole through it that permits or restricts the flow of gas based on whether the hole or the solid portion of the ball was rotated over the tubing.  Figures 1 and 2 below illustrate a flapper-valve SCSSV, while Figure 1 also illustrates a ball-valve SCSSV.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

1

Figure 1:

2

3

4

5

6



7

8

9

10

11

12

13

Figure 2:

14

15

16

17

18

19

20



21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

38.     According to a task force led by the U.S. Department of Energy ("DOE"), before the Gas Leak, Well SS-25 last had a casing inspection in 1979 and had a "complicated [natural gas] flow path due to slots in [its] tubing from removal of [a] subsurface safety valve."  This conclusion – that a subsurface "safety valve" had been in place on Well SS-25 but was removed by SoCalGas – was corroborated by Rodger Schwecke, a SoCalGas executive who helped coordinate the response to the Gas Leak.  During an interview by *L.A. Weekly*, published December 22, 2015, Schweke was asked about a "safety valve" and responded, "We removed that valve in 1979."  The *L.A. Times*, in an article published January 3, 2016, similarly reported that Schweke had said in a public meeting in late December 2015 that SoCalGas opted not to replace the safety valve on Well SS-25.

39.     After the Gas Leak, the California Governor's Office of Emergency Services ("OES") stated that Well SS-25 used to have a sliding sleeve valve, which is used to direct the flow of natural gas into the well's internal pipe rather than its external casing.  OES stated that, according to California Department of Conservation's Division of Oil, Gas, and Geothermal Resources ("DOGGR") records, Well SS-25's sliding sleeve valve stopped functioning in 1979 and was not replaced.

40.     It is undisputed that Well SS-25 lacked both an SCSSV or any other safety or shutoff valve and a sliding sleeve valve since at least 1979.  Sempra and SoCalGas simply opted not to replace them, despite SoCalGas's having requested and obtained regulatory permission to increase rates to replace leaking valves at the Aliso Canyon storage field in 2010.

41.     Defendants knew of the missing safety valve, yet authorized the decision to not replace it, to not upgrade Well SS-25, and to do nothing to remedy its degraded condition and its deficient safety mechanisms prior to the Gas Leak.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

They did so despite knowing that Well SS-25's casing was only partially cemented and that natural gas was regularly injected into Aliso Canyon's reservoir and withdrawn from it using both Well SS-25's internal tubing and its external casing.

42.     Significantly, Well SS-25 was hardly an outlier.  As would later be revealed, in the many months after the Class Period when Aliso Canyon was completely shut down by government order following the Gas Leak, Sempra and SoCalGas were required to test each and every well at Aliso Canyon.  The results were shocking: *sixty-five* wells were removed from service altogether due to their severely-degraded conditions, while ***nearly twenty more*** had their casings repaired. All wells not permanently taken out of service were to be retrofitted with upgraded safety technologies and leak detection and prevention equipment.

43.     The foregoing facts evidence Sempra's and SoCalGas's knowing violation of their legal obligations.   For instance, the Franchise Agreement governing Aliso Canyon, which is codified in Los Angeles County Ordinance No. 6765, has – since 1955 – required installation of shutoff valves to be installed to protect life and property in the event of a leak.  Similarly, Public Resources Code §3219 requires the operator of a well, wherein high pressure gas is known to exist, to equip that well with casings of sufficient strength and such other safety devices as may be necessary to prevent blowouts.

*The Gas Leak*

44.     In September 2015, SoCalGas injected 5.7 Bcf of gas underground near the residents of Porter Ranch.   Sometime in October 2015, SoCalGas was injecting what is believed to be similar amounts of gas when workers discovered the Gas Leak. Although SoCalGas claims to have discovered the Gas Leak on or about October 23, 2015, there is no certainty as to when the Gas Leak actually began, and on information and belief, it began even earlier.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

45.     State records indicated that Well SS-25 was used for gas injections on 197 out of the prior 237 days before the Gas Leak, including every day in October 2015 (state records indicate 24 days of injection in October, despite SoCalGas's claim to have halted injections as of October 23, 2015) – the highest rate of usage of the Well since 1978.  SoCalGas injected natural gas into the Aliso Canyon reservoir through Well SS-25 using both its internal tubing and its external casing, subjecting both to 2,600+ pounds of pressure per square inch.  This practice prevented SoCalGas from filling the space between the casing and the tubing with a protective brine that would have inhibited corrosion and helped stifle a leak.

46.     When the Gas Leak occurred, Aliso Canyon was filled almost to its 86 Bcf capacity with gas.  It became the largest natural gas leak in U.S. history and the worst U.S. environmental disaster since the 2010 *Deepwater Horizon* rig explosion and resulting oil spill in the Gulf of Mexico.  According to SoCalGas's calculations, as stated in Sempra's 2016 10-K, the Gas Leak released 4.62 Bcf of natural gas before it was stopped.

47.     According to the CARB, the Gas Leak caused the release of roughly 99,650 metric tons of flammable methane (and possibly as much as 109,000 metric tons).  Methane, when released, absorbs the sun's heat and traps it in the earth's atmosphere, and is a far more destructive greenhouse gas than others, such as carbon dioxide.  The Gas Leak became the biggest single source of methane emissions in all of California practically overnight. In just 114 days, the Gas Leak spewed the equivalent emissions of two coal-fired power plants for an entire year. Put another way, the Gas Leak's release of 100,000 metric tons of methane gas – over 1,200 tons per day during  the Gas leak – and 10 million tons of carbon dioxide was roughly the same amount of pollution produced by half a million cars in one year.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

48.    The following infrared image, taken December 17, 2015 (almost two entire months after the leak was discovered) illustrates the vast clouds of methane gas spewing from the Well:



49.    On November 5, 2015, Stephen Conley, an atmospheric scientist at the University of California, Davis, who founded Scientific Aviation, wished to conduct a low-altitude flight over Aliso Canyon to measure methane concentrations using a Picarro analyzer.    As a courtesy, he notified SoCalGas's director of environmental services, prompting a flurry of text messages from SoCalGas executives telling him that his flight would be unsafe and inappropriate – purportedly because it might distract workers on the ground, despite the fact that Porter Ranch lies in the flight path of Van Nuys Airport, where nearly 600 flights take off or land every day.    Mr. Conley asked whether flying one mile away, or at any distance, would be safe, but SoCalGas said no, forcing him to turn back.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

50.     These actions delayed third-party aerial measurements of the leaking methane until November 7, 2015, when Mr. Conley, under the authority of the California Energy Commission, conducted the first of 15 flights during the next four months.  That day, his Picarro analyzer registered 50 parts per million, which was ***twenty-five times*** higher than the normal reading of 2 parts per million.  By Thanksgiving 2015, he recorded a methane-emission rate of 58 metric tons per hour, which doubled the rate for the entire Los Angeles basin – meaning that Well SS-25 was itself producing more emissions than every power plant, oil and gas facility, airport, factory, smoke stack, and vehicle tailpipe in greater Los Angeles.

51.     SoCalGas's first attempts to stop the Gas Leak reportedly failed because the Well's safety valve had failed.  However, as described *supra*, Well SS-25's safety valve and its sliding sleeve valve had been removed in 1979.   In actuality, without these valves in place on an aged and deteriorated Well SS-25, Sempra and SoCalGas lacked any credible means of stopping the Gas Leak shy of drilling a relief well and plugging the Well with concrete.

52.     Figure 3 below indicates how the Gas Leak likely occurred, including the leaking of gas through a faulty pipe, and shows where the safety valve should have been placed. While the leak may have occurred towards the top of the internal gas pipe, which was capped, gas escaped, travelled down the concrete casing, and out through the casing's bottom around 990 feet below the surface. The safety valve should have been located around 8,500 feet below surface, near the gas reservoir, and could have closed off the gas pipe completely, thus preventing any gas from flowing upward out of the massive gas reservoir into the leaking pipe. Figure 4 below, taken from the SoCalGas website, illustrates how SoCalGas has, since the Gas Leak, retrofitted any remaining wells at Aliso Canyon so the inner pipe tubing maintains a closed sliding sleeve.  This retrofit accomplishes the same preventative

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

outcome as a sliding sleeve valve would have permitted during the Gas Leak, *i.e.*, directing the gas flow into the internal gas pipe rather than the external casing.

Figure 3:



SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

Figure 4:



SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

53.     Without either a safety or shutoff valve or a sliding sleeve valve on Well SS-25 before the Gas Leak began, in order to stop it, Sempra and SoCalGas tried *eight* separate top-kill attempts, between October 24, 2015 and December 22, 2015.   The DOE-led task force characterized these attempts as "increasingly aggressive" and found that they were counter-effective and actually "caused erosion and expansion of the vent."  In other words, they made the Gas Leak worse.

54.     Sempra and SoCalGas had no choice but to dig a relief well, as shown in Figure 2 above.  Work on the relief well *finally* began on December 4, 2015 - - *42 days after the Gas Leak was discovered* - - after *six* of the top-kill attempts had failed.  Given the absence of any safety or shutoff and sliding sleeve valves on the Well, a relief well was practically inevitable, but in any event, should have begun right after the Gas Leak was detected.  Outside experts criticized both the delay in setting up the relief well and the overly-large time estimate to complete it.  For instance, *L.A. Weekly* quoted Greg McCormack, an industry engineering expert, as stating on December 22, 2015, "They really should have started drilling that well as soon as they found out it was leaking.  They would be well on their way to being able to control the well."

55.     The relief well was finally completed February 18, 2016, when SoCalGas finally sealed the Gas Leak by injecting cement to displace mud and other liquids and effectively seal the Well on a permanent basis.

### Air Contamination and Release of Toxins by the Gas Leak

56.     In addition to methane, the Gas Leak released ethane and toxic additives like tert-butyl mercaptan ("mercaptan") and tetrahydrothiophene, which are added to natural gas to aid in detecting leaks.  The Gas Leak has also released large amounts of dangerous and harmful substances (collectively, the "Air Pollutants"), including: (a) several federally-listed hazardous air pollutants that are components of natural gas, including toluene (a reproductive toxin), benzene (a

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

known carcinogen and reproductive toxin), hydrogen sulfides, sulfur dioxide, ethylbenzene (a carcinogen), and xylenes, which are contained in the natural gas and (b) vaporized droplets of heavy drilling muds and other undisclosed "kill fluids" that Sempra and SoCalGas injected into the Well SS-25 during their eight unsuccessful top-kill attempts to stop the Gas Leak and of undisclosed chemicals that Sempra and SoCalGas used in attempts to mask the smell of the Gas Leak.

57.     Mercaptan is a chemical compound added to otherwise colorless, odorless natural gas to give it a rotten-egg smell that aids in leak detection. Mercaptan and tetrahydrothiophene are air contaminants within the meaning of Health and Safety Code 41700 and District Rule 402.  According to the Centers for Disease Control and Prevention (CDC), mercaptan is known to cause short-term neurological, gastrointestinal, and respiratory symptoms, including headaches, nausea, weakness, dizziness, fatigue, incoordination, difficulty breathing, and irritation of the eyes and mucous membranes.  In addition, the human nose is sensitive to mercaptan and can detect it at very low levels. Thus, even at small concentrations, people exposed to mercaptan can suffer physiological symptoms for the duration of the exposure, and possibly beyond, in addition to discomfort and respiratory distress caused when subjected to the noxious odor.

58.     The Air Pollutants from the Gas Leak are known toxic and hazardous substances and, in many cases, are listed as such under the California Safe Drinking Water and Toxic Enforcement Act of 1986, better known by its original name of Proposition 65.  For instance:

(a)     Benzene is categorized as a carcinogen by the U.S. EPA, is a hazardous waste under the U.S. federal Resource Conservation and Recovery Act ("RCRA"), and is considered a carcinogen and a male and developmental reproductive toxicant under Proposition 65. Acute exposure to benzene can cause drowsiness, dizziness, and headaches, as well as eye, skin, and respiratory tract irritation, and long-tern

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

exposure can cause blood disorders.  The World Health Organization has declared that no safe level of exposure can be recommended.  Air sampling in residential areas nearby detected benzene from the Gas Leak.

(b)     Toluene, a reproductive toxin, is considered a developmental toxicant under Proposition 65 and a hazardous waste under RCRA.  Exposure to elevated levels of toluene can cause acute and chronic damage to the central nervous system, with symptoms including fatigue, sleepiness, headaches, and nausea. Air sampling in adjacent residential areas detected toluene from the Gas Leak.

(c)     Hydrogen sulfides are considered a hazardous waste under RCRA and are designated by the federal Occupational Safety and Health Administration ("OSHA") as toxic and reactive chemicals.

(d)     Sulfur dioxides are designated by OSHA as toxic and reactive chemicals and are listed as a developmental reproductive toxicant under Proposition 65.  Sulfur dioxide is a hazardous gas that can harm the human respiratory system and make breathing difficult, particularly in children, the elderly, and those with asthma.  High concentrations of sulfur dioxide in the air can lead to the formation of sulfur oxides, which can react with other atmospheric compounds to form small particles that contribute to particular matter pollution and that can penetrate deeply into sensitive parts of the lungs and cause health problems.

(e)     Ethylbenzene is a listed carcinogen under Proposition 65.

(f)     Xylene is considered, but not listed as, a reproductive toxin under Proposition 65.

59.     In addition, over the course of eight attempts to plug the well between October and December 2015, Sempra and SoCalGas, injected it with heavy drilling muds and other "kill fluids," which were ejected at sufficiently high pressures as to vaporize into aerosols that coated Porter Ranch houses, cars, and playgrounds with little droplets.  The exact makeup of these substances is known only to Sempra and

SoCalGas, but is the subject of litigation by area residents seeking transparency into the substances to which they were exposed.  SoCalGas also used undisclosed chemicals during the Gas Leak, for instance to attempt to mask its smell.  After the Gas Leak was halted, heavy metal contaminants were found in Porter Ranch homes.

60.    Plaintiffs worked with an expert in economic methane emissions reduction to calculate the amounts released of these toxins released by the Gas Leak.  Plaintiffs' expert, a retired Vice President of Emissions Management for ICF International, has 48 years of relevant experience, including: (a) 18 years at the U.S. EPA Climate Change Division working in programs for methane emissions reduction in the U.S. and international oil and natural gas industries, making presentations at over 100 conferences and technology transfer workshops in 17 U.S. states and 18 foreign countries, (b) 27 years of employment by major oil and gas companies like Chevron, ARAMCO, and Mobil, in areas such as process design, refinery, terminal and oil field technical services, operations and facilities planning, operation and engineering management, project management, environmental, health and safety management, and technology transfer.  Over 18 years at ICF, Plaintiffs' expert was the primary subject matter expert on numerous technical studies and reports for the U.S. EPA, the State Department, and other government agencies and non-governmental organizations, leading more than 40 air emissions inventory audits in six countries.

61.    Given its huge scale and extended duration, the Gas Leak released enormous quantities of the Air Pollutants.  Plaintiffs' expert used CARB's methane release figures to calculate the quantities of Air Pollutants leaked.  CARB said the Gas Leak released 99,650 metric tons of methane, with a +/- margin of 9,300 metric tons.  Plaintiffs' expert used the high and low figures, 90,350 tons and 108,950 tons, as a basis for the calculations.  Specifically, the expert calculated as follows:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

(a)     CARB estimated between 90,350 and 108,950 metric tons of methane escaped from SS-25 during the Gas Leak. Methane has a density of 19.3 grams per cubic foot. Accordingly, by utilizing the methane gas density figure of 19.3 grams per cubic foot to convert metric tons into cubic feet (by multiplying the metric tons by 1,000 kilograms/metric ton to convert into kilograms, by multiplying by 1000 grams/kilogram to convert into grams, multiplying by 19.3 grams/cubic foot to convert into cubit feet, then dividing by 1,000,000,000 to convert cubic feet into billion cubic feet), between 4.68 and 5.65 billion cubic feet of methane leaked into the atmosphere during the Gas Leak.

(b)     Pipeline-quality natural gas consists of 96% methane gas. Given the amount of methane gas that leaked into the environment during the Gas Leak, this ratio yields a total natural gas leak of between 4.88 billion cubic feet and 5.89 billion cubic feet (after dividing the billion cubic feet figures in (a) by 96%).

(c)     Pipeline-quality natural gas consists of other chemicals in addition to methane gas, including toluene, ethylbenzene and xylene. On average, pipeline-quality natural biomethane gas consists of: 4.2 parts per billion by volume ("ppbv") of benzene; 43.27 ppbv of toluene; 10.94 ppbv of ethylbenzne; and 17.66 ppbv of xylene.

(d)     Given the average ppbv of these pollutants within pipeline-quality natural gas and multiplying these amounts by the total amounts of natural gas released during the Gas Leak (between 4.88 billion cubic feet and 5.89 billion cubic feet, as set forth in (b) above), the following amounts by volume were released into the atmosphere during the Gas Leak: (i) between 20.48 and 24.74 cubic feet of benzene; (ii) between 211.00 and 254.86 cubic feet of toluene; (iii) between 53.35 and 64.44 cubic feet of ethylbenzene; and (iv) between 86.12 and 104.02 cubic feet of xylene.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

(e)     The Gas Leak persisted for 119 days. By dividing the total emissions of each chemical during the entire Gas Leak by 119, the following average amounts of each pollutant were released into the atmosphere on a daily basis (in micrograms, μg):  (i) Benzene: 18.9 million μg / day to 22.8 million μg /day, (ii) Toluene: 192.7 million μg /day to 232.4 million μg / day, (iii) Ethylbenzene: 54.9 million μg / day to 66.1 μg / day; and (iv) Xylene: 88.5 million μg / day to 106.8 million μg / day. (Micrograms are calculated by multiplying kilograms by 1,000,000,000. Kilograms are calculated by multiplying metric tons by 1,000. The metric tons of each chemical are obtained by multiplying the cubic volume of the pollutants by their respective densities and dividing by 1 metric ton or 2,240 pounds.)

62.     These releases were sufficiently large as to trigger reporting obligations for Sempra and SoCalGas.  Proposition 65 requires business to provide a "clear and reasonable" warning before knowingly and intentionally exposing anyone to a listed chemical and requires warnings to be made unless exposure is low enough to pose no significant risk of cancer or is significantly below levels observed to cause birth defects or other reproductive harm.   Those reporting thresholds are clearly established under Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, which list the "No Significant Risk Level – Inhalation" for benzene at 13 micrograms/day and for ethylbenzene at 54 micrograms/day, and list the "Maximum Allowable Dose Level – Inhalation" for benzene at 49 micrograms/day and for toluene at 13,000 micrograms/day.

63.     In actuality, using a consistent average calculated release rate is conservative, inasmuch as researchers performing overflight measurements of methane releases observed a very high release rate from the start of the Gas Leak until the first week of December 2015, then a lessening of the rate between the first week of December 2015 and the first week of January 2016 coinciding with decreasing Aliso Canyon reservoir pressure due to deliberate gas withdrawals,

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

followed by a relatively flat release rate until the Well was plugged in February 2016.  In other words, the first six weeks of the Gas Leak likely exposed residents to significantly higher levels of methane and Air Pollutants.

64.    Moreover, SoCalGas knew it had exceeded the reporting thresholds for the Air Pollutants.  Based on testing that began on October 30, 2015, the L.A. DPH reported that the highest SoCalGas readings for benzene were 30.6 parts per billion (as compared to ambient levels of 0.1 – 0.5 parts per billion) and some samples exceeded the acute exposure limit of 8.0 parts per billion.  The L.A. DPH also noted that benzene and other chemicals were originally detectable at levels above normal from within community sampling sites.

<u>*Resulting Serious Health Impacts;*</u>

<u>*Defendant Knowledge and Attempts To Cover Up*</u>

65.    The Well SS-25 wellhead is just **one mile** from the residential community of Porter Ranch, home 30,500 people, including families with children, senior citizens, and persons with disabilities and other medical conditions, including respiratory conditions such as asthma.  It is within a few miles of the similar residential communities of Chatsworth, Granada Hills, and Northridge.  These images illustrate the proximity of Aliso Canyon to area residents:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB





SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

66.     Porter Ranch residents initially reported what they thought was a home with a major gas leak on October 23, 2015. Sempra and SoCalGas knew of the Gas Leak by no later than that date.   Yet, rather than report the Gas Leak to the appropriate government agencies and regulatory/oversight bodies and warning area residents of the health and safety risks it posed, SoCalGas actually went door-to-door *reassuring* residents that all was under control and that no danger existed.

67.     SoCalGas did not report the Gas Leak to authorities until October 26, 2015.   Its initial report gravely understated the risks posed by the Gas Leak, inasmuch as the terse report it filed with the CPUC stated in its "Summary" section: "No ignition, no injury.  No media."

68.     Moreover, Sempra's and SoCalGas's three-day delay in reporting the Gas Leak after its discovery was in direct contravention of the law, which required it to be reported immediately.   Specifically, under California Health and Safety Code §25510(a), "the handler or an employee, authorized representative, agent, or designee of a handler, shall, *upon discovery*, *immediately report* any release or threatened release of a hazardous material to the unified program agency, and to the office, in accordance with the regulations adopted pursuant to this section."  Under §25510(a), SoCalGas had to report the leak to proper authorities, including the California Office of Emergency Services and the local Certified Unified Program Agency, which was the Los Angeles County Fire Department.   SoCalGas's violation of this law led to the Los Angeles County District Attorney to file a misdemeanor complaint, which was settled on terms discussed below.

69.     Significantly, SoCalGas actually attempted the first of its eight failed top-kill attempts on October 24, 2015, *during* the three-day period when it was delaying the reporting of the Gas Leak to authorities.   Clearly, SoCalGas hoped to stop the leak before ever having to report it, all while falsely reassuring area

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

residents that no danger existed.  This fact is highly indicative of SoCalGas's scienter, and that of Defendants Sempra, Reed, and Arriola as control persons.

70.     These actions placed area residents, SoCalGas employees, and persons responding to the Gas Leak squarely at risk, keeping them in the dark as to whether it posed risks, whether it was the cause of unexplained illnesses and symptoms, whether to keep their children indoors, and whether to evacuate altogether.  Yet, despite SoCalGas's characterization, and contrary to Defendants' materially misleading post-Leak misstatements and omissions as discussed below, the Gas Leak had immediate, serious, and persistent health impacts.

71.     Residents of Porter Ranch and the surrounding communities reported physiological symptoms including nausea and vomiting, dizziness, nosebleeds, and headaches, attributable to exposure to the Gas Leak.  Young children experienced rashes, spontaneous bloody noses, mood swings, and decreased appetites and were rushed to emergency rooms with shortness of breath.  The L.A. DPH's complaint line data shows that over 1,800 health complaints were received and indicated that the primary symptoms reported were headaches/migraines (61%); nausea, vomiting, stomach aches, diarrhea (40%); nose bleeds (32%); respiratory or breathing symptoms (27%), chest tightness, coughing, palpitations (24%); and dizziness/lightheadedness (22%).  Significantly, the L.A. DPH expressly noted that only 17% of residents reported a smell or odor, and further noted that figure to be a lower prevalence of reports than would be expected to correlate with the higher prevalence of nose bleeds if mercaptan and the odorants in the leaked gas were to blame.  Thus, the data point to the *Air Pollutants*, not mercaptan, as the more likely cause of the reported symptoms.

72.     The L.A. DPH's complaint line data is summarized in Figure 5 below.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

Figure 5:

| Symptom | Reports 9/23/15-1/25/16** n=498 | % of Total | Reports 1/26/2016-2/2/2016 n=102 | % of Total | Running Total 9/23/15-2/2/16** n=600 | % of Running Total |
|---|---|---|---|---|---|---|
| Headache/Migraine | 303 | 61% | 63 | 62% | 366 | 61% |
| Nausea/Vomiting/Stomachache/ GI/Diarrhea | 207 | 42% | 31 | 30% | 238 | 40% |
| Bloody Nose | 170 | 34% | 19 | 19% | 189 | 32% |
| Respiratory/Breathing Symptoms | 126 | 25% | 33 | 32% | 159 | 27% |
| Chest Tightness/Coughing/Palpitations | 111 | 22% | 30 | 29% | 141 | 24% |
| Dizzy/Lightheaded | 106 | 21% | 26 | 25% | 132 | 22% |
| Eye Irritation/Vision Complaints | 81 | 16% | 25 | 25% | 106 | 18% |
| Sore Throat | 80 | 16% | 16 | 16% | 96 | 16% |
| Smell/Odor*** | 76 | 15% | 27 | 26% | 103 | 17% |
| Sinus Pressure/Irritation/Nasal Congestion/Runny Nose | 75 | 15% | 23 | 23% | 98 | 16% |
| Fatigue/Lethargy/Weakness | 55 | 11% | 27 | 26% | 82 | 14% |
| Rash/Itchy, Dry, Irritated Skin | 42 | 8% | 4 | 4% | 46 | 8% |
| Irritability/Insomnia/Stress/ Depression/Anxiety | 24 | 5% | 9 | 9% | 33 | 6% |
| Body Aches/Flu-like Symptoms | 12 | 2% | 9 | 9% | 21 | 4% |
| | | | | | | |
| Pre-existing Condition | 55 | 11% | 18 | 18% | 73 | 12% |
| Went to MD/ER/Hospital | 54 | 11% | 26 | 25% | 80 | 13% |
| | | | | | | |
| Pet Affected | 43 | 9% | 8 | 8% | 51 | 9% |
| | | | | | | |
| Complained to SCG | 11 | 2% | 14 | 14% | 25 | 4% |
| Complained to AQMD | 2 | 0% | 0 | 0% | 2 | 0% |
| Relocated or Requested Relocation | 26 | 5% | 34 | 33% | 60 | 10% |

73.    Defendants learned of these health impacts very shortly after the Gas Leak began.  Beginning on October 24, 2015, and continuing thereafter, SCAQMD received over 2,000 complaints from the public living or working near the Gas Leak.  A hearing at the Community School in Porter Ranch on November 4, 2015, drew 100 residents complaining of headaches, respiratory problems, nosebleeds, and vomiting.  During the Gas Leak, some 200 people per month reported these symptoms to the L.A. DPH, leading to over 1,800 complaints by the time the Gas

Leak was plugged, as shown in Figure 5 above.  The L.A. DPH began tracking complaints by email on November 9, 2015 and by phone on November 20, 2015 from residents with complaints of symptoms.  By December 2, 2015, over 1,000 complaints, and counting, had been received by the SCAQMD.

74.     Even after the Gas Leak was plugged, reported symptoms continued. In the month after the Gas Leak was plugged, the L.A. DPH said that two-thirds of the people it surveyed in the area continued to experience similar symptoms to those they had before the Gas Leak was stopped.  Months after the Gas Leak, between 20 and 50 people per month continued to report symptoms to the L.A. DPH.

75.     Over time, thousands of families – tens of thousands of residents – were relocated to escape the adverse health effects caused by the Gas Leak, with over 5,000 homes evacuated and multiple schools closed and transferred to alternative facilities.  Even after the Gas Leak ended and residents returned home, the health impacts continued.  As reported by the *New York Times Magazine*, on March 10, 2016, following complaints from relocated residents that reported nosebleeds and skin rashes upon returning home, Michael Jerrett of U.C.L.A. tested dust samples at seven homes and found that two contained benzene and hexane.

### *The Fines, Penalties, and Settlements Imposed to Date*

76.     Among the avalanche of criminal and civil complaints filed in the wake of the Gas Leak, Sempra and SoCalGas have already incurred significant costs to settle actions brought by governmental authorities due to violations of the law.

77.     For instance, SCAQMD filed suit against SoCalGas in the Superior Court for the County of Los Angeles, Central District (Case No. BC608322).  The complaint alleged that on November 23, 2015, SCAQMD issued Notice of Violation P62646 to SoCalGas for causing an ongoing public nuisance in violation of Rule 402 and Health and Safety Code §41700 due to odors from the Gas Leak. SoCalGas settled this lawsuit in February 2017 for an agreement to pay $8.5

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

million, which included $1 million for a health study, $5.65 million in emissions fees, $1.6 million to reimburse SCAQMD for air monitoring costs, and $250,000 in legal fees.

78.   Also, The Los Angeles County District Attorney's case against SoCalGas in the Superior Court for the County of Los Angeles (Case No. 6SC00433) charged SoCalGas with, *inter alia*, misdemeanor violations of Health and Safety Code §25510(a) and Health and Safety Code §41700(a).  SoCalGas pled "no contest" to the count alleging violation of Health and Safety Code 25510(a) for SoCalGas's three-day delay in reporting the Gas Leak starting October 23, 2015. SoCalGas agreed to pay penalties and costs exceeding $4 million and agreed to institute significant reforms, including installation of an infrared methane leak detection system, installation of real-time pressure monitors in all Aliso Canyon wells, hiring of a third party company to ensure proper functioning of this equipment, adoption of new reporting policies consistent with §25510(a), and employee training programs.

## Defendants' Materially False and Misleading
## Pre-Leak Misstatements and Omissions

### *Pre-Leak Misstatements Regarding Well Risk Mitigation*

79.   Sempra (through SoCalGas) submitted an application for a rate increase to the CPUC on November 14, 2014, seeking an average rate increase of $256 million (12%) over then-current levels purportedly to, among other things, enhance well safety.   In support of the application, Sempra and SoCalGas submitted, *inter alia*, the testimony of Phillip Baker, Director of Storage (the "Baker Testimony"), which is imputable to Sempra and SoCalGas. While omitting to disclose that Well SS-25 and the other wells at Aliso Canyon completely lacked any safety or shutoff valve or any sliding sleeve valve, Mr. Baker falsely and misleadingly testified about SoCalGas's safety practices, stating:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

Well risk mitigation is evaluated on a case-by-case basis. ***Whenever a well may pose a safety risk, we act immediately to address the problem***. ***Alternatives, such as plugging and abandoning the well, versus a major repair or well replacement, are evaluated based on conditions, including the age of the well, prior repair or maintenance history***, performance during withdrawal or injection periods, and surface considerations, such as susceptibility to landslides. ***These various conditions,*** and their associated costs, ***are evaluated to determine the safest,*** most cost-effective mitigation ***option***. ***Another consideration that may influence repair decisions is the age and condition of certain well components that may have become obsolete and are no longer supported by the original equipment manufacturer and cannot be readily replaced or maintained***.

80.     These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Wells at Aliso Canyon were aging and in a deteriorated condition, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance.  Yet, Defendants knowingly permitted ***all*** wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter.  Further, Defendants knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection occurring in 1979).  SoCalGas also did not prioritize the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

of SoCalGas's 2010 rate increase application.  Moreover, SoCalGas's later actions during the Gas Leak demonstrated the falsity of this statement (*e.g.*, SoCalGas's failure to start drilling a relief well for six weeks, despite failure after failure of top-kill attempts).

### *Pre-Leak Misstatements Regarding Procedures For Responding To Gas Leaks*

81.    Throughout the Class Period, Sempra published statements on its corporate websites, including the SoCalGas website, that made false and misleading misstatements and omissions about the safety of its facilities and infrastructure and about its safety procedures. For instance, at least as of November 16, 2014 and thereafter throughout the Class Period, the SoCalGas website[1] misrepresented SoCalGas's procedures for responding to natural gas leaks, stating the following:

> **It is our practice to respond <u>promptly</u> when we receive calls from customers regarding a natural gas leak**. We have about 5,000 employees who are trained and ready to respond to incidents that occur throughout our service territory.

82.    These statements were materially false and misleading, as discussed herein, as evidenced by SoCalGas's actions following discovery of the Gas Leak and complaints by residents about the Gas Leak on October 23, 2015.  SoCalGas delayed reporting of the Gas Leak to authorities by three days, in violation of California Health and Safety Code §25510(a), misconduct that caused SoCalGas to later plead no contest and pay $4 million in fines and penalties while agreeing to significant reforms.  Moreover, during the delay, SoCalGas actually went door-to-door reassuring residents while at the same time, unbeknownst to them, attempting the first of many failed top-kill attempts on the Well, in an effort to avoid reporting

---

[1] The webpage is available at:
https://web.archive.org/web/20141126055127/http://socalgas.com/safety/pipeline.shtml.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

the Gas Leak.   SoCalGas also delayed drilling a relief well for 42 days, notwithstanding Defendants' knowledge as to the deteriorated condition of the Well, the significant stresses it had been put under during injections and withdrawals, its lack of functional sliding sleeve and subsurface safety or shutoff valves, the failure of the first six (out of eight total) top-kill attempts, and the worsening of the Gas Leak caused by the increasingly aggressive top-kill measures that were tried.   SoCalGas also delayed implementation of air quality testing for a week after the Gas Leak was discovered and, thereafter, failed to report release of the Air Pollutants, despite its reporting obligations under Proposition 65.

83.   At least as of May 12, 2015, and thereafter throughout the Class Period, the SoCalGas website posted a link to the "Aliso Canyon Safety Plan,"[2] which bore the logos of both SoCalGas and Sempra (the "Safety Plan").  The Safety Plan misrepresented Sempra's and SoCalGas's procedures for responding to, and reporting, gas leaks, by stating, *inter alia*:

(a)   "Leak indications are to be recorded and assigned a priority code based upon the concentration of gas recorded by the instrument as well as other relevant factors that may exist in proximity to its location. ***The highest priority leaks are to be continuously monitored and repaired promptly***."

(b)   Sempra and SoCalGas required "all employees" to "***report all incidents, near misses and at-risk conditions***" and required the Aliso Canyon Safety Committee to "Be alert to the presence of any hazard or hazardous conditions. ***If necessary secure the area and/or correct the hazard. Report these to supervision as soon as possible after discovery***."

---

[2] This document is available at https://web.archive.org/web/20150328215834/http://socalgas.com/documents/safety/aliso-canyon-safety-plan-2014.pdf.

84.     These statements were materially false and misleading, as discussed herein, as evidenced by SoCalGas's actions following discovery of the Gas Leak and complaints by residents about the Gas Leak on October 23, 2015.  SoCalGas delayed reporting of the Gas Leak to authorities by three days, in violation of California Health and Safety Code §25510(a), misconduct that caused SoCalGas to later plead no contest and pay $4 million in fines and penalties while agreeing to significant reforms.  Moreover, during the delay, SoCalGas actually went door-to-door reassuring residents while at the same time, unbeknownst to them, attempting the first of many failed top-kill attempts on the Well, in an effort to avoid reporting the Gas Leak.   SoCalGas also delayed drilling a relief well for 42 days, notwithstanding Defendants' knowledge as to the deteriorated condition of the Well, the significant stresses it had been put under during injections and withdrawals, its lack of functional sliding sleeve and subsurface safety or shutoff valves, the failure of the first six (out of eight total) top-kill attempts, and the worsening of the Gas Leak caused by the increasingly aggressive top-kill measures that were tried.  SoCalGas also delayed implementation of air quality testing for a week after the Gas Leak was discovered and, thereafter, failed to report release of the Air Pollutants, despite its reporting obligations under Proposition 65.

85.     On May 14, 2015, SoCalGas issued a press release (the "5/14/2015 Press Release"), entitled "SoCalGas Pursues Expanded Pipe Replacement, Repair Program; Utility to Accelerate Repair of Non-Hazardous Leaks, Reduce Emissions," which notified investors that Sempra and SoCalGas sought to accelerate its "pipeline replacement and leak repair program."  It misrepresented SoCalGas's response protocols to hazardous gas leaks, stating:

> SoCalGas today published an interactive map on its website that allows the public to view methane indications and non-hazardous gas leaks located near its pipeline system. Federal regulations consider a non-

hazardous leak to be one that is far from an ignition source and away from a structure where the gas can accumulate and become concentrated to dangerous levels. ***All hazardous leaks are repaired immediately*** and do not appear on the map.

86.    These statements were materially false and misleading, as discussed herein, as evidenced by SoCalGas's actions following discovery of the Gas Leak. Defendants knew that the Gas Leak could not be stopped "immediately" given Well SS-25's lack of a functional sliding sleeve or subsurface safety or shutoff valve. SoCalGas also delayed drilling a relief well for 42 days, notwithstanding Defendants' knowledge as to the deteriorated condition of the Well, the significant stresses it had been put under during injections and withdrawals, its lack of functional sliding sleeve and subsurface safety or shutoff valves, the failure of the first six (out of eight total) top-kill attempts, and the worsening of the Gas Leak caused by the increasingly aggressive top-kill measures that were tried.

### *Pre-Leak Misstatements Regarding Legal Compliance*

87.    The Safety Plan misrepresented Aliso Canyon's legal compliance, stating  that "***Aliso is committed to comply with*** applicable international***, federal, state and local health and safety laws*** and requirements" and "***We are committed to complying with*** all applicable ***federal, state and local safety laws, rules and regulations*** and SCG Standards."

88.    These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Wells at Aliso Canyon were aging and in a deteriorated condition, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance.  Yet, Defendants knowingly permitted ***all*** wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

and did not replace them thereafter.  Further, Defendants knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection occurring in 1979).  SoCalGas also did not prioritize the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval of SoCalGas's 2010 rate increase application.  Moreover, SoCalGas's later actions during the Gas Leak demonstrated the falsity of this statement (*e.g.*, SoCalGas's failure to start drilling a relief well for six weeks, despite failure after failure of top-kill attempts).  These circumstances knowingly violated Sempra's and SoCalGas's legal obligations, including the Franchise Agreement governing Aliso Canyon, codified in Los Angeles County Ordinance No. 6765, which since 1955 required shutoff valves to be installed to protect life and property in the event of a leak, and Public Resources Code §3219, which required SoCalGas as operator of the Well to equip it with casings of sufficient strength and such other safety devices as may be necessary to prevent blowouts.  Once the Gas Leak occurred, Sempra and SoCalGas also violated their reporting obligations, including the obligation to immediately report the Gas Leak under California Health and Safety Code §25510(a) and the obligation to report releases of the Air Pollutants under Proposition 65.

89.    The Safety Plan misrepresented Aliso Canyon's legal compliance with applicable laws and regulations, such as General Order 112-E and 49 CFR Part 192, including as regards to the facility's valves and other safety features, stating:

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

The pipe and facilities are also designed with materials of sufficient strength to contain internal pressures plus appropriate design and/or safety factors. ***Components, including valves***, flanges, and fittings ***meet the minimum prescribed requirements*** specified in the regulations. The design also includes pressure relief or other protective devices to prevent accidental over pressurization as further described in the maintenance section.

90.     These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Wells at Aliso Canyon were aging and in a deteriorated condition, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance.  Yet, Defendants knowingly permitted ***all*** wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter.  Further, Defendants knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection occurring in 1979).  SoCalGas also did not prioritize the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval of SoCalGas's 2010 rate increase application.  These circumstances knowingly violated Sempra's and SoCalGas's legal obligations, including the Franchise Agreement governing Aliso Canyon, codified in Los Angeles County Ordinance No. 6765, which since 1955 required shutoff valves to be installed to protect life and property in the event of a leak, and Public Resources Code §3219, which

required SoCalGas as operator of the Well to equip it with casings of sufficient strength and such other safety devices as may be necessary to prevent blowouts.

91.    The Safety Plan misrepresented SoCalGas's maintenance of Aliso Canyon safety components, like its safety or shutoff valves and sliding sleeve valves, as required by applicable laws and regulations, stating, "Maintenance activities include…performing leakage surveys, …making repairs, inspection and testing of pressure limiting and regulating equipment, and *valve* and vault *inspection and upkeep*. *SoCalGas maintains its* pipelines and *facilities in accordance with these requirements*."

92.    These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Wells at Aliso Canyon were aging and in a deteriorated condition, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance.  Yet, Defendants knowingly permitted *all* wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter.  SoCalGas also did not prioritize the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval of SoCalGas's 2010 rate increase application.   These circumstances knowingly violated Sempra's and SoCalGas's legal obligations, including the Franchise Agreement governing Aliso Canyon, codified in Los Angeles County Ordinance No. 6765, which since 1955 required shutoff valves to be installed to protect life and property in the event of a leak, and Public Resources Code §3219, which required SoCalGas as operator of the Well to equip it with casings of sufficient strength and such other safety devices as may be necessary to prevent blowouts.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

*Pre-Leak Misstatements Regarding Safety Valves*

93.    The Safety Plan misrepresented SoCalGas's processes and procedures for ensuring that all necessary valves were in place and operational, stating:

> ***SoCalGas performs maintenance and inspection activities on <u>all valves</u> that may be necessary for the <u>safe operation</u> of its <u>natural gas system</u>***. ... All identified valves are to be checked and serviced at least once each calendar year. Routine maintenance and inspection activities verify:
>
> - Valve is not leaking ;
> - Valve is properly identified;
> - Valves are adequately lubricated;
> - ***Valve operation is verified***.
>
> ***Any issues requiring immediate action are to be addressed <u>right away</u>***.

94.    These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Wells at Aliso Canyon were aging and in a deteriorated condition, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance.  Yet, Defendants knowingly permitted ***all*** wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter.  Further, Defendants knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection

43

occurring in 1979).   SoCalGas also did not prioritize the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval of SoCalGas's 2010 rate increase application.   These circumstances knowingly violated Sempra's and SoCalGas's legal obligations, including the Franchise Agreement governing Aliso Canyon, codified in Los Angeles County Ordinance No. 6765, which since 1955 required shutoff valves to be installed to protect life and property in the event of a leak, and Public Resources Code §3219, which required SoCalGas as operator of the Well to equip it with casings of sufficient strength and such other safety devices as may be necessary to prevent blowouts.

## Post-Leak Misstatements and Omissions

95.     Prior to October 28, 2015, gas began leaking from the Well.  SoCalGas claimed to have purportedly discovered the Gas Leak on October 23, 2015. Thereafter, after waiting nearly a week to speak publicly, Sempra and SoCalGas began a series of *forty-five* false and misleading statements and omissions that minimized the Gas Leak's scope and the risks it posed, while creating a false sense that they could stop the Gas Leak before a state of emergency was declared.  These statements continued until late December 2015, materially misleading Sempra investors and the public by misrepresenting the Gas Leak's dangers, as well as Sempra's and SoCalGas's to control and remediate it promptly (and therefore before having to incur catastrophic expense).   Collectively, they served to perpetuate the inflation in Sempra's stock price.

### *Post-Leak Misstatements about the*
### *"Harmless" "Odor" of the "Non-Toxic" Gas*

96.     On October 28, 2015, SoCalGas publicly addressed the Gas Leak for the first time, despite having learned of it at least five days earlier, in a  press release

bearing both the SoCalGas and Sempra logos that was posted on the SoCalGas website (the "10/28/2015 Press Release").   The 10/28/2015 Press Release, in language that was later repeated in daily press releases issued from November 21 – December 3, 2015 (the "11/21/2015-12/3/2015 Press Releases") and from December 9 – 17, 2015 (the "12/9-12/17/2015 Press Releases") published on Sempra's and SoCalGas's corporate websites, stated:

> We regret that the smell of the odorant in natural gas is unpleasant and that some people are sensitive to the ***odor***, and we sincerely apologize for the annoyance and concern this odor is causing the neighboring communities. However, ***the leak does not pose an imminent threat to public safety.*** The well is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest home or public area. Scientists agree ***natural gas is not toxic*** and that ***its odorant is harmless at the minute levels at which it is added to natural gas.*** In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.

97.    These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations.  Defendants also knew of the massive volume of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015.  As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas.  The rest were passed along to SoCalGas by the government authorities. Defendants also knew that they were

using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015. Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants. Despite this knowledge, and despite Defendants' reporting obligations, these statements falsely and misleadingly discussed only the odorant in natural gas, falsely called the odorant "harmless," falsely stated "natural gas is not toxic," and falsely said that "the leak does not pose an imminent threat to public safety."

98.    On October 30, 2015, SoCalGas issued a press release, which was posted on SoCalGas's website and bore SoCalGas's and Sempra's logos (the "10/30/2015 Press Release"), stating:

> We want to again apologize for any concerns, inconvenience or annoyance you experience from the gas leak at our Aliso Canyon facility. Although *natural gas is not considered to be toxic*, we realize the odorant smells bad and can bother some people. …
>
> *The leak continues to pose no threat to public safety as the site is confined to a localized, remote area.* In outdoor locations such as this, natural gas quickly dissipates into the air. …
>
> We have experts taking air samples in multiple random locations to reassure the community that *the air quality continues to be within safe levels*.

99.    These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations. Defendants also knew of the massive volume

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015.  As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas.  The rest were passed along to SoCalGas by the government authorities. Defendants also knew that they were using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015. Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants.

100.   Sempra and SoCalGas issued daily press releases from November 2 - 4, 2015 (the "11/2-11/4/2015 Press Releases") and from November 5 – 20, 2015 (the "11/5-11/202015 Press Releases"), all of which were published on Sempra's corporate and Leak-specific (like www.alisoupdates.com) bearing the logos of both Sempra and SoCalGas, stating:

> We recognize that the smell of the odorant in natural gas is unpleasant, and we sincerely apologize for the annoyance and concern this **odor** is causing the Porter Ranch community and surrounding areas. However, **the leak poses no threat to public safety.** It is located in an isolated, mountain area more than a mile away from and more than 1,200 feet higher than any home or public area.  Scientists agree **natural gas is not toxic** and that **its odorant is harmless in the minute levels at which it is added to natural gas.** In outdoor locations such as this, natural gas quickly dissipates into the air, greatly reducing the possibility for ignition and further diluting the gas as it reaches the public. The human nose is amazingly sensitive and can detect the smell of the odorant at levels much lower than any level of concern.

101.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations.  Defendants also knew of the massive volume of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015.  As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas.  The rest were passed along to SoCalGas by the government authorities. Defendants also knew that they were using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015. Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants.  By the time of these statements, Defendants also knew of the November 4, 2015 hearing at the Community School in Porter Ranch, which drew 100 residents complaining of health symptoms.  They also knew that the L.A. DPH had begun receiving and tracking complaints by email as of November 9, 2015 and by phone as of November 20, 2015.

102.    The 11/2-11/4/2015 Press Releases and the 11/5-11/20/2015 Press Releases both reassured the public based on air testing purportedly conducted by Sempra and SoCalGas.  Specifically:

(a)      The 11/2-11/4/2015 Press Releases stated:
A team of our environmental specialists and retained experts continued conducting air quality sampling and monitoring on both Saturday and Sunday, at both the leak site and within the community. Although experts agree that **natural gas is non-toxic**, and **the levels of the odorant in the natural gas are too low to be a concern**, we are conducting this sampling to reassure the community.

(b)      The 11/5-11/20/2015 Press Releases, 11/21-12/3/2015 Press Releases, and 12/9-12/17/2015 Press Releases all stated:
A team of our environmental specialists and retained experts continued conducting daily air sampling and monitoring at several representative sites both within the leak site and the community. Although experts

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

agree that natural gas is not toxic and that ***the levels of the odorant in the natural gas are too low to be a long-term health concern***, we are continuing to conduct this sampling to provide the community with more information.

103.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations.  Defendants also knew of the massive volume of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015.  As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas.  The rest were passed along to SoCalGas by the government authorities. Defendants also knew that they were using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015. Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants.  By the time of these statements, Defendants also knew of the November 4, 2015 hearing at the Community School in Porter Ranch, which drew 100 residents complaining of health symptoms.  They also knew that the L.A. DPH had begun receiving and tracking complaints by email as of November 9, 2015 and by phone as of November 20, 2015.

104.   On November 12, 2015, Sempra and SoCalGas  published a bulletin on SoCalGas's website entitled "Aliso Canyon Storage Facility" (the "11/12/2015 Bulletin"), which stated:

> We sincerely apologize for any concern this odor is causing the neighboring communities. However, ***the leak does not pose an imminent threat to health or public safety.*** The well is located in an

isolated, mountain area more than a mile away from and more than 1,200 feet higher than the closest home or public area.  Scientists agree **natural gas is not toxic** and that **its odorant is not toxic at the minute levels at which it is added to natural gas**.  Health and air-quality officials said that the levels of the additive found in air samples taken in Porter Ranch should not pose a health problem.

105.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations.  Defendants also knew of the massive volume of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015.  As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas.  The rest were passed along to SoCalGas by the government authorities. Defendants also knew that they were using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015. Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants.  By the time of these statements, Defendants also knew of the November 4, 2015 hearing at the Community School in Porter Ranch, which drew 100 residents complaining of health symptoms.  They also knew that the L.A. DPH had begun receiving and tracking complaints by email as of November 9, 2015 and by phone as of November 20, 2015.

106.   On December 1, 2015, Defendant Arriola testified before the Los Angeles City Council.  In testimony that was covered by news outlets, Defendant Arriola apologized for "the concern, the discomfort, the inconvenience, the frustration, and the bad smell."  The same day, in a letter to Porter Ranch residents

that was posted on the SoCalGas website (the "12/1/2015 Arriola Letter"), Defendant Arriola alerted them of the need to have a relief well halt the Gas Leak and stated, "Starting today, we are also taking additional steps that may help reduce the flow of natural gas and the odorant in the interim."

107.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations.  Defendants also knew of the massive volume of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015.  As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas.  The rest were passed along to SoCalGas by the government authorities. Defendants also knew that they were using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015. Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants.  By the time of these statements, Defendants also knew of the November 4, 2015 hearing at the Community School in Porter Ranch, which drew 100 residents complaining of health symptoms.  They also knew that the L.A. DPH had begun receiving and tracking complaints by email as of November 9, 2015 and by phone as of November 20, 2015.  Despite this knowledge, Defendant Arriola falsely and misleadingly apologized for only the "bad smell," not the release of the Air Pollutants and the health effects they were causing, and mentioned only the a reduction in the flow of "natural gas and the odorant," not a reduction in the release of the Air Pollutants.

*Post-Leak Misstatements about the Ability to "Stop" the Leak "Quickly"*

108.   Beginning with their first public statements about the Gas Leak, Sempra and SoCalGas materially misrepresented, though a series of false and misleading statements and omissions, their ability to quickly stop the Gas Leak, prior to the declaration of a state of emergency.

109.   The 10/28/2015 Press Release and the 10/30/2015 Press Release falsely and misleadingly stated, "***We have assembled a world-class team of experts, and we are working as quickly as safety will allow to stop the leak***."   The 10/30/2015 Press Release added, "Timeline Update:   ***After considerable testing and analysis, we expect this situation to take another week*** or longer ***to resolve***. We know this will come as unwelcome news to many and regret you may continue to experience odors."

110.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Wells at Aliso Canyon were aging and in a deteriorated condition, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance.   Yet, Defendants knowingly permitted ***all*** wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter.   Further, Defendants knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

occurring in 1979).   SoCalGas also did not prioritize the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval of SoCalGas's 2010 rate increase application.   Moreover, by this point, SoCalGas's first top-kill attempt on October 24, 2015 had already failed and SoCalGas had not even started drilling a necessary relief well, which, once begun, would in any event take months to complete.   All the foregoing make any reference to "another week," even if hedged with "or longer," material false and misleading.

111.   The 10/28/2015 Press Release stated, "On October 23, SoCalGas crews discovered a leak at one of the natural gas storage wells at its Aliso Canyon storage field. *In response, we activated the appropriate procedures to begin to address the leak*."   Variations of this statement were repeated throughout the Class period.   The 11/2-11/4/2015 Press Releases and the 11/5-11/20/2015 Press Releases stated, "On October 23, SoCalGas crews discovered a leak at one of its natural gas storage wells at its Aliso Canyon storage field. *In response, we activated the appropriate procedures, alerted public officials and began addressing the leak*."   Similarly, the 11/21-12/3/2015 Press Releases and the 12/9-12/17/2015 Press Releases all stated, "On October 23, SoCalGas crews discovered a leak at one of its natural gas storage wells at its Aliso Canyon storage field. *In response, we activated the appropriate procedures, alerted public officials and began to address the leak*."

112.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, once the Gas Leak began, Sempra and SoCalGas also violated their reporting obligations, including the obligation to immediately report the Gas Leak under California Health and Safety Code §25510(a) and the obligation to report releases of the Air Pollutants under Proposition 65.   SoCalGas also delayed Mr. Conley's aerial emissions

analysis by several days under false pretenses, before he proceeded under state authority.   Moreover, in light of the aging and deteriorated condition of Aliso Canyon's wells, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance, Defendants had knowingly permitted **all** wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter. Further, Defendants had knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection occurring in 1979).   SoCalGas also had not prioritized the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval of SoCalGas's 2010 rate increase application. Moreover, by this point, SoCalGas's first top-kill attempt on October 24, 2015 had already failed.   In this context, SoCalGas should have already begun drilling a necessary relief well, which, once begun, would in any event take months to complete.   Yet, SoCalGas delayed doing so for 42 days after the Gas Leak began, until after six (out of a total of eight) top-kill attempts had failed.

113.   In the 12/1/2015 Arriola Letter, Defendant Arriola informed Porter Ranch residents of SoCalGas's decision that a relief well would be required to seal the Well and added, "Please know that we are doing everything we can to stop this

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

leak as fast as possible, as well as provide the support the Porter Ranch community needs."

114.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, once the Gas Leak began, Sempra and SoCalGas also violated their reporting obligations, including the obligation to immediately report the Gas Leak under California Health and Safety Code §25510(a) and the obligation to report releases of the Air Pollutants under Proposition 65.   During its three-day delay in reporting the Gas Leak, SoCalGas had even gone door-to-door reassuring residents that there was no need for concern.   SoCalGas also delayed Mr. Conley's aerial emissions analysis by several days under false pretenses, before he proceeded under state authority. Moreover, in light of the aging and deteriorated condition of Aliso Canyon's wells, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance, Defendants had knowingly permitted *all* wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter.   Further, Defendants had knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection occurring in 1979).   SoCalGas also had not prioritized the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25

despite the CPUC's approval of SoCalGas's 2010 rate increase application. Moreover, by this point, SoCalGas's first top-kill attempt on October 24, 2015 had already failed.  In this context, SoCalGas should have already begun drilling a necessary relief well, which, once begun, would in any event take months to complete.  Yet, SoCalGas delayed doing so for 42 days after the Gas Leak began, until after six (out of a total of eight) top-kill attempts had failed.

115.  On December 2, 2015, the *Los Angeles Times* quoted Defendant Arriola as apologizing for the Gas Leak, saying "it's done on way too long" and that SoCalGas is working "as safely and expeditiously as possible" to stop it.

116.  These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, in light of the aging and deteriorated condition of Aliso Canyon's wells, in which context having fully functional sliding sleeve vales and shutoff or safety valves was of paramount importance, Defendants had knowingly permitted *all* wells at Aliso Canyon to operate without functional sliding sleeve and subsurface shutoff of safety valves, including Well SS-25, from which they knowingly removed these valves in 1979 and did not replace them thereafter.  Further, Defendants had knowingly permitted Aliso Canyon's wells to be over-used (*e.g.*, Well SS-25's 197 days of gas injections in the 237 days preceding the Gas Leak, including every day in October 2015) in a manner that maximized well casing stress while minimizing the chances of preventing or managing leaks (*e.g.* SoCalGas's regular practice of injecting and withdrawing gas through both Well SS-25's inner tubing and its casing), despite a shoddy record of casing inspections (*e.g.*, Well SS-25's last casing inspection occurring in 1979).  SoCalGas also had not prioritized the wells with greatest vulnerability and need for valve replacement and critical upgrades, inasmuch as it did not address the known deficiencies in Well SS-25 despite the CPUC's approval

of SoCalGas's 2010 rate increase application.  Moreover, by this point, SoCalGas's first top-kill attempt on October 24, 2015 had already failed.  In this context, SoCalGas should have already begun drilling a necessary relief well, which, once begun, would in any event take months to complete.  Yet, SoCalGas delayed doing so for 42 days after the Gas Leak began, until after six (out of a total of eight) top-kill attempts had failed.

### *Post-Leak Misstatements  Characterizing Relocation as Voluntary*

117.   In the 12/1/2015 Arriola Letter, Defendant Arriola stated, "We are committed to providing home-like accommodations to those households who have **requested** to be relocated as well as deploying additional resources to support residents who are remaining in their homes."

118.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations.  Defendants also knew of the massive volume of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015.  As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas.  The rest were passed along to SoCalGas by the government authorities. Defendants also knew that they were using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015.  Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants.  By the time of these statements, Defendants also knew of the November 4, 2015 hearing at the Community School

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

in Porter Ranch, which drew 100 residents complaining of health symptoms. They also knew that the L.A. DPH had begun receiving and tracking complaints by email as of November 9, 2015 and by phone as of November 20, 2015. Despite this knowledge, Defendant Arriola falsely and misleadingly conveyed the message that relocation was an option, something that could happen if someone requested it while others remained in their homes.

119.   On December 18, 2015, Sempra and SoCalGas issued a Press Release on its website titled "SoCalGas Commits to Mitigate Environmental Impact of Gas Leak" (the "December 18, 2015 Press Release"), stating:

Addressing the Community's Concerns

SoCalGas opened its Porter Ranch Community Resource Center Dec. 16 in the Porter Ranch Town Center, 19731 Rinaldi Street, to provide services and information to the community.

SoCalGas recently began providing several **options** of in-home air filtration to reduce residents' exposure to the **odorant**, which may produce symptoms in **those sensitive to its smell.**

The company is also continuing to provide temporary accommodation for **those who _want_ to relocate until the leak is stopped**.

120.   These statements were materially false and misleading because, as alleged herein and as unbeknownst to investors, as Defendants knew, the Gas Leak was causing the release of large quantities of the toxic Air Pollutants, in quantities sufficient to trigger reporting thresholds under applicable laws, including Proposition 65 and Title 27 of the California Code of Regulations, Art. 7 §25705, and correlating reporting obligations. Defendants also knew of the massive volume of thousands of serous health complaints that were logged during the Gas Leak, beginning as early as October 24, 2015. As tracked by the L.A. DPH, some of these complaints were registered directly with SoCalGas. The rest were passed along to

SoCalGas by the government authorities. Defendants also knew that they were using dangerous chemicals as part of their failed top-kill attempts at stopping the Gas Leak, the first such attempt having been made on October 24, 2015. Defendants also knew that the litany of serious health problems being reported were consistent with exposure to the Air Pollutants.  By the time of these statements, Defendants also knew of the November 4, 2015 hearing at the Community School in Porter Ranch, which drew 100 residents complaining of health symptoms.  They also knew that the L.A. DPH had begun receiving and tracking complaints by email as of November 9, 2015 and by phone as of November 20, 2015.  Despite this knowledge, these statements falsely and misleadingly conveyed the message that relocation was for those who "want" to do so and that air filtration was an "option," while continuing to falsely and misleadingly discuss the "smell" of the odorant, rather than the risks of the Air Pollutants.

## The Truth Emerges Through Partial Corrective Events

121.   On November 23, 2015, displaced Porter Ranch residents filed a class action lawsuit against SoCalGas in California Superior Court, Los Angeles County, seeking damages and an order requiring disclosure of information related to the health risks associated with the Porter Ranch Leak.  Their complaint partially revealed details about the Gas Leak and indicated that Sempra and SoCalGas might be downplaying its dangers and the impacts on area residents.  On news of the lawsuit, Sempra stock fell $0.80 to close at $100.28 on November 24, 2015.

122.   However, Defendants denied the allegations of the lawsuit, while Defendants' ongoing stream of false and misleading statements, as described above, contradicted the bases for the lawsuit, continued to mislead Sempra investors, and served to mute the lawsuit's corrective impact while perpetuating inflation in Sempra's stock price.

123.   It was not until Governor Brown issued a Proclamation of a State of Emergency after the close of markets on January 6, 2016 (the "Proclamation"), that the truth was revealed to Sempra investors that the Gas Leak posed grave health and safety risks and that Sempra's and SoCalGas's responses to the Gas Leak were wholly inadequate and incapable of expeditiously and safely ending the crisis.

124.   The Proclamation made clear that Sempra's and SoCalGas's responses to the Gas Leak had been inadequate and unacceptable in the eyes of the state of California and the Governor, a circumstance about which the Governor had alerted SoCalGas *a month earlier*.  Specifically, it stated:

> ***Given the prolonged and continuing duration of the Aliso Canyon gas leak*** and at the request of residents and local officials, Governor Edmund G. Brown Jr. today issued a proclamation that ***declares the situation an emergency*** and details the administration's ongoing efforts to help stop the leak. ***The order also directs further action to protect public health and safety***, ensure accountability and strengthen oversight of gas storage facilities. …
>
> <div align="center">*   *   *</div>
>
> ***Last month,*** the Governor sent a letter to the CEO of Southern California Gas stating that the ***company's response has been "insufficient" and must be sped up***, while noting that state agencies' multiple ongoing investigations will be coordinated with the California Attorney General's Office.

125.   The Proclamation also described the broad array of state resources that had to be mobilized to address the deficiencies in Sempra's and SoCalGas's leak response efforts, stating in relevant part:

> The Office of Environmental Health Hazard Assessment is reviewing air quality measurements, evaluating public health concerns from the gas leak and assisting other state agencies in determining whether

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

additional actions are needed beyond those already required by local public health agencies.

The Governor's Office of Emergency Services established an incident command structure, including a physical post on-site at Aliso Canyon to better coordinate the local, state and federal response and information sharing and is maintaining a public webpage to provide real-time information regarding the state's multi-agency response and air quality monitoring.

The Division of Oil, Gas and Geothermal Resources is investigating the leak and overseeing Southern California Gas Company's efforts to stop it, including issuing emergency orders in November and December directing Southern California Gas Company to halt gas injections into the storage facility, immediately work on alternatives to stop the leak and provide testing results, data, daily briefings and a written plan and schedule for sealing the well. The Division also established a panel of experts from the Lawrence Berkeley National Laboratory, Lawrence Livermore National Laboratory and the Sandia National Laboratory to provide independent monitoring and technical expertise and review Southern California Gas Company data and information reported to the Division.

The Office of Environmental Health Hazard Assessment is reviewing air quality measurements, evaluating public health concerns from the gas leak and assisting other state agencies in determining whether additional actions are needed beyond those already required by local public health agencies.

The California Public Utilities Commission is investigating the gas leak to determine its cause and any possible violations and is collecting information about the costs of responding to and fixing the leak. The Commission and Division of Oil, Gas and Geothermal Resources also directed Southern California Gas Company to retain and pay for an independent, third party to perform a technical analysis of the well failure and its cause and share the results with regulators and the public.

The California Air Resources Board is measuring the leak rate and estimating total methane emissions over the duration of the leak and is

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

using ground-level monitoring, specially-equipped airplanes, and satellite information to provide updates of emissions.

The Division of Occupational Safety and Health is ensuring on-site worker safety at Aliso Canyon.

The California Energy Commission is coordinating with California Public Utilities Commission to maintain energy reliability during this incident.

The California Air Resources Board is measuring the leak rate and estimating total methane emissions over the duration of the leak and is using ground-level monitoring, specially-equipped airplanes, and satellite information to provide updates of emissions. …

126.    The Proclamation also described the "key orders" implemented by the state to impose corrective measures on SoCalGas for its abject failure to ensure the safe operation of the Aliso Canyon facility, including, *inter alia*:

(a)     It described the necessity to stop the Gas Leak, showing that all actions taken up to this point were inadequate, stating:

Stopping the Leak: All necessary and viable actions will be taken to ensure Southern California Gas Company: maximizes daily withdrawals of natural gas from the Aliso Canyon Storage Facility for use or storage elsewhere; captures leaking gas and odorants while relief wells are being completed; and identifies how it will stop the gas leak if relief wells fail to seal the leaking well, or if the existing leak worsens.

(b) It described the state's ***total shutdown*** of the Aliso Canyon facility until California could do a "comprehensive review" of its safety, stating:

Protecting Public Health and Safety: The state will: continue its prohibition against Southern California Gas Company injecting any gas into the Aliso Canyon Storage Facility until a comprehensive review of the safety of the storage wells and the air quality of the surrounding community utilizing independent experts is completed; expand its real-

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

time monitoring of emissions in the community; convene an independent panel of scientific and medical experts to review public health concerns; and take all actions necessary to ensure the continued reliability of natural gas and electricity supplies in the coming months.

(c) It heightened all gas storage oversight, stating:

Strengthening Oversight: The state will promulgate emergency regulations for gas storage facility operators throughout the state, requiring: at least daily inspection of gas storage well heads using gas leak detection technology such as infrared imaging; ongoing verification of the mechanical integrity of all gas storage wells; ongoing measurement of annular gas pressure or annular gas flow within wells; regular testing of all safety valves used in wells; minimum and maximum pressure limits for each gas storage facility in the state; a comprehensive risk management plan for each facility that evaluates and prepares for risks, including corrosion potential of pipes and equipment. Additionally, the Division of Oil, Gas and Geothermal Resources, the California Public Utilities Commission, the California Air Resources Board and the California Energy Commission will submit to the Governor's Office a report that assesses the long-term viability of natural gas storage facilities in California.

(d) It ensured that SoCalGas took responsibility for the Gas Leak, requiring it to cover all costs, stating:

Ensuring Accountability: The California Public Utilities Commission will ensure that Southern California Gas Company covers costs related to the natural gas leak and its response, while protecting ratepayers; and the state will develop a program to fully mitigate the leak's emissions of methane funded by the Southern California Gas Company.

127. On January 7, 2016, Sempra filed with the SEC a Form 8-K announcing the "Status Update Regarding the Company's Aliso Canyon Natural Gas Storage Facility" ("January 7, 2016 Form 8-K") and attached the Proclamation

as exhibit 99.1. The January 7, 2016 Form 8-K also revealed that Sempra's and SoCalGas's efforts up to this point were insufficient, stating:

> Since discovering the leak, the Company has made **seven attempts** to plug SS25 by pumping fluids down the well shaft. The Company has been unable to stop the leak using this approach and is now working to stop the leak through a relief well.
>
> On December 4, 2015, the Company commenced drilling a relief well that is designed to stop the leak by plugging SS25 at its base. The Company currently estimates that the relief well will be completed between the end of February and the end of March. The Company is also preparing to drill a back-up relief well as a precautionary measure. At the same time, the Company is actively working with leading experts to engineer technologies for reducing the natural gas emissions from SS25, as well as reducing the impact of the odorant that is required to be added to the natural gas for safety purposes.
>
> In order to reduce the pressure of the gas in storage and the amount of gas emitted by SS25, the Company continues to withdraw gas and has not injected natural gas into the Aliso Canyon natural gas storage facility since October 25, 2015. The Company estimates that as of December 31, 2015, approximately 33 billion cubic feet ("Bcf") of natural gas has been delivered to customers or moved to other gas storage facilities from an initial starting point of approximately 77 Bcf of gas in storage on October 23, 2015 at the Aliso Canyon facility. Based on information from the California Air Resources Board ("CARB"), gathered by fly-overs of the site, the leak rate and estimated level of methane emissions appear to have declined significantly since CARB began providing preliminary estimates in November 2015. Once the gas leak is terminated, the Company will conduct an objective measurement of natural gas lost from the leak and will provide that information to the relevant regulatory bodies.

128.   Additionally, the January 7, 2016 Form 8-K partially revealed the truth about the health risks posed by the mercaptan released via that Gas Leak (while failing to disclose the risks and effects of the Air Pollutants that it also released), stating in pertinent part:

According to the Los Angeles County Department of Public Health ("LA County DPH"), mercaptans, the odorant in the gas at Aliso Canyon, are not associated with long-term health effects. Mercaptans may, however, cause eye, nose and throat irritation, coughing and nasal congestion, shortness of breath, nausea, stomach discomfort, dizziness and headaches. A number of the residents of the nearby Porter Ranch community have reported experiencing one or more of these symptoms. These symptoms may recur on a daily basis as long as the odors remain.

129.   On this news, shares of Sempra common stock fell from $93.51 per share on January 6, 2016, to $87.00 per share at close on January 7, 2016, a drop of approximately 7% on usually heavy trading volume. The significant decline in Sempra's stock price was caused directly by disclosure of the state of emergency and the revelation of the dangers surrounding the Gas Leak.

130.   As of March 31, 2017, the Gas Leak has cost Sempra ***$799 million***, and the total is still rising. Sempra and/or SoCalGas has been named as a defendant in hundreds of lawsuits and are or have been the subject of criminal allegations over their conduct before and during the Gas Leak.  Investigations have been commenced and/or are ongoing by a number of governmental agencies, including the CPU, DOGGR, L.A. DPH, SCAQMD, CARB, U.S. EPA, as well as prosecutors at the Los Angeles and the California Attorney General's Offices.

131.   The DOGGR and CPUC retained an independent third-party investigator, Blade Energy Partners, to conduct a root cause analysis of the Gas Leak, which was expected to be completed in late-2016 and/or early-2017, but has not yet been completed.  It will likely substantially support the allegations herein.

132.   In the meantime, DOGGR (which has primary jurisdiction over Well SS-25) and CUPC (which has jurisdiction over the above-ground infrastructure, beginning at the wellhead and jurisdiction to ensure SoCalGas provides safe service

at reasonable rates) are conducting their respective investigations in parallel.  Future potential enforcement options include staff citations or formal CPUC proceedings to consider fines and penalties.

### **Defendants Acted with Scienter**

133.    The materially false and misleading misrepresentations and omissions alleged herein were made by the Defendants with scienter.

### *Defendants Sempra and SoCalGas Benefitted Financially*

134.    Sempra and SoCalGas are regulated by the CPUC. As stated in the Sempra's filings with the SEC, Sempra and SoCalGas are subject to significant fines and penalties if found to be in noncompliance with regulatory and/or safety rules, including those pertaining to Aliso Canyon.

135.    In November 2014, Sempra and SoCalGas submitted an application for permission to increase consumer rates. To ensure approval, Sempra and SoCalGas omitted material information from their application about the Aliso Canyon facility and, in particular, the fact that Well SS-25, like the other wells at Aliso Canyon, was materially deficient and lacked any safety or shutoff valve and lacked any sliding sleeve valve. Sempra and SoCalGas were motivated to withhold this information in order to secure the rate hike, acting with scienter in hopes that the benefit would outweigh the cost.

136.    Similarly, on November 13, 2015, Sempra filed a prospectus with the SEC (the "Prospectus") for the offering and sale of $400 million of 2.85% notes due in 2020 and $350 million of 3.75% notes due in 2025.  Despite being filed during the Gas Leak crisis, the Prospectus *makes no mention of the Gas Leak or of the deficiencies that would render impossible any prompt remedy.* By downplaying the Gas Leak and effect on the public, while not disclosing the fact that stopping the leak would be a long-term, costly and difficult effort, Sempra was

able to benefit financially from the fraud. Thus, this transaction is material and highly indicative of scienter, including the corporate scienter of Defendant Sempra.

### *Defendant Reed Benefitted Financially*

137.   Defendant Reed was motivated to commit the fraud alleged herein to benefit financially.  On January 4, 2016, just **two days** prior to Governor Brown's Proclamation, Reed received her **biggest** stock payout since taking the helm in 2011. The stock award was for 140,852 shares of Sempra common stock at $0, instantly worth $13.1 million. Additionally, according to a Form 4, filed with the SEC on January 4, 2016, at the same time Reed was awarded the shares, Reed immediately disposed of 72,000 shares, almost double the amount she ever sold in the past, at $93.18, for a gain of $6,708,960. Had Reed waited just three days, that point at which the truth was fully revealed, Reed would have lost approximately $444,960, almost 33% of her base salary in 2015.

138.   Additionally, there is a strong inference that Defendant Reed knew that the Proclamation was about to be disclosed as Governor Brown's sister, Kathleen Brown serves on Sempra's Board and was compensated $235,000 in 2015, despite having no natural gas or utility industry background.  Ms. Brown serves on Sempra's Board so as to facilitate political connections and access to the Governor. Moreover, in an interview with the *Los Angeles Daily News* on December 18, 2015, despite stating that Sempra saw no conflict of interest in Ms. Brown's service on its Board, a Sempra spokesman **declined** to say whether Ms. Brown's role on the Board and on the Board's environmental committee involved her directly in decision-making concerning the Gas Leak or in interacting with the state of California in managing the Gas Leak.  In this context, Ms. Brown's giving Defendant Reed a slight advance-warning as to the declaration of a state of emergency would not only have been proper, it would have been prudent, so as to ensure that Sempra and

SoCalGas were prepared to meet the obligations imposed by the Proclamation.  It was Defendant Reed's decision to sell shares while in possession of such non-public information (which Ms. Brown herself did not do, despite holding $400,000 shares of Sempra in December 2015) that was improper.

139.  Defendant Arriola was not obligated to report his sales of Sempra stock during the Class Period.  As such, his sales, or lack thereof, are facts unknown to Plaintiffs at this time and do not impact the scienter analysis, one way or the other.

*Defendants Knowingly Delayed Reporting The Gas Leak,*

*Before Understating Its Severity and Attempting To Block Press Coverage*

140.  Contrary to their legal obligations, Sempra and SoCalGas delayed reporting the Gas Leak to authorities for at least three days, from October 23, 2015 (the date on which SoCalGas claims it first knew of the Gas Leak) to October 25, 2015.  This delay violated California Health and Safety Code §25510(a).

141.  During the three-day delay in reporting the Gas Leak, SoCalGas actually attempting the first of eight failed attempts to halt it via a top-kill.  At the same time, SoCalGas was going door-to-door reassuring area residents that there were no dangers posed by the strong gas odors they were smelling.  Clearly, SoCalGas hoped to halt the leak before ever having to report it.

142.  Once it did finally alert authorities to the Gas Leak, SoCalGas's initial report gravely understated its risks in the terse report it filed with the CPUC stated in its "Summary" section: "No ignition, no injury.  ***No media***."  The report, on its face, illustrates that Sempra's and SoCalGas's attempts to suppress press coverage of the Gas Leak, to the clear detriment of Sempra investors and nearby residents and business owners.

143.  Moreover, when Sempra and SoCalGas issued the 10/30/2015 Press Release, which stated, "Timeline Update:  After considerable testing and analysis,

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

we expect this situation to take another week or longer to resolve," they already knew that the first top-kill attempt had failed.  The fact, combined with the lack of any safety or shutoff valve and any sliding sleeve valve on the Well, eliminated any reasonable basis for referencing "another week" as part of the timeline articulated to area residents.  Indeed, seven more top-kill attempts failed.

144.   These facts are highly indicative of SoCalGas's scienter, and that of Sempra, Reed, and Arriola as control persons.

### Defendants Knew About the Hazardous Gases

145.   Indicative of scienter is the fact that Defendants knew the Gas Leak contained hazardous materials but failed to disclose both the Gas Leak and the release of the Air Pollutants to the public, as discussed above, in violation of their reporting obligations under California Health and Safety Code §25510(a) and Proposition 65.  SoCalGas pled "no contest" to violations of California Health and Safety Code §25510(a) and paid $4 million in fines and penalties, while agreeing to implement significant reforms.

### Defendants Knew about the High Rate of Health Complaints by Area Residents

146.   Defendants also knew of the serious health impacts being experienced by area residents very shortly after the Gas Leak began.  Beginning on October 24, 2015, and continuing thereafter, SCAQMD received over 2,000 complaints from the public living or working near the Gas Leak.  A hearing at the Community School in Porter Ranch on November 4, 2015, drew 100 residents complaining of headaches, respiratory problems, nosebleeds, and vomiting.  During the Gas Leak, some 200 people per month reported these symptoms to the L.A. DPH, leading to over 1,800 complaints by the time the Gas Leak was plugged, as shown in Figure 5 above.  The L.A. DPH began tracking complaints by email on November 9, 2015 and by phone on November 20, 2015 from residents with complaints of symptoms.

As L.A. DPH noted, some of these complaints were logged directly with SoCalGas. By December 2, 2015, over 1,000 complaints, and counting, had been received by SCAQMD. Defendants also knew that these health complaints were consistent with exposure to the Air Pollutants.

### *Change in Warning Language*

147.    Changes over time in the language of Sempra's and SoCalGas's post-leak misstatements support the inference of Defendants' scienter. For instance, they began by calling the Gas Leak "harmless," before later changing the language to say that the Gas Leak did not pose a "long-term health concern." Similarly, they began by stating, "we are conducting this [air quality] sampling to reassure the community," but later changed this language to state, "we are continuing to conduct this sampling to provide the community with more information." These changes give rise to the inference that Defendants knew that their statements were misleading investors and affected residents.

### *Defendants Failed to Ensure that Evidence Was Not Destroyed*

148.    Sempra's and SoCalGas's delay in initially reporting the Gas Leak to authorities, with respect to which SoCalGas pleaded no contest to a misdemeanor criminal charge and paid a $4 million fine, delayed action by the District Attorney's environmental crimes rollout team by several days, during which evidence and witness accounts were not preserved.

149.    Moreover, even when asked, Defendants would not agree to ensure that evidence was not destroyed. As posted on the CPUC website, CPUC President Michael Picker spoke with Defendant Arriola on December 9, 2015. During this conversation, Defendant Arriola refused to guarantee that pertinent evidence related to the Gas Leak would not be destroyed. As memorialized by Mr. Picker "immediately    after    [the]    phone    call," Defendant    Arriola    stated    that

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

"SoCalGas…[was] working with DOGGR to ensure that evidence doesn't get destroyed but there are so many people are out there and the urgency to close well may affect."

150.   Similarly, SoCalGas's initial refusal to permit Mr. Conley to conduct aerial Picarro analyzer readings, ostensibly to prevent him from distracting workers on the ground, delayed such measurements by three days, from November 5, 2015 to November 7, 2015, when Mr. Conley was able to initiate readings under the auspices of the California Energy Commission and finally began to secure data revealing that methane readings were twenty-five times higher than normal.

### *Defendants Consistently Understated Negative Metrics*

151.   Sempra's 2016 10-K stated that the Gas Leak released 4.62 Bcf of natural gas before it was stopped.  However, SoCalGas had told Porter Ranch residents in late December 2015 that it could not measure the gas leak's output and were only able to report the overall level of gas remaining in the storage facility due to the combined reductions from the gas leak and from "maximum" withdrawals of gas intended to reduce pressure within the reservoir.

152.   Moreover, Sempra and SoCalGas have consistently understated the scope of the Gas Leak and are financially incentivized to do so, so as to minimize their exposure to fines and penalties.  For instance, the CARB estimated that the Gas Leak released about 99,650 metric tons of methane into the air and that it would require SoCalGas to pay for programs to capture the upper range of the margin of error as to the quantity of gas lost, or 109,000 metric tons.  These figures sharply contradicted those put forward by SoCalGas, which had maintained that the Gas Leak had released 14% less than the prior 94,500 metric ton estimate by CARB.

### *SoCalGas Refused to Cooperate with Public Health Authorities*

153.   L.A. DPH executive Angelo Bellomo called SoCalGas "recalcitrant" due to its "unwillingness to implement directives…by the health department and others who were concerned about getting this information quickly and in responding with a due level of urgency."  Mr. Bellomo also noted that SoCalGas resisted requests for samples of what was escaping from the Well and challenged the county's directive to clean thousands of home.

154.   Mr. Bellomo added that SoCalGas did not cooperate in providing samples of the substances being blown out of the Well at high pressures during the Gas Leak, when eight separate top-kill attempts caused such ejections.  As Mr. Bellomo stated, "During the peak period of the release, in order to assess potential exposures, the information most needed is what was ejected out.  Because  the storage facility is a depleted oilfield, oil residuals, in addition to natural gas components and drilling mud/killing  fluids, were likely ejected under high pressure during the period of active release."

155.   For that reason, the L.A. DPH directed SoCalGas during the Gas Leak to expand its air monitoring to include a wide range of potential chemicals and substances coming out of the well.  However, SoCalGas resisted.  As Mr. Bellomo stated, "They pushed back and we missed data on this full range of contaminants in the air during the peak period of the release.  We got a watered down version of what was requested, and later than needed."

### *Sempra's Core Operations Were Implicated*

156.   Knowledge as to all the foregoing topics is also imputable, given the Individual Defendants' titles, roles, responsibilities, and duties in overseeing the day-to-day operations of Sempra, as well as the implication of Sempra's core operations. The Aliso Canyon storage facility is the largest natural gas storage facility West of the Mississippi and was particularly important to Sempra's

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

operations and profitability. By itself, Aliso Canyon has a capacity of 86.2 Bcf, accounting for 63% of SoCalGas's total capacity. SoCalGas accounted for 29% of Sempra's 2014 revenues.

## Southern California Gas Company
### Descriptive Statistics of Gas Storage Fields

| Descriptive Statistic | Aliso Canyon | La Goleta | Honor Rancho | Playa del Rey | Total All Fields |
|---|---|---|---|---|---|
| Year Field Placed in Service | 1973 | 1941 | 1975 | 1942 | - |
| Injection/Withdrawal/Observation Wells | 115 | 20 | 40 | 54 | 229 |
| Gas Compressor Units (number) | 8 | 8 | 5 | 3 | 24 |
| Compression Horsepower (bhp) | 42,000 | 5,700 | 27,500 | 6,000 | 81,000 |
| Maximum Reservoir Pressure (psig) | 3,600 | 2,050 | 4,400 | 1,700 | - |
| Working Gas (Bcf) | 86.2 | 21.5 | 26.0 | 2.4 | 136.1 |
| Maximum Withdrawal Rate (MMcfd) | 1,860 | 420 | 1,000 | 400 | 3,760 |
| Maximum Injection Rate (MMcfd) | 600 | 140 | 300 | 75 | 1,115 |
| Maximum Well Depth (feet) | 10,691 | 6,912 | 13,300 | 6,575 | - |
| Minimum Well Depth (feet) | 6,997 | 4,247 | 9,165 | 6,049 | - |
| Average Well Depth (feet) | 8,146 | 4,886 | 9,959 | 6,339 | - |

## *Defendants Were Reckless To The Extent They Disclaim Knowledge*

157. The Safety Plan contained a detailed "Expectations of Leadership" section that included, among other things, requirements to document safety issues in an electronic database. Among other things, the Storage Operations Manager was required to conduct semi-annual safety inspections of the Aliso Canyon facility; document the results, including any corrective actions, in a Safety Information Management System (SIMS); and verify all corrective actions are completed within specified timeframes. The Storage Operations Manager also had to conduct "an annual self-assessment of Aliso Canyon facilities and operations to assess compliance with applicable safety regulatory requirements and internal company policies," the results of which, including any corrective actions, likewise had to be

documented in SIMS, with corrective actions verified as completed. The Safety Plan described SIMS in some detail, stating that, "Using SIMS maintains compliance with policy requirements of…the Environmental and Safety Compliance Management Program (ESCMP)." Per the Safety Plan, all inspections were recorded and all inspection records retained in SIMS.

158.   The Safety Plan also describes the ESCMP as, *inter alia*, instituting a Self-Assessment Process regarding Sempra's and SoCalGas's facilities and operations, designed to "assess compliance with the applicable safety regulatory requirements and internal Company policies; identify areas, actions or activities that are not consistent with regulatory requirements or internal policies; and finally, develop the appropriate corrective action(s)." It describes required "periodic communications" and quarterly reports as to, among other things, "the status of ESCMP open corrective actions pertaining to safety." It also describes ESCMP checklists to be completed by the Storage Operations Manager "to assess compliance with safety and environmental laws and regulations and Company policies and procedures," which were then approved by an in-line Director, a Vice President, and a Senior Vice President, and thereafter kept for four years. The Safety Plan stated, *inter alia*:

> The Safety & Environmental ESCMP Facility-Based Year-end Checklist is a combined safety and environmental ESCMP checklist signed by the Aliso Canyon Storage Operations Manager and the Director of Storage to address safety and environmental permitting, spill reporting and other safety and environmental facility-based compliance concerns.
>
> \*      \*      \*
>
> Prior to certifying an ESCMP year-end checklist, it is important that a thorough review is conducted to verify that compliance processes and activities reasonably ensure compliance with safety and environmental laws and regulations and Company policies and procedures. Electronic

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

approval of the checklist certifies that to the best of the approver's knowledge, after all appropriate inquiry, all entries are true, accurate and complete. The annual reviews create an opportunity to identify gaps in compliance and implement corrective measures. The checklist review is completed through the end of each year and due back to the Directors of Safety, Wellness, & Disability Services and Environmental Services by early-January. The Aliso Canyon Storage Operations Manager or the Director of Storage, or their designees, must provide quarterly updates on the status of open corrective actions to Safety and Environmental Services until properly closed.

159.   In addition, the Safety Plan included an Aliso Canyon Safety Committee Organizational Chart, which displayed the clear chain-of-command that led all safety issues and materials, including the SIMS and ESCMP, to the Aliso Storage Operations Manager, whose duties it described as, among other things, "Provides overall authority and support to the Aliso Canyon Safety Committee," "Has overall facility responsibility for the safe operation and maintenance at Aliso Canyon, and for compliance with all regulations," and "Approves safety committee findings and audits."  According to the Safety Plan:

> *The function of the Aliso Canyon safety committee is to work with corporate* and site *management to* help *recognize safety hazards and assist in finding corrective actions* to better incorporate safe work practices and continue to meet state, federal, and local requirements. Assist in safety inspections, audits, and review and make Aliso specific recommendations for corrective actions.

160.   The Safety Committee also had to report hazardous conditions:

> Be alert to the presence of any hazard or hazardous conditions. If necessary secure the area and/or correct the hazard. Report these to supervision as soon as possible after discovery. Create a corrective work order in Maximo and send an email describing the issue to all members of the safety committee and assist with the delivery of safety meetings and training.

161.   Maximo is a "computerized maintenance management system for scheduling and tracking maintenance, inspections and follow-up corrective activities," which the Safety Plan describes as follows:

> The IBM MAXIMO computerized maintenance management system is an integrated productivity tool and database that helps manage assets on a single software platform. MAXIMO provides a comprehensive view of all asset types, their conditions and location, and the work processes that support them, to provide planning, audit, and compliance capability.
>
> All maintenance work performed by Storage Operations personnel on pipelines, equipment, and facilities is planned, scheduled, and documented using MAXIMO, in accordance with Company Gas Standard 223.0375, MAXIMO – Transmission and Storage Operations. This includes maintenance work required by the DOT, CPUC, and DOGGR, and maintenance work that is not mandated by a regulatory agency or entity.
>
> All pipeline, facility or maintenance data, including all scheduled (planned) and corrective (reactive) maintenance work is entered or uploaded into MAXIMO by various work groups consistently and accurately to facilitate: creating/generating work orders; scheduling and tracking work activities and; querying/creating reports on the maintenance work or assets in the system.

162.   The Safety Plan also required inspections be done whenever a "new unidentified hazard is recognized" or "injury or illness" occurs, and stated that "All inspection records are retained for a minimum of one year. It similarly required that all records of hazard control actions had to be retained for a minimum of three years.

163.   Defendants had access to all the foregoing databases, reports, and information sources before and throughout the Class Period. Such access meant that Defendants knew or were reckless in not knowing that their Class Period statements were materially false or misleading as alleged herein.

## **Control Person and Agency Allegations**

164.   Defendant Reed, as Chairman and CEO of Sempra, was responsible for and controlled the misstatements and omissions made by Sempra as outlined herein.  Inasmuch as Sempra wholly owned and controlled SoCalGas, Defendant Reed was likewise responsible for and controlled the misstatements and omissions made by SoCalGas as outlined herein.

165.   Defendant Arriola, as Chairman, President, and CEO of SoCalGas, was responsible for and controlled the misstatements and omissions made by SoCalGas as outlined herein.

166.   The Individual Defendants, because of their positions with Sempra (Defendant Reed) and SoCalGas (Defendant Arriola), possessed the power and authority to control the contents of Sempra's reports to the SEC, Sempra's and SoCalGas's press releases and other public statements, and Sempra's and SoCalGas's presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Sempra's and SoCalGas's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, investors and the public, and that the positive representations being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements, if not specifically attributed to any one Individual Defendant, were each "group-published" information, the result of the collective actions of the Individual Defendants.

167.   Moreover, Defendants Reed and Arriola each were involved in, and responsible for, the safety of Sempra's and SoCalGas's operations generally, the operation of Aliso Canyon and Well SS-25, and they oversaw Sempra's and SoCalGas's actions during the Gas Leak. For instance, Defendant Reed provided investors with an in-depth update as to the status of the Gas Leak during a conference call in February 2016.  Defendant Arriola likewise provided investors with updates as to the Gas Leak and Aliso Canyon.

168.   Similarly, Sempra, because of its status as the parent company to and controlling stockholder of SoCalGas, possessed the power and authority to control the contents of SoCalGas's reports to the SEC, press releases, and public statements in general and its statements about the Gas Leak in particular.   Many such statements bore the logos of both Sempra and SoCalGas, and Sempra owns and controls the corporate websites of all its subsidiaries, including SoCalGas. Sempra was provided with copies of SoCalGas's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of its position of control and access to material non-public information, Sempra knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, investors and the public, and that the positive representations being made were then materially false and/or misleading. Sempra is thus liable for all the false statements pleaded herein.

169.   Sempra is also liable for the acts of the Individual Defendants, and all its and SoCalGas's employees, under the doctrine of respondeat superior and common law principles of agency, as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

170.   The scienter of the Individual Defendants, and other employees and agents of Sempra and SoCalGas, are similarly imputed to Sempra under respondeat superior and agency principles.

## Loss Causation and Economic Loss

171.   During the Class Period, as detailed herein, Sempra and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sempra's securities and operated as a fraud or deceit on Class Period purchasers of Sempra's securities by materially misleading the investing public. Later, when Sempra and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Sempra's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Sempra's securities during the Class Period, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages under federal securities laws.

172.   Sempra's stock price fell in response to partial corrective events on November 23, 2015, January 6, 2016, and January 7, 2016, as noted *supra*. The November 23, 2015 drop was muted, and its effects dulled, by the contemporaneous and ongoing stream of misstatements by Defendants, as alleged herein. The January 6, 2016 drop, tied to the Governor's Proclamation of a state of emergency, was sharp, on high volume, and removed the inflation from Sempra's stock. Defendants' disclosure on January 7, 2016 through the January 7, 2016 Form 8-K caused a further decline in Sempra's stock, as the market received the truth about the Defendants' efforts to repair the Gas Leak as well as the health risks posed by the Gas Leak.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## **Presumption of Reliance; Fraud-On-The-Market**

173.   At all relevant times, the market for Sempra's common stock was an efficient market for the following reasons, among others:

(a)   Sempra's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)   Sempra communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)   Sempra was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)   Unexpected material news about Sempra was reflected in and incorporated into Sempra's stock price during the Class Period.

174.   As a result of the foregoing, the market for Sempra's common stock promptly digested current information regarding Sempra from all publicly available sources and reflected such information in Sempra's stock price. Under these circumstances, all purchasers of Sempra's common stock during the Class Period suffered similar injury through their purchase of Sempra's common stock at artificially inflated prices, and a presumption of reliance applies.

175.   Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not

a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

176.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

177.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

178.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Sempra and/or SoCalGas who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

179.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sempra securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of Sempra and SoCalGas, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

180.   The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sempra securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by Sempra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 28, 2015, the date of Sempra's last quarterly or annual report within the Class Period, there were 248,210,449 shares of Sempra's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

181.   Plaintiffs' claims are typical of the claims of the other Class members, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

182.   Plaintiffs will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

183.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sempra;

(c)   whether SoCalGas and/or the Individual Defendants caused Sempra to issue false and misleading financial statements during the Class Period;

(d)   whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)   whether the prices of Sempra's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)   whether the Class members have sustained damages and, if so, what is the proper measure of damages.

184.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

## COUNT I
### Against All Defendants
### for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

185.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

186.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

187.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sempra securities; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Sempra's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

188.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or

issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sempra's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sempra and the Gas Leak.

189.   Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

190.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Sempra (Reed) and SoCalGas (Arriola), the Individual Defendants had knowledge of the details of Sempra's internal affairs.

191.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sempra (Reed) and SoCalGas (Reed and Arriola). As officers and/or directors of a publicly-held company (Reed) and its operating subsidiary at issue (Arriola), the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sempra's and

SoCalGas's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sempra's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Sempra, SoCalGas, and the Gas Leak which were concealed by Defendants, Plaintiffs and the other Class members purchased or otherwise acquired Sempra's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

192.   During the Class Period, Sempra's securities were traded on an active and efficient market.  Plaintiffs and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sempra's securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Sempra's securities was substantially lower than the prices paid by Plaintiffs and the other Class members. The market price of Sempra's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

193.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

194.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of Sempra's common stock during the Class Period, upon the disclosure that Defendants had been disseminating misrepresentations and omissions as to Sempra's and SoCalGas's operations and the Gas Leak to the investing public.

## COUNT II

### Against the Individual Defendants and Sempra
### for Violations of Section 20(a) of the Exchange Act

195.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

196.   During the Class Period, the Individual Defendants participated in the operation and management of Sempra (Reed) and SoCalGas (Reed and Arriola), and conducted and participated, directly and indirectly, in the conduct of their business affairs. Because of their senior positions, they knew the adverse non-public information about Sempra's misstatements regarding the Gas Leak.

197.   As officers and/or directors of a publicly owned company (Reed) or its operating subsidiary at issue (Arriola), the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Gas Leak, and to correct promptly any public statements issued by Sempra and SoCalGas that had become materially false or misleading.

198.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sempra disseminated in the marketplace during the Class Period concerning the misrepresentations.

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sempra to engage in the wrongful acts complained of herein.

199.   The Individual Defendants therefore, were "controlling persons" of Sempra (Reed) and of SoCalGas (Reed and Arriola) within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sempra's securities. By reason of their senior management positions and/or being directors of Sempra (Reed) or of SoCalGas (Arriola), each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sempra (Reed) and SoCalGas (Reed and Arriola) to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Sempra (Reed) and SoCalGas (Reed and Arriola) and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Class members complain.

200.   During the Class Period, Sempra participated in the operation and management of SoCalGas, and conducted and participated, directly and indirectly, in the conduct of SoCalGas's business affairs. Because of Sempra's control over SoCalGas through its ownership structure and overlapping management, Sempra knew the adverse non-public information about SoCalGas's misstatements regarding the Gas Leak.

201.   Sempra, as the parent company and controlling stockholder of SoCalGas, had a duty to disseminate accurate and truthful information with respect to the Gas Leak, and to correct promptly any public statements issued by SoCalGas (as well as by Sempra) which had become materially false or misleading.

202.   Because of its position of control and authority as SoCalGas's parent company, Sempra was able to, and did, control the contents of the various reports,

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

press releases and public filings which SoCalGas disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, Sempra exercised their power and authority to cause SoCalGas to engage in the wrongful acts complained of herein. Sempra therefore, was a "controlling person" of SoCalGas within the meaning of Section 20(a) of the Exchange Act. In this capacity, Sempra participated in the unlawful conduct alleged which artificially inflated the market price of Sempra's securities.

203.   Sempra, therefore, acted as a controlling person of SoCalGas. By reason of its status as the parent company and controlling stockholder of SoCalGas, Sempra had the power to direct the actions of, and exercised the same to cause, SoCalGas to engage in the unlawful acts and conduct complained of herein. Sempra exercised control over the general operations of SoCalGas and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Class members complain.

204.   By reason of the above conduct, the Individual Defendants and/or Sempra are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sempra and/or SoCalGas.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

1        C.    Awarding Plaintiffs and the other Class members pre-judgment and

2   post-judgment interest, as well as their reasonable attorneys' fees, expert fees and

3   other costs; and

4        D.    Awarding such other and further relief as this Court may deem just and

5   proper.

6   <div align="center">**<u>DEMAND FOR TRIAL BY JURY</u>**</div>

7       Plaintiffs hereby demand a trial by jury.

8

9   Dated: July 11, 2017      /s/ Adam C. McCall

10          **LEVI & KORSINSKY LLP**
    Adam C. McCall (SBN 302130)

11  445 South Figueroa Street, 31st Floor

12  Los Angeles, CA 90071
    Tel: (213) 985-7290

13  Fax: (202) 333-2121

14  Email: amccall@zlk.com

15  **LEVI & KORSINSKY LLP**

16  Nicholas I. Porritt (DC 457611) (NY 2798460)
    Adam M. Apton (DC 1017720) (NY 4759841)

17  1101 30th Street NW, Suite 115

18  Washington, DC 20007
    Tel: (202) 524-4290

19  Fax: (202) 333-2121

20  Email: nporritt@zlk.com

21  Email: aapton@zlk.com
    *pro hac vice to be submitted*

22

23  ***Attorneys for Stephen Graham and Co-Lead
    Counsel for Plaintiffs***

24

25  **POMERANTZ LLP**

26  Jennifer Pafiti (SBN 282790)
    468 North Camden Drive

27  Beverly Hills, CA 90210

28

<div align="center">90</div>

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

<div align="right">No. 3:16-cv-00512-BEN-RBB</div>

Telephone:  (818) 532-6499
Email:  jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman (NY 4161352)
Matthew L. Tuccillo (NY 5008750)
J. Alexander Hood II (NY 5030838)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (NY 2212736)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Richard Berkowitz and Co-Lead Counsel for Plaintiffs*

**GOLDBERG LAW PC**
Michael Goldberg  (SBN 188669)
Brian Schall  (SBN 290685)
13650 Marina Pointe Dr.. Ste. 1404
Marina Del Rey, California 90292
Phone: 800-977-7401
Fax: 800-536-0065
Email: michael@goldberglawpc.com
Email: brian@goldberglawpc.com

*Attorneys for Richard Berkowitz*

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
No. 3:16-cv-00512-BEN-RBB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I, Adam C. McCall, hereby declare under penalty of perjury as follows:

On July 12, 2017, I electronically filed the foregoing complaint with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on July 12, 2017.


/s/ Adam C. McCall
Adam C. McCall